ESTATE OF THOMAS H. BLYTHE, DECEASED.

[No. 2401; decided July 31, 1890.]

(CASE OF ALICE EDITH BLYTHE.)

Marriage—Proof by Conduct.—An isolated instance of a man introducing a woman as his wife does not necessarily establish their marriage; the whole conduct and behavior of the parties must be considered.

Evidence—Quality Rather than Quantity.—A court, sitting as a jury, is not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction, against a less number or against a presumption or other evidence satisfying the mind. The rules of evidence favor quality rather than quantity.

Marriage—Its Nature and Importance.—Marriage is more than a contract; it is a status; an institution of society and its foundation; it does not come from society, but contrariwise; it is the parent of society, and it is supremely important that its stability shall be secured; its contraction must be surrounded by safeguards and its sanctity upheld.

Marriage—Contract or Consent.—The defendant claiming marriage by contract or consent, followed by mutual assumption of marital rights and duties under section 55 of the Civil Code, the court remarked: Consent is the pervading principle of the law. Marriage is

derived from consent duly authenticated, independent of the conjunctio corporum; publicity is the publication of that consent; and that consent must go right up to the moment of their taking up life as husband and wife; it must coexist with the assumption of marital rights, duties, and obligations.

Marriage—Assumption of Marital Relation.—Section 55 of the Civil Code declares that if there is no solemnization of a marriage, there must be consent followed by the assumption of marital rights, duties, or obligations. Such assumption should be immediate, or at least, within a reasonable time; if two years intervene between the two events, the agreement to marry will be deemed abandoned.

Marriage—Assumption of Marital Rights—Cohabitation.—There cannot be an assumption of marital rights and duties, within the meaning of section 55 of the Civil Code, without cohabitation, and cohabitation must be a living together as husband and wife. Constancy of dwelling together is the chief element of cohabitation. Therefore, for the parties to live in separate houses is totally incompatible with the notion of matrimonial cohabitation.

Marriage—Consent or Contract—Cohabitation.—The mere fact that parties who have agreed to become husband and wife thereafter have sexual intercourse is not sufficient of itself to show a consummation of the marriage, or that they have assumed toward each other marital rights, duties, and obligations within the meaning of section 55 of the Civil Code.

Marriage—Consent and Consummation.—Under section 55 of the Civil Code, providing that consent followed by a mutual assumption of marital rights and obligations may constitute marriage, consent and consummation should be consequent and complete.

Marriage—Insufficiency of Evidence to Prove.—The evidence is examined in detail by the court in this case, and is found to be insufficient to establish a marriage by consent followed by an assumption of marital rights and obligations. The claimant's contention presents "a case without legal merit." "She was not the wife and she is not the widow of the decedent."

H. E. Highton, Esq., and Hon. E. D. Wheeler, counsel for defendant, Alice Edith Blythe.

COFFEY, J. The counsel for this defendant, in stating his case to the court, alluded to the very great importance of an opening statement, which used to be regarded as the chief argument, and the counsel described this controversy intrinsically and viewed upon its merits as one of the great cases of the century. The questions are of importance to the community as well as to the litigants; the questions of law are

intricate and involved, and by no means easy of solution, and no case has ever been presented with greater dignity and courtesy, and, it may be added to what counsel said, with greater skill of advocacy. It is a peculiar controversy, most unusual in its nature, unlike most other civil actions; the court, in a special sense, represents the state; the sole office of the court is to ascertain and establish the truth. All the defendant, Alice Edith Blythe, can claim is one-half of this estate; it may be that as to the rest no one of the claimants will have finally established a case, and that ultimately the half, if not the whole, may escheat to the state of California.

This litigation, says counsel, like all other litigation of a similar kind, grows out of irregularities; men of obscure origin who accumulate means, who have no fixed religious belief or habit, possessing strong appetites, create just such controversies as this; many men of millions die, men who have passed orderly lives, and their estates go through processes of probate without causing any clamor in the community or sensation in the press, but not so in a case of this character.

Thomas H. Blythe was no common man; in different circumstances and with a different original education, his career would have been other than it was socially; he had no fixed religious belief; no creed or moral polity controlled his conduct, such as is necessary to establish a home or domestic environment. Under different and better auspices, a man of his intellectual caliber would undoubtedly have made for himself a name and founded a family that would have regarded with pride and respect their ancestor.

### WHAT CONSTITUTES A CODE MARRIAGE?

But counsel thought that he should be able to show that whatever irregularities, judged by a conventional or religious standard, the decedent may have been guilty of in connection with his relations with this lady defendant, Alice Edith Blythe, he always treated her affectionately, deferentially and respectfully, as a husband should treat his wife; although no ceremonial marriage was contracted, yet there was an incorporate union, a marital relation, such as comes within section 55 of the Civil Code of California and other related sections.

Counsel said he proposed and expected to make a case which should meet the most extreme views of Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131, and also to make a case which would constitute a valid marriage according to the majority opinion in that case; he promised to present a case which would discriminate between the facts in that case and in this; there might be an analogy for a certain period as to the secrecy of the relation, but for the greater part of the period the conditions of the two cases were opposite. Counsel claimed that he would establish that this lady defendant and the decedent were man and wife, and became so fully and completely when they began to live together, in 1880, at 6 O'Farrell street; the marriage was legally complete at that time.

Whenever the measure of the statute has been filled, the fact of marriage has been thoroughly and finally established. The case of Sharon v. Sharon is founded upon an intelligible principle, sic ita lex scripta est; whether the facts justified that decision or not, it is the law; it is so written, and we must accept it: Sharon v. Sharon, decided January 31, 1889, 16 Pac. Rep. 346; see pages 350, 354, 356, 357, Mr. Justice McKinstry's opinion; also pages 358, 360 and 361; see, also, in same case concurring opinion of Mr. Justice Temple, 75 Cal. 49. The word "manifested," in section 57, Civil Code, goes to the fact of proof. A mere secret intimacy is not proof of marriage, but a marriage may be secret and established by evidence otherwise.

Mr. Justice Thornton, in the same case, in his dissenting opinion, stating an extreme view, is good enough, in the estimation of the counsel for the defendant, Alice Edith Blythe, for the facts of her case (75 Cal. 56), and her case can be brought within the lines of either the prevailing or dissenting opinions in the first appeal of the Sharon case just cited. That appeal was from the judgment alone; the second appeal was on the motion for new trial, denied in the lower court, and counsel proposed to show that the defendant in this case responded to the extent of the definition, in its fullest import, of the minority opinion in the first appeal and the majority opinion in the second appeal of Sharon v. Sharon.

THE CLAIM OF DEFENDANT, ALICE EDITH BLYTHE.

The defendant, Alice Edith Blythe, is a woman of respectable origin, born in this state, educated and accomplished, a good musician, a fine artist, an excellent housewife, a fit conjugal companion for the decedent; and upon the facts in evidence and the authorities, counsel asserted his ability to establish her claim as set forth in her answer and cross-complaint in this action, which is here inserted:

1. That on or about the fourth day of April, A. D. 1883, at the city and county of San Francisco, state of California, the said Thomas H. Blythe died intestate, then being, and for many years having been, a citizen and a resident of said city and county, and then being the owner and in possession of all and singular the real estate in said second amended complaint described and mentioned, and of a large quantity of personal property.

2. That on or about the twelfth day of June, A. D. 1883, after proceedings duly had in that behalf, the superior court of the said city and county of San Francisco, by its order and judgment of that date, in the matter of the estate of said Thomas H. Blythe, deceased, appointed Philip A. Roach the administrator of the said estate, and thereupon, to wit, on the date last aforesaid, letters of administration upon the said estate were issued to the said Philip A. Roach, who then and there qualified as said administrator, and has ever since been and now is the duly appointed, qualified and acting administrator of the said estate.

3. That the said estate and property of the said Thomas H. Blythe, deceased, has not, nor has any part thereof, been distributed, and no proceedings of final distribution thereof have been instituted.

4. That at the time of the death of the said Thomas H. Blythe, the defendant and claimant was, and ever since the month of May, A. D. 1878, had been, the true and lawful wife of the said Thomas H. Blythe, deceased, and, upon and according to her information and belief, she then was, ever since has been, and now is, the sole heir at law of the said Thomas H. Blythe, deceased, unless, as this defendant and claimant, according to her information and belief, has alleged, he left one brother, whose name and whose residence this de-

fendant and claimant does not know, and therefore cannot state, and as such was, ever since has been, and now is entitled to have and receive on distribution one-half of the whole of the entire estate and property of the said Thomas H. Blythe, deceased, wheresoever the same may be situated.

5. That, according to her information and belief, the said Thomas H. Blythe died, leaving him surviving no father, no mother, no sister, no child, no next of kin, save and except this defendant and claimant, and probably one brother as aforesaid.

6. That the facts and circumstances constituting the marriage of this defendant and claimant to the said Thomas H. Blythe, deceased, and her claim of heirship are as follows, to wit:

(a) This defendant and claimant was born at Ione City, county of Amador, state of California, A. D. 1855. Her maiden name was Alice Edith Dickason. Her father, who at one time was United States marshal for the territory of Arizona, died A. D. 1878. Her mother is still living. She attended various schools in the state of California, and among them Pope's Seminary at Benicia, county of Solano, and Professor P. S. Williamson's Classical Seminary, on California street, San Francisco.

(b) A. D. 1875, she was attending an art studio on Market street, San Francisco, and had frequent occasion to pass to and fro through Brooks street, which then was and still is a small street leading from Geary street to Market street, between Dupont and Kearney streets alongside of real property owned by said Thomas H. Blythe, deceased, and now part of his estate. It was then the habit of said Thomas H. Blythe to stand on said Brooks street and on Market street, in front of his own property, with some fine dogs he owned, during a considerable portion of each day. In passing and repassing, his attention was attracted to this defendant, and a harmless flirtation ensued, which resulted in mutual recognition. In this way their acquaintance was commenced, but it was limited to mere bowing and a very few words of no importance, and, on the twenty-eighth day of October, A. D. 1875, at the Congregational Church at Oakland, county of Alameda, of which the Rev. J. K. McLean was the minister, this defend-

ant and claimant was married to Pearl L. Peters, a young artist of San Francisco. Her acquaintance with the said Thomas H. Blythe, although she did not then know his name, then ceased, and was only renewed as hereinafter stated. On the nineteenth day of February, A. D. 1877, in the then district court of the nineteenth judicial district of the state of California, in and for the city and county of San Francisco, in an action wherein this defendant and claimant was plaintiff and the said Pearl L. Peters was defendant, by the judgment of said court, duly rendered, and on or about the twenty-fourth day of September, A. D. 1877, duly entered and recorded, this defendant and claimant was divorced from the said Pearl L. Peters, on the ground of his willful failure to provide for her, and allowed to resume her maiden name. After the dissolution of said marriage, this defendant and claimant lived for some months with her grandmother at Stockton, county of San Joaquin, state of California, and returned to San Francisco, where for a number of months, and until the latter part of April, A. D. 1878, she earned her own livelihood by teaching music.

(c) In the early part of May, A. D. 1878, this defendant and claimant determined to procure a house for herself, in which she could pursue her profession as a teacher of music, and found a small cottage on the southeast corner of Geary and Dupont streets, San Francisco, on land which is part of the estate here involved, which exactly suited her. There was a notice to let on this cottage, which referred her to Thomas H. Blythe, 724½ Market street, San Francisco, as the proprietor. She went to the office of Mr. Blythe, and upon seeing him discovered that he was the same gentleman, then somewhat advanced in life, with whom she had formed a casual acquaintance, A. D. 1875. He recognized her, and at once seemed to be deeply interested in her, and as they were frequently interrupted in Mr. Blythe's office, he requested her to meet him at lunch at his private residence, which was then at No. 6 O'Farrell street, San Francisco, at 12 o'clock M. of that day. They met accordingly and lunched together, and he was minute in his inquiries about her former life, and displayed great interest in her. No conclusion was reached at that time about the cottage, and within the next

few days they lunched and dined together several times, but there were no other relations between them. On these occasions he progressively manifested great affection for this defendant and claimant, and urged her repeatedly to be with him as much as possible and to permit him to become her protector; but while she liked his appearance and realized that, in view of his wealth, of which she had become informed, an alliance with him might be of great advantage to her, she informed him distinctly that she could only live with him or be under his protection in the capacity of his wife, and that there could be no relations between them on any other conditions. On or about the seventeenth day of May, A. D. 1878, she removed into the cottage aforesaid, where she continued to live for some time, and where the said Thomas H. Blythe was nominally her landlord, and she was handed by him several receipts for rent which she had not paid. At or about the date of this removal, the said Thomas H. Blythe, who was or professed to be a spiritualist, and had very peculiar ideas about marriage and the ceremonies connected therewith, distinctly proposed to this defendant, and claimed that they should live together as husband and wife, that he should become and remain her protector and adviser, and that they should be mutually faithful to each other so long as both should live. He gave her a week to think over this proposal. She had not then contracted toward him the devoted affection which she afterward felt for him, but she was young and dependent upon her own exertions for her livelihood; she was away from her parents and from all relatives; she liked his personal appearance and manners, and she believed that his wealth and his affection for her would be a guaranty to her for a comfortable support during her life. At the end of the week he called upon her at the cottage aforesaid, and she then and there consented to his proposals as they were then and there modified and elaborated. He then and there asked her if she would consent to live with him and be to him a faithful and loving wife, and if she would accept him as a faithful and loving husband, and give him the right and the power to look out for her and protect her during the remainder of their joint lives. She placed her hands within his, at his request, and said she would accept him as her husband,

and give him the right and the power to protect and care for her while they both should live, and at his request she promised that she would be a faithful and a loving wife to him, and that she would renounce everything else for him, and live for him and care for him through health and sickness and until death.   These pledges were then and there mutually made by the said Thomas H. Blythe and this defendant and claimant, both of them then being unmarried and over the age of twenty-one years, each to the other, as above stated, and, no other person being present, they mutually called upon God to witness their sincerity.   This ceremony, dictated by the said Thomas H. Blythe himself, was immediately followed by ·cohabitation and by the mutual assumption of marital rights, duties and obligations, in manner and form hereinafter stated.   The marriage of the said Thomas H. Blythe and this defendant and claimant, was consented to and consummated, and the pledges of each, speaking for herself positively, and for the said Thomas H. Blythe upon and according to her information and belief, kept down to the date of his death, on the fourth day of April, A. D. 1883.

(d)  At the time of the ceremony aforesaid, the said Thomas H. Blythe, as he informed this defendant and claimant, was having some litigation and much personal difficulty with one Nellie Firmin, who falsely claimed to be his wife, and who was a woman of violent temper and conduct; and, until this litigation and this difficulty were settled, it was mutually agreed between the said Thomas H. Blythe and this defendant and claimant, that their marriage should be kept as secret and private as possible, and that they should not ostensibly and openly live together.   By agreement with him at that time, and for a considerable period afterward, she went by the name of Mrs. A. P. Villette; and, in order to disarm suspicion and avoid any question of propriety, for several months he gave her receipts for rent of the cottage aforesaid, made out in that name.   She continued to live at that cottage, however, cohabiting with the said Thomas H. Blythe and enjoying his society to a considerable extent, and eating her meals principally with him at No. 6 O'Farrell street and elsewhere, until the first day of October, A. D. 1878; when, as the said Nellie Firmin had obtained some inkling of the relations be-

tween them, the said Thomas H. Blythe, fearing violence to himself or to this defendant and claimant from the said Nellie Firmin, requested her to remove from the said cottage, which was at No. 28 Dupont street, and secure lodgings with some respectable and elderly woman, with the understanding that they were to meet temporarily at his rooms, No. 6 O'Farrell street, and be together as much as possible under the circumstances. She removed accordingly to the house of Mr. and Mrs. Fagan, No. 7 Mason street, San Francisco. These were people of unquestionable respectability, and she remained with them at that place—being with her husband and taking her meals with him as much as possible—until February, A. D. 1879, when, as her health was delicate, at his suggestion and request, and in order to give him an opportunity for exercise and more frequent opportunities for seeing her without attracting attention, she removed from the thickly settled portion of San Francisco to No. 433 Hayes street, in that city, where she had a cottage to herself. The litigation and difficulty between the said Thomas H. Blythe and the said Nellie Firmin was still unsettled, and in fact became aggravated; and the said Thomas H. Blythe, whose fears of the violence of the said Nellie Firmin were constant, was afraid to call upon this defendant and claimant, conspicuously, at the cottage last aforesaid; and she, therefore, continued to visit and cohabit within and take her meals with him at his apartments aforesaid, No. 6 O'Farrell street. During all this time, and at all times after the ceremony aforesaid, she was steadily under his protection, and he paid all her bills, and they were together as much as seemed practicable under the existing conditions.

(e) In the latter part of May, A. D. 1879, this defendant and claimant had to vacate the cottage last aforesaid rather suddenly, because the owner wanted to tear it down to make room for a larger building, and, with the consent and assistance of the said Thomas H. Blythe, her things were packed up and removed to a room in his own building, No. 724½ Market street, San Francisco, where this defendant and claimant has ever since had a studio, and she herself remained at his apartments, No. 6 O'Farrell street, for about a month. One night, however, the said Nellie Firmin came to their

apartments and demanded admission to them, and fearing, as he did, some disturbance and violence, with the consent of the said Thomas H. Blythe and at his request, this defendant and claimant went to live with the Sisters of Mercy at St. Mary's Hospital, on Rincon Hill, San Francisco, and remained with them, visiting, cohabiting and taking her meals with the said Thomas H. Blythe as frequently as possible, until the fall of the year last aforesaid, but until what month she cannot state, when she removed, with the consent and at the request of the said Thomas H. Blythe, to the house of Mrs. Captain Robinson, on Jones street near Eddy street, San Francisco. One reason for this last removal was that the rules of St. Mary's Hospital were so strict that, while it was deemed best, as aforesaid, to keep their marriage secret and to avoid any publicity as to their relations, it was impossible for this defendant and claimant to be with her husband as much as he desired. While living on Jones street up to January, A. D. 1880, although having her room there, she was with her husband and took her meals with him regularly. In the early part of the month last aforesaid, at his request, she removed all the things she had on Jones street to the building No. 724½ Market street, and until about the last day of March, of the year last aforesaid, while having her furniture in that building, took her meals constantly with her husband, and slept with him in his apartments, No. 6 O'Farrell street. Just then something occurred which removed the said Thomas H. Blythe's apprehensions about the said Nellie Firmin, and which this defendant subsequently understood was the favorable termination of his litigation with her and her departure from San Francisco. At all events, he felt that he could act more freely, and, at his request, this defendant and claimant openly took up her residence with him at 6 O'Farrell street, and assumed full control and superintendence of his household affairs. From that time until the period of his death she lived with him constantly, and was never absent from him for a single day or night.

(f) They lived together at 6 O'Farrell street until on or about the twelfth day of October, A. D. 1882, when they removed from 6 O'Farrell street, of which the said Thomas H. Blythe had a lease which was about to expire, to the upper

floor of his own building, No. 27 Geary street, where they resided until he died. During all this period she had full control and superintendence of his household affairs. She carried the keys of their rooms. She directed the servants, and was known to them as his wife. She made all the purchases of groceries, meats, vegetables and such other articles as were necessary in a household. She made these purchases and contracted some bills, of which she holds the receipts, in his name and with his knowledge and consent and as his wife. She slept with him every night, as his wife. She presided at his table, where they had numerous guests, to many of whom she was introduced, and by whom she was treated, as his wife. He recognized and acknowledged her as his wife to a large number of persons. She received and paid social visits as his wife. Numerous persons addressed her in his presence as his wife. He used to her constantly, and in the presence of others, the endearing and affectionate expressions which a husband usually addresses to his wife. He formed and expressed plans for the future, founded upon their relations as husband and wife. He called her his wife when they were alone together, as well as in the presence of other people. He treated her with the respect and courtesy due a wife. He supplied all her wants and paid all her bills as a husband does for his wife. She addressed and treated him as her husband, without dissent and with expressions of approval on his part. Their conversations and discussions, both alone and before others, were such as take place only between husband and wife. He never spoke or acted to her at any time, either when alone or in the society of other persons, as his mistress, or with anything less than with the courtesy and respect which a husband owes to his wife. In every particular as she understands marital rights, duties and obligations, they were exercised, observed and fulfilled between herself and husband. He kept no secrets from her, upon and according to her information and belief, and treated her with perfect confidence in all personal matters and even in all his business affairs. His prospects for the future were all entertained and discussed by him with her without reserve, and on the basis of the marital relations between them. He

publicly and openly acknowledged and declared this defendant and claimant to be his wife.

7. That a large part of the estate and property of the said Thomas H. Blythe, at the time of his death, but what part or portions thereof this defendant does not know, and therefore cannot state, was and it still is community property of the said Thomas H. Blythe, deceased, and this defendant and claimant, acquired by the said Thomas H. Blythe, deceased, after his marriage to this defendant and claimant, and not by gift, devise, descent or bequest.

### THE STORY OF ALICE EDITH BLYTHE AS TOLD BY HERSELF IN EVIDENCE.

The story of Alice Edith Blythe as told by herself in her evidence is that she was born the 18th of March, 1855, at Ione City, Amador county, California; had one brother Willis Courtney Dickason; he was born in 1857; he was drowned at Benicia many years ago; cannot remember how long she lived in Ione; first remember being in Monterey; was very small; simply a memory; remember being in Calaveras and Tuolumne counties; lived in Altaville with her father, mother and brother; lived in Angel's Camp with her aunt, Mrs. Alice Stickles; from Monterey they went to Cloverdale; stopped with the family of Daniel Sink; her grandfather was Thomas Gillette; he lived partly at Salinas, and partly in Napa county, where he had a stock ranch; he lived also in San Bernardino; it was in 1861 that they went to Cloverdale; her mother went there for her health, which was bad; thence they went to Angel's Camp, and after to Shaw's Flat, where the mother taught school for a while. After they went to Mr. Ramie's ranch, near Columbia, Tuolumne county; mother and brother went to the Sandwich Islands, and left the witness with Ramie; they sent her to a Catholic school in the town of Columbia, where she remained for about a year; after that her mother sent for her, she went to her aunt's at Angel's; remained there but a short time, when her mother came up and took her away, and they came to San Francisco. Afterward they went to Sacramento; her mother left her with Mr. and Mrs. Harris; remained there and went to the public schools; then her mother came and took her to

Stockton; was there quite a while; her mother then took her to Benicia and left her in St. Catherine's Convent; in 1866 she gave the name "Alice Weston" because her mother had married George Weston, of Austin, Nevada; remained in the convent until October, 1868, when her mother brought her to San Francisco, and placed her in Madame Swedenstierna's seminary a short time, when her mother took her to Los Angeles in the latter part of the same year, 1868; her mother placed her there in the convent school; stayed there until June, 1869, and took her then to Prescott, Arizona; her mother's husband had died meanwhile; when she married again, James Morgan, who had a ranch in Petaluma; he treated mother badly; in Los Angeles she secured a divorce from him; then it turned out that witness' own father, Mr. Dickason was living, although her mother had for years mourned him as dead, he having been reported as killed in the war. He demanded the custody of his only daughter, and her mother took her to him at Prescott, Arizona, where he had a ranch at Agua Frio; father died in 1878, in July; witness learned from him that he had been a policeman in San Francisco, that he was a captain of volunteers in the war; he had been also in the saloon and hotel business in Monterey; he was for four years United States marshal in Arizona. Witness remained in Prescott until May, 1871, when she came here to San Francisco alone, and went to the convent at Benicia; after awhile went to Pope's Seminary in the same town, afterward Snell's Seminary; remained there perhaps eight months or so; came down and went to the Rev. Williamson's Classical Seminary on California street, south side, between Kearny and Dupont streets; was there until the latter part of 1873; first boarded and afterward was a day scholar; then lived with her mother at 30 Moss street; studied the ordinary branches of knowledge, and in addition music and languages, French, Spanish and the guitar; commenced to study drawing; that was independent of the school; later on, painting. A card attracted her attention in the window of a music store on Market street, opposite the Blythe Block, "Pearl Peters, Teacher of Drawing and Painting," and she inquired of the proprietor as to the attainments of the teacher, and he directed her across the way to the studio of Mr. Peters;

she engaged him to give her lessons, independently of the
school; her studies with him were interrupted by a visit she
made to Arizona in 1874, the latter part; she returned in the
early part of 1875; knew while there a man named Charles
W. Beach; he was proprietor of the "Arizona Miner" and
also afterward kept a wayside inn; he was killed, she heard,
by being shot through a window, since this trial began; in
1874, her mother undertook to start a lodging-house at 817
Mission street, but that venture was not carried out; about
that time she went to visit her uncle, Gillette, near Salinas;
stayed there about a month; came back and stayed at Mrs.
Fagan's, 930 Mission street, until the latter part of 1874;
then went to Arizona, and upon her return went again to
Mrs. Fagan's; it was in 1874 that she visited her grandfather
in San Bernardino; witness was married in October, 1875;
she married Pearl Lawrence Peters; her marriage was kept
secret from her mother, because her mother was very much
opposed to it; witness remained at Mrs. Fagan's and visited
the studio of Mr. Peters, and sometimes stopped over from
Saturday until Monday; went to San Bernardino in Novem-
ber, 1875; her grandfather, Gillette, had a large livery-stable
and private residence; she was living there with his little boy
and daughter; witness has forgotten the name of the daugh-
ter; her grandfather was married twice; he had just lost the
second wife when he sent for witness; he got hurt and sent
for her; witness knew a man named Fred Cook, a photog-
rapher; he lived once at Woodside, near Prescott, Arizona;
also at Agua Frio, at her own father's house; was never
married to him; he was a good friend of her family; he did
not stop at her grandfather's house at San Bernardino; wit-
ness met Mrs. Gutierrez in 1876; knew her sister, Mrs. Pietra
Doyle, who lived in the same house, witness' grandfather's
house; Mrs. Doyle occupied two rooms in that house in 1876;
became very well acquainted with them; Mrs. Gutierrez's
name was Mrs. Pedro Pacheco when she first met her in Los
Angeles; when witness went to San Bernardino she was
known as Alice Dickason; she kept her marriage secret; her
mother and father were contributing to her support; her hus-
band was not well-off, and her grandfather was assisting her,
and giving her a home, and she did not wish to tell them;

Mr. Peters came first to Los Angeles, in May or June, 1876; he stopped at a hotel and she stopped with Mrs. Sanchez, the mother of Mrs. Gutierrez; he came to San Bernardino afterward, and stayed a few days, and then returned to San Francisco; she came to San Francisco after a few weeks, and went to 930 Mission street, Mrs. Fagan's; witness was at work in 1877; went up to Stockton to her mother, remained but a short time, and returned to San Francisco; had apartments at Garcia's house, corner Broadway and Stockton streets; afterward moved to Howard street and attempted to teach drawing and painting, but had very few pupils; moved then to Post street, between Kearny and Dupont streets; then to the corner of Dupont and Geary street, a cottage where the "City of Paris" now stands; moved then about October, 1878, to 7 Mason street; thence to 433 Hayes street, Mrs. Joice; then witness attended Tojetti's Art School, on Leavenworth street; when she moved to Dupont and Geary street, she took no more pupils; when she moved from Hayes street she fitted up a room for a studio at 724½ Market street, and went to live at the Sisters of Mercy on Rincon Hill; her room on Market street was No. 15, directly opposite Mr. Blythe's office, room 21; remained with the Sisters only a few months; then in the latter part of 1879, she fitted up two more rooms at her studio, and stopped there some time; in October or November, 1879, her mother came up from Arizona; witness secured rooms for her on Jones street, above Turk street, at the house of Mrs. Ford, who was an old friend of her mother's from Shaw's Flat, a daughter of Mrs. Markley; remained there over the holidays; in January, 1880, she occupied the rooms she had fixed up at 724½ Market street; continued such occupancy until April, 1880; then used some of the furniture from Mr. Blythe's office; she went over to 6 O'Farrell street, but retained one of the rooms, No. 17, for a studio; still retain that room for that purpose; occupied 6 O'Farrell street from April, 1880, to October, 1882; in May, 1880, she began to attend the School of Design, kept at it until 1881, for about a year, as a permanent scholar, and afterward went there to sketch by the hour; in October, 1882, moved to 27 Geary street, and remained there until 1885 or 1886; witness identifies a certificate of marriage between Pearl L. Peters

and Alice E. Dickason, October 28th, 1875, by Rev. J. K. Mc-Lean, Oakland, and says she is the person named in that paper; was divorced February 19, 1877, by decree of the nineteenth district court, E. D. Wheeler, Judge, which is produced and admitted in evidence; witness knew Thomas H. Blythe; first saw him in the latter part of 1873, or the first part of 1874, on Market street, near Dupont street, in that vicinity, as she was passing to and from school; going from Moss street she then came through on Geary street, frequently passed through Brooks street or Floral Grove on her way to the studio of Mr. Peters, which was opposite the Blythe Block on Market street; used to notice Mr. Blythe, a dignified looking old gentleman, well dressed; used to wear, witness thinks, something unusual in those days, at least for her to notice, a white vest; saw him a good deal on the street until she went to Arizona; he saw her; they began a sort of mute flirtation; they met so frequently that he at one time lifted his hat to her, and she returned his bow; this went on until she left for Arizona; did not know his name then, or anything about him; next saw him in May, 1878; she was directed to go to his office to see about a cottage at the corner of Geary and Dupont streets; her grandmother directed her to look up a quiet place in a central part of town where they could live; she went to his office, 724½ Market street, in the forenoon; he was there; she went into the main office; he was sitting at the desk, writing; she told him her business; he told her he was then very busy, but he gave her a slip of paper with his address, 6 O'Farrell street, and told her to come there at 12 o'clock and he would continue the conversation; he kept walking up and down the room, and said, "You have a very nice foot"; she was very much embarrassed, but said nothing; then he sat down and after a little he arose again and paced the room, and suddenly said, "Don't you know you have an effect on me that no woman has had for a long time?" Witness went to 6 O'Farrell street at noon; he was not in at first, but when he came he asked her to have lunch with him, and she did so, and he asked her to play the piano for him; then he said he had to go back to his office, and he told her to go and inspect the cottage, and suggest any alterations or changes, and he would make them, and to come back in the evening;

she came back after her own dinner; they spoke about the cottage mainly; she went through it there; subsequently she went there and to his office about every day; the cottage was ready for occupancy on the 17th of May, when she took possession; between the first interview with him and that day, had conversations with him at 6 O'Farrell street; a day or two after she remembers he asked her very closely about her life, whether she was married or not; whether she maintained herself, and what were her resources. She told him. He said he could see that she was worried and troubled, too frail to battle alone, and that he wished to become her friend, a protector to her—in fact, her husband. She first told him that she did not think he meant that; she wished time to think over it, and requested him to take time; he consented to do so. Before the 17th of May he told her a good deal about his then recent trouble with Miss Firmin, that he feared for his life and that he would have to be married secretly; witness told him if she should accept him she wanted some ceremony or contract made, that she wanted the matter to be permanently fixed if it were to be done privately or secretly; that she had had a good deal of trouble in her life, and wanted the matter so arranged that it should be a matter of life or death forever. Most of their conversation was about the furnishing of the cottage, Dupont and Geary streets; he told her that when it was finished and furnished completely, he wished her to let him know, as he wished to go over and look at it; she moved into the cottage on the 17th of May; she occupied the whole of the top floor; beneath there was a grocery store; she had a colored man to come around each morning to clean up, and a Chinese cook; she did not have the studio on Market street then; Mr. Blythe came over about two days after she moved in; that was about 5 or 6 o'clock in the evening; he stayed for about an hour, she had taken dinner with him, and she came home rather annoyed, and he followed her; he begged her to forgive him for the manner in which he had acted, that he loved her very dearly, and he could not restrain his feelings; she began to cry, and he said if she would repeat what he would dictate, it would be as good as going to church; he said he wished her to marry him; he asked her to place her hand in his; he asked her if she was willing to

renounce her folks and give up all for him, to care for him in sickness and health, and to live with him as his wife until death did them part; she said she would; she then asked him if he would repeat what he would do for her, and he did, and then said "Amen," and she said the same. During the week before this he asked her if she would consent to be married by a spiritual ceremony; she said she didn't understand anything about spiritualism; that she was a Catholic; she was baptized about 1863, when she was with Mr. and Mrs. Ramie; the incident that took place at O'Farrell street that annoyed her was an attempt on his part to kiss and caress her at the table, and she went into the parlor and he followed her and there repeated his attempt to embrace her; she resisted and went home; he had prior to that time made an attempt of that kind; at the time they went through the formula at the cottage, she admired Mr. Blythe very much, respected him, had a deep regard for him, and felt that she could place confidence in him; that he would do whatever he promised; she had then some pecuniary resources, a few hundred dollars; had no relatives here at that time; after the pledges were made she went over to 6 O'Farrell street and remained there all night; she had a piano and guitar at the cottage; he frequently came over to the cottage in the afternoons at odd hours from the office; she moved to 7 Mason street, Mrs. Fagan's, for several reasons; one was that Nellie Firmin was troubling him at that time; a second one was that her health was not very good, and the third was that he was then thinking of tearing that building down, and he advised her to find some nice old lady to stay with until he could have her permanently with him at 6 O'Farrell street; she remained at 7 Mason street from October, 1876, to February, 1879; she took her meals at 6 O'Farrell street and slept there most of the time; when she was not feeling well she remained at 7 Mason street, and he never came there; Mr. Blythe told her that Mrs. Fagan called at his office and told him that the witness' health was getting poor, and that he ought to send better food than she, Mrs. Fagan, was able to furnish; that he ought to send up some wine and ale; that was about all Mr. Blythe told witness of Mrs. Fagan's visit to his office; Mrs. Fagan addressed her simply as "Alice" or "my dear child"; witness

was paying $75 per month; she paid it, and she thinks Mr. Blythe once did so; witness received money from him; received from four to five hundred dollars when she was furnishing her cottage; a few weeks after he gave her two or three hundred dollars to get a coat; he gave her some money to pay for some earrings, again to buy some jewelry, and also to buy a ring; this was at 28 Dupont street; she purchased all these articles; she didn't give up the cottage till October, but spent but little time there; spent most of her time at 6 O'Farrell street; witness identifies several papers presented to her marked "A. E. B. Ex. W 3," "May 17, 1878, X 3, June 17, 1878, Y 3, July 15, 1878, and Z 3, August 15, 1878"; all the witness remembers of these papers is that Mr. Varney gave them to her from time to time, "Received of Mrs. Villette $25 for rent of rooms, 28 Dupont street"; she told Mr. Blythe at first that the cottage was for her grandmother, Mrs. Gillette, and he simply got the name down wrong, her grandmother did not come here; witness did not send her word to come, as she had agreed to do; she thinks Mr. Varney gave her the first receipt; sometimes Thomas Dunn, the watchman, would bring her the receipt; witness told Mr. Blythe that he got the name wrong in the receipt and he said, "Never mind, let it pass"; he said it would be better to assume the name in the present circumstances, as her life was in danger, as her lately divorced husband had attempted to annoy her, and the woman Nellie Firmin was annoying him, and it would be better for the present to keep the marriage secret; she took nearly all her meals at 6 O'Farrell street; occasionally would breakfast alone at the cottage; at 6 O'Farrell street they sat together at the table; there was a colored woman servant, Mary Stepney, who waited on the table and took care of the rooms and did the housework; witness slept there in the same room with Mr. Blythe; there was a piano upon which the witness played; Mr. Blythe was giving her money all the time to pay the China boy, the grocery bills, the oyster bills and other expenses; at No. 7 Mason street he would give her money for many things that she desired; while there she did some painting; among other pictures she painted one under the direction of Tojetti, "The Peruvian Girl"; she thinks that is in her studio; another is in the possession of Mr. Win-

del; while she was rooming at 7 Mason street witness would go every day to 6 O'Farrell street and do very much the same as she did when at 28 Dupont street, the cottage; she saw Nellie Firmin once at 6 O'Farrell street; that was when witness was in Hayes Valley; the witness slept at 6 O'Farrell street in the same room and in the same bed with Mr. Blythe; from 7 Mason street she went to 433 Hayes street, the cottage rented of Mrs. Joice in February, 1879; she hired the cottage and stayed there until June; she furnished the cottage from what she had retained at 28 Dupont street; occupied the whole of the cottage, about eight rooms; had a colored cook, Thompson, who was there always; she took her dinner at 6 O'Farrell street and the other meals at the cottage; most of the time she slept at 6 O'Farrell street; saw Mr. Blythe nearly every day; she paid rent with the money he furnished her, and the other current expenses; while witness was living on Rincon Hill with the Sisters, she visited 6 O'Farrell street every day; she slept at the Sisters' house, but on Saturdays and Sundays she stayed with Mr. Blythe at 6 O'Farrell street; she took breakfast, lunch and dinner there every day; she painted nearly all the time; cannot remember all the paintings; one was a large picture called "My Roses," life-size, a fancy picture of a girl's head; her studio then was right opposite Mr. Blythe's office; her mother came up in November, 1879, and she went with her to Jones street, near Eddy, to the house of Mrs. Herson, formerly Mary Markley; witness had a conversation with Mr. Blythe in which he complained that he didn't see as much of her as he desired, and she said that her mother was up for the holidays, and she desired some of her society; this was while her mother and she were on Jones street; he said that there should be no more of that, and as soon as her mother returned she should stay permanently at 6 O'Farrell street; Mr. Blythe paid her bills on Jones street; her mother knew nothing at that time of her relations with Mr. Blythe; her mother left there first; from Jones street witness moved to 724½ Market street; she furnished two rooms 9-11 Geary street, for her colored cook, whom Mr. Blythe retained; when she furnished three rooms at 724½ Market street, Mr. Blythe told her to make herself comfortable for a few months, as he thought he would then

have his affairs fixed with Miss Firmin and it would be possible for her to reside permanently at 6 O'Farrell street; during this time she looked after affairs at the latter place; moved to that house in March or April, 1880; he told her that it was absolutely necessary for her to go there and take complete charge of the house, as he was troubled with the servants; when she moved over there she recarpeted two of the rooms, put new carpets in; when she went to 6 O'Farrell street she took complete charge of the house; in 1880, in the spring or summer, they rented a room at the head of the stairs to Gershom P. Jessup; he was not a permanent roomer, but came and went for over three months; he was an old friend of Mr. Blythe's; all the furniture was very handsome and fine; Axminster carpets and the furnishings elegant; ordinarily they spent the evenings at home; sometimes they went out for a walk, and occasionally took a ride: seldom went to places of amusement, once or twice to the Baldwin theater; from April, 1880, to October, 1882, they seldom went out; could not specify how many times; they had very little company there; in 1880 when he was building the Coquille he had many visitors, mostly Spanish, and among others, Commodore Monasterio, General Andrade, Consul Pritchard, and others whose names she does not recall; she knew James E. Carr; remembered his calling there one evening; does not remember his dining there; she sat at the table every meal, except when she might happen to be late.

The formula of marriage took place the 19th of May, about two days after she moved into the cottage; proposals were made about nine or ten days prior to that; at that time he used hair dye; he was ruddy, rosy-cheeked, bright and vivacious in manner, quick-stepped, dressed rather neatly; she thought him an extremely handsome man; during the last years of his life he looked very poorly; he had ceased to use hair dye, and his hair and mustache were white; he told her at the cottage that Nellie Firmin was annoying him very greatly, and he apprehended violence from her; that she once concealed a man in his house with a design upon his life; one reason why the witness moved out to 433 Hayes street was that her health was not good, and Mr. Blythe said that she ought to have more exercise and occupation, and he thought

it would be better if she were living out a little nearer the country, and he got her some chickens, and she had a sort of chicken-house on Hayes street; at the time she lived in the house of the Sisters on Rincon Hill, she made a disclosure to the Superior Mother Mary Francis of the relations between Mr. Blythe and herself; she was preparing for her first communion, was receiving instructions from her, and in that way it came about that she told her of the secret marriage and of the reason for keeping the marriage secret; she accounted for her occasional absences from the Sisters' house because she was secretly married and her husband insisted upon seeing her every day; when she removed from Rincon Hill to Mrs. Herson's, it was because Mr. Blythe said he was dissatisfied because he did not see her more frequently; the rules of the Sisters' institution were so strict that it was almost impossible to absent herself except on Saturdays or Sundays; Mr. Blythe moved from 6 O'Farrell street because his lease was about to expire; some rooms were let to lodgers at 6 O'Farrell street; the servants came to her for instructions; they sometimes called her Madam, sometimes "Mrs. Blythe"; she purchased the household supplies; sometimes the servants did; she paid most of the bills; he paid some of them; he often went to see the goods which she purchased for herself, and selected goods for her; in fact, everything she bought for herself he wanted to see; sometimes she went with him and looked at articles for himself, such as neckties and shirts, at Beamish's, corner Third and Market streets; he sometimes had money in his room, kept it in a box at the foot of the bed; sometimes as high as thirty or forty dollars, sometimes a few dollars; witness knew an old gentleman named Colonel Ryerson; he was at the house; took dinner there once in May, 1881; Mr. Pomroy was also there one time at dinner when she was there; it was at 27 Geary street that Mr. Pomroy called; Mr. Yberri from Mazatlan stopped at 6 O'Farrell street for about two weeks; he took lunch and dinner with them; while at 6 O'Farrell street witness visited some ladies she had formerly roomed with, among others Mrs. Fitzpatrick, Mrs. Phillips and Miss Phillips, Mrs. Jones, Mrs. Dunlap, Mrs. Joice's daughter, and some of her old schoolmates; she visited Mrs. Hadeler, Mrs. Ford, Mrs. Gutierrez when she came up here

and Mrs. Pietra Doyle; witness remembers nothing especial of what Mr. Blythe said to her in the presence of Mr. Yberri and Andrade; she cannot remember anything particularly that tradespeople said; at one time they called her Mrs. Villette, at another time those who knew her mother called her Miss Dickason; later on some called her Mrs. Blythe; when Mr. Fletcher came to leave milk he invariably called her Mrs. Blythe, so did Mr. Hansen, Mr. Maguire, the poultry dealer, and various others with whom she traded in 1882 and 1883; when she visited Mrs. Phillips, an old schoolmate, she went as Miss Dickason, and so Mrs. Phillips called her; subsequently she had a conversation with her mother, and afterward she and Mrs. Phillips called her Mrs. Blythe, as did some other ladies, as already mentioned; Mr. Blythe used to speak to her when alone; she cannot remember all he said; he would call her "My dear," sometimes "Baby," and when she did anything especially pleasing to him he would say "You are a good little wife," or, "My dear little wife"; she remembers a visit from Mrs. Ford and Miss Newell at 27 Geary street; she met them in the hall as she was going into the dining-room, and Mr. Blythe introduced her to them; he showed them her plants, and of course the wonderful cat; they said, "Mr. Blythe, you must be very happy in your little home here"; he said, "Yes, I and my sweetheart are very happy"; Mr. Blythe gave her permission to attend a ball once a year; she went to a masquerade; once went to a ball; a young man escorted her to the door and Mr. Blythe attended her afterward; she remembers the last time he went to Mexico and when he returned; he said, when he looked around the room, that he did not know whether he was in his own home or not, and he complimented her upon what she had done, and said she had been a good little wife during his absence; upon returning home, when his business affairs had gone all right during the day, he would come home in a very good humor; would act like a schoolboy; would play with the cat, and would be very affectionate; when his affairs were not so satisfactory, he would be morose, would act like a baby and want to be petted, would lie on the lounge and want her to bathe his head; witness addressed him sometimes as "Mr. Blythe," "My dear," "My darling," "My sweetheart,"

"My friend," and sometimes "My uncle"; she did not use endearing terms to him in the presence of others; she never treated him with disrespect; he used to tell her at first a great deal about Nellie Firmin; afterward he told her about himself, when he lived in England, in France, in Naples; he never used to speak about his business affairs; he said he wanted to sell one-half the block, and that Luning was after it; that as soon as the latter reached a certain figure he would sell and put the money into his Mexican scheme, and that he would retain the other half during his life; he intended to settle all his Mexican land; he would be landlord over a great many persons, and he would sell lands on reasonable terms; he said his projects would take twenty millions to carry out, and would hardly be finished in his lifetime; he also intended to send to England eventually and bring his little girl out and have her here, but first he would have to sell some of his property; he said that the next time he went down he would take witness, but she must expect some discomfort, and things were very rough there then.

A paper that was shown to witness, marked "A. E. B.'s Exhibit A4," was identified as a sketch or plan of the house that was to be built in Mexico, that was drawn by Mr. Andrade one evening after dinner at 27 Geary street; the plan or diagram contained different apartments, parlors, a court in the center, a music-room and studying-room for Florence; witness says they occupied the whole of the top floor at 27 Geary street; she attended to the household affairs in the same way as at 6 O'Farrell street; had no regular allowance for household expenses; he gave her money in the same way as before; he wished her to be constantly with him; hardly ever wanted her to be out of his sight; before that, she attended the Art School, but latterly he wanted her to be at home all the time; she attended the old Art School on Pine street from 1873; she attended it up to the year 1880, afterward as a special student; Mr. Blythe used often to take a walk on Sundays with his dog; on Saturday night he would like to have a little supper, when he would take a good deal of wine; would invite some friends there to have what he called a jolly time.

Witness knew Charles W. Beach; he called upon her at 27 Geary street to see his "little Arizona girl," as he called her; he said to Mr. Blythe that he didn't know she was married, or he would not call her his "little Arizona girl"; Mr. Blythe laughed; witness identifies a letter which she received from Mr. Beach, a letter of condolence, after Mr. Blythe's death, dated April 6th; witness had a music teacher whom she paid, but Mr. Blythe gave her the money; she thinks it was in 1879 that she first heard of the Colorado river land; she assisted him in composing a speech in which there was considerable said about our sister republic and the feelings he had to the Mexican people, and his intention to go there and settle with his family and spend his days there; the speech was never delivered, because he was not able to deliver it, but it was presented to Commodore Monasterio; first heard of his Mexican plans in 1878; she dictated the first letter to the child Florence, and followed her studies and took great interest in her; in fact, if she had been her own child, could not have taken greater interest, and so she said to him; they had as household pets at 6 O'Farrell street two cats, "Bob," or "Sir Robert," "Squint," and a little shaggy dog and some pigeons; at 27 Geary street they had the cats and the dog "General Grant," which she kept until two years after Mr. Blythe's death, when he was poisoned.

Witness identified several bills for domestic goods from tradesmen; she remembers when Mrs. Ford came to see them at 6 O'Farrell street; recalls nothing special about that; they had some wine, treated her nicely; remembers that colored porter, Henry Williams; he used to bring her things from Mr. Blythe, and he used to bring her some nice fish occasionally; she remembers Dr. Maldonado, a witness here, who was formerly a druggist on Geary street, opposite 27 Geary street; remembers Philip Scattiny, who kept an oyster saloon at 15 Stockton street, and his predecessor, a lady, Mrs. Dickinson; witness went there occasionally; she remembers Charles E. Edwards, the butcher with whom she dealt on Fourth street; began dealing there in 1882; identifies a bill, "A. E. B.'s Exhibit N3," dated April 14, 1883; she remembers Mr. Webster, who hired a room at 6 O'Farrell street; she knows the young man, Herman Kohn, who was a witness; was present

in his store when he addressed her as Miss Dickason, and Mr. Blythe told him she was no longer Miss Dickason, but Mrs. Blythe; she remembers also Mr. Edward Neumann, Mr. Tosteman, Mrs. Feeney, Mrs. Frances Pique, Juan F. Bernal, Mrs. Sanchez; remembers Wong Louis, the Chinese servant; after dinner each day he used to go out and return about 10 o'clock; on Sundays he used to go out a little earlier; she knows the jeweler, Nathan J. Hyman, Morris Raphael and Henry Myers; witness remembers the incident of April 4, 1883; Mr. Blythe rose as usual, seemed to feel in good health, but was very hurried; he had to hurry up to his office; neglected to take his bath that morning, as had been his custom from their marriage; on that day he received from fifty to sixty persons; he came to lunch at noon; he had a very light lunch, a few chops and a glass of wine; in the course of that afternoon he received fifteen or sixteen Italians with Charles Dondero at their head; these were persons whom he intended to send down to the colony; a little after 5 o'clock witness went into his office; Mr. Blythe was fondling a beautiful little dog; he had been sending all his pets to Mexico, and she suggested that he keep this one; his answer was, "Well, Alice, my dear, I will promise you I will not let the little dog go"; when he came home he went to take his bath; she told him dinner was nearly ready, and asked him if she should delay dinner; he pinched her chin and said, "No, my dear, I will be through"; so she dressed for dinner and began to read until Mr. Blythe was ready; suddenly she looked up; Mr. Blythe was staggering toward the door; she got him into her arms; dragged him as well as she could to the lounge; she called the China boy, and told him to get her hot water and mustard; she made a little hot drink and tried to get him to take it, but he seemed to get into a sort of spasm, and she could not get the liquid through his teeth; she asked him if she should call a doctor, but he said, "No, just cover me up and get me warm"; soon after that he expired; she had already sent for Dr. Stallard, Mrs. Gutierrez and Mr. Varney; the doctor came; by that time Mr. Blythe was lying on the floor, and she was bathing his feet with hot water; the doctor stooped over him a moment and then said, "I can do nothing for Mr. Blythe, he is dead"; she was distracted with grief,

it is hard to say exactly what she did; she remembers that some one suggested that Mr. Blythe's body be removed from the house; she protested against that, and had him placed in the parlor; that evening, after they had locked out inquisitive reporters, rival undertakers and other prying persons and had a little quiet restored, M. M. Estee, Mr. Jeffers and she sat down and conversed; Mr. Jeffers asked her if she had made any search for a will, and she said she was too much overcome with grief to think of such a thing; Mr. Jeffers said that inasmuch as there would be much excitement and inquiry, they ought to make a search, and they did so, very thoroughly, all through the house; found no paper of any great importance; during this time Mr. Estee was in the dining-room; Mr. Roach and Mr. John A. Wright, his attorney, took all those papers away; this was four or five days after; they came with an order of court to inspect papers; they took charge and sealed them up until they took them away; witness was at the funeral of Mr. Blythe as his widow; she stood near the head of the funeral casket; she went out to the cemetery; the body was placed in the vault; it did not remain there, but was returned that night to Mr. Porter's undertaking rooms, and he took care of it until an attempt was made clandestinely to remove it, which was prevented and the body was returned to the rooms, and after a while was removed to a vault in the Masonic Cemetery, and afterward buried.

The defendant in her cross-examination testified as follows according to the judge's manuscript notes, pages 555-601, volume 6:

The first time Mr. Blythe spoke to me about the little girl, Florence, was while I was living at 28 Dupont street; it was while I was renovating his trunk at 6 O'Farrell street and came across some photographs and letters; when he first spoke to me about his Mexican plans was in 1878 or 1879, when he was engaged in building the steamer for Mexico and was preparing the speech; it was in May, 1878, that I first visited his office to hire the cottage; I had asked Mr. Jo. Harris to look about for a house in a central portion of the city for myself and my mother and he brought me this number with several others and I thought that would be the most suitable, and I went to Mr. Blythe's office and was surprised to meet the man

whom I met years before and with whom I had a "mute flirtation"; the speech he was preparing for a banquet to be given on the steamer "Coquille," but he did not make the speech because there was no opportunity to deliver it, and he presented it to the commodore on board the steamer; I did not go to the affair on the steamer; Mr. Blythe came home about 1 o'clock in the morning with a few companions; he was very jolly and said he had been at another banquet after the affair on the steamer; I had had some lunch prepared and they partook of it; it was usually over a glass of wine, after the business of the day was over, that he would tell me of his amorous adventures in England and elsewhere; he told me of his lady love in London when he was visiting there; he had many, among them the young lady who was the mother of Florence, and another young lady of whom he seemed to be very fond whom he called "Lou"; her other name I do not know; he said he used to have great sport in striving to have the young ladies come separately, but sometimes his plans failed and the ladies met; this was at his chambers in London, where he kept bachelor quarters, and an old lady kept his sideboard and furnished roasts and the like, and occasionally he went out to take a chop and a cup of tea; I have a faint recollection that I reproved him for his treatment of the mother of Florence, and he told me that he had left her well provided for; don't remember that he said that he had given her the name of Florence, nor that he said his mother's name was Florence; my impression is that others gave her the name; don't remember that he said that he had left instructions as to the name of the child in case it was a boy and also in case it was a girl; had conversation with him on the subject of her name. (Plaintiff's Exhibit 52, letter from Mr. Blythe to James Crisp Perry, June 15, 1881, the "baptismal letter," shown witness.) I don't remember ever having read that letter before; that is not the letter I composed. (Plaintiff's Exhibit 54, October 21, 1881, shown to witness, letter from Mr. Blythe to Florence.) I never saw that letter in ink before; it is not an exact copy of the one I composed; it has some of the ideas, something about cats and dogs and household pets; don't think I could pick out any particular phrases or words of expression; we were for about a week or so com-

posing the letter; he said it was a new pose for him as a father and hardly knew how to write to a child and asked me to assist, so I wrote from time to time and he made selections and finally told me he had written a letter to suit himself in his office; I made no objection to Mr. Blythe's acknowledging this child; I concurred in it thoroughly; he was very anxious that I should concur in it; he was pleased to learn that I was satisfied with his wishes and offered no opposition; I told him I had a right to be consulted as his wife in such a matter; he was glad to have me concur, because he knew that if I should be jealous of the little girl or object to his corresponding with the mother I could make it disagreeable for him; he didn't say anything about "adoption" at that time, but before going down to his ranch the last time he spoke to me one morning at breakfast, and asked me how I came to be baptized a Catholic and I told him it was done through the lady and gentleman who had adopted me when I was a little child; he said, "Nonsense, they did not adopt you; you were simply left there by your mother"; I said that they had adopted me because I always called them "father" and "mother"; he said that that did not make an adoption, that there must be a legal form; they should consult lawyers and have it done according to law; and then he arose from the table, put his hands in his pockets and passed up and down the floor and said, "Don't you know, that is what I must do for the little one"? this was in the early part of 1883, January or February; know that was the time because then we used to have fires all the time in the parlor. (Letter produced and shown to witness, Plaintiff's Exhibit 57. Witness reads the letter.) I never saw that letter before, I never saw any of the letters he wrote at the office; that letter is dated January 4, 1882; I do not recognize any phrase or expression in that letter as having been suggested or dictated by me. Cannot remember how long before the date of that letter, January 4, 1882, but it was as early as 1878 that he first spoke of the Mexican lands. (Letter shown to witness, May 17, 1882, from deceased, Mr. Blythe, to Florence, Plaintiff's Exhibit 61.) Don't remember seeing that before; it is written in indelible pencil; I bought two or three such pencils from Denny, on Montgomery street, for him. (Letter shown

to witness, Plaintiff's Exhibit 62-62a, from deceased, Mr. Blythe, to Florence.) The letter I don't remember, but the envelope address is in ink and looks like my handwriting; the letter is written with an indelible pencil, dated May 22, 1882; when he was ill in bed he frequently wrote in bed and then he wrote with a pencil, it being inconvenient to use pen and ink; Mr. Blythe told me that he did not want it to be known in England that he was a married man; he told me that Nellie Firmin had stolen papers and pictures and various little articles; witness repeats what she testified on her direct examination as to the picture of Florence and tracing a resemblance between him and Mr. Blythe; that was on a Sunday afternoon and I think it was in the fall of 1878; and that was the first time he told me that he had received letters from England that he was the father of the little girl; he read to me several letters at that time from various persons, some from Mr. Finley, some from Miss Firmin, and some of them from England, but I cannot remember the substance of them; that picture is not among those shown to me. (Plaintiff's Exhibit 76, shown to witness.) Saw that, I think, in 1882. (Exhibit 79.) I think I saw it in 1882. (Exhibit 80.) I saw it 1881. (Exhibit 77.) I don't remember where or when I saw it. (Exhibit 81.) I am familiar with this style of picture, a similar one; I saw pictures like these (Plaintiff's Exhibit 77 and 81), and Mr. Blythe said she looked well fed and cared for; from time to time I had the pictures framed and put in brackets and put them where visitors could easily see them, and he frequently pointed to the picture and showed it to mostly everyone that came in and told them it was his little daughter; he would often talk about the child and said her mouth was getting larger with each picture; that his mother had a small mouth and he himself resembled her, and he was much annoyed at the largeness of the child's mouth and the angularity of her limbs, as he had a well-turned ankle and rounded limbs; I said that at the child's age it was natural that she should be angular, as she was not yet developed; none of the photographs that I gave to Mr. Highton were ever returned to me; when Mr. Blythe spoke about his plans for the future he said he wanted Florence to learn Spanish, as it would be of use to her in

Mexico, whither he designed to take her; he didn't think the climate of California was good for her, as he thought she was too frail for this severe climate; long before she was so ill he intended to go to Mexico; his own health was poor; I was taking lessons in music and art, and he was paying for the instruction; I told him that if there were any branches in which Florence was deficient I would supply them if I were competent; it was in the latter part of 1882 that he alluded to the matrimonial prospects of Florence, and it was after his visit to Mexico in November that Mr. Blythe communicated his change of mind about giving her for a wife to Mr. Irish; it was not after the last trip to Mexico—I made a mistake in so saying in my direct testimony Tuesday (see page 547); he said after that visit to his ranch in Mexico that he was very much disappointed in Irish, that he had greatly deceived him, that he had discovered discrepancies in his character, and that he should not have Florence; I could fix the date if I had a letter Mr. Blythe wrote me from Mexico; I think I gave the letter to Mr. Highton, but I really don't know where it is now; he sent me a few notes or scraps; I don't know what has become of them; he was away the first time from about the first of November and returned just before Christmas, 1882; the second time he went March 1st and returned in about two weeks; I wrote about every other day, and directed my letters to care of Mr. Ginocchio of Yuma, banker; he wrote to me but once on that trip; I have retained none of his notes; on the second trip he did not write at all; on the first trip it was that he wrote the one letter, and that was all that he ever wrote; on his sixtieth birthday he was dancing around and laughing, and saying that he would not have to pay poll-tax any more; I know of his going to Mr. Jeffers to have a birthday dinner; I was not invited; I did not know Mrs. Jeffers at that time; I did not say to Mr. Blythe that he ought not to go to a dinner party where ladies were present to which his wife was not invited; witness repeated what took place after his return from the Jeffers dinner; he spoke of the mutual pledges that were given there, and he insisted that I should join him in a glass of wine and pledge myself to care for the little one and protect her rights in the event of his death; he said if he should die before I

did he wanted to be buried down there in Mexico, and that if he died and was buried there he felt that he would be at rest where we would plant flowers on his grave; he quoted some lines of poetry, whether it was original or not I do not know, that he wanted on his gravestone:

> "The orphan girl he tried to save,
>   Has planted flowers on his grave;"

I promised him solemnly to carry out his wishes; he did not want to be buried in San Francisco; he seemed determined to not die here; I solemnly promised that night and at that time that I would carry out his wishes in respect to Florence and protect her rights so far as within my power; I couldn't find the letter, but I must have destroyed the one received from Mr. Blythe; I destroyed some papers about two years ago; cannot recollect now, because at that time I was out of my head; that was about two years ago this coming May; I had five receipts for the rent of the cottage at 433 Hayes street; gave all I had (three) to my counsel; don't know what became of the others; once threw a lot of papers in a Japanese desk out of the window, when I was out of my head at 27 Geary street.

Witness was questioned as to her dealings with various persons, marketmen and others, and as to visitors at 433 Hayes street; some ladies called, but witness declined to give names unless required by the court, and objection being interposed the court sustained the same and exception was entered. A Mr. Henderson, with whom I had had some trouble once, called; sometimes I had some conversation with Mrs. Joice's brother from my back door, our premises adjoining; I once told Mrs. Joice that Mr. Blythe was paying my expenses, and that if she would come to my figures, and if she wanted to sell, Mr. Blythe would give me the money to buy it; don't remember that I told her that I was married to him, or that he was my husband; she marveled greatly that I went to so much expense in having such fine chickens and improving the place; she wanted to know what I was to do with the chickens; told her that Mr. Blythe and I were going to take them to our ranch in Mexico; I don't know how old Mrs. Joice's daughter was

when she made out the receipts; have not conducted a voluminous correspondence with her; may have written to her from Napa; have not seen her in a long time; I was never very careful with papers; disliked to accumulate them; it is not a fact that those receipts were written since I left the cottage, 433 Hayes street; I had no social visitors there.

A Mr. Myers called, but not on a social visit; he was a friend of Mr. Henderson, and brought a note from him when I had some trouble with him; Henderson pretended to think that Mr. Blythe was taking advantage of me, and that as he knew my father in Arizona, he was taking an interest to see that I behaved myself; he annoyed me greatly and made himself obnoxious by writing notes, and I ordered him away; he went to the school to which I was going and traduced me, and I went to the Stock Exchange and called him out and reproved him by horsewhipping him; I was stopping then at the Sisters on Rincon Hill; I did not tell the Sisters about this; this occurred in 1879; Henderson claimed to have bought my furniture and some jewelry; this was not true; he claimed that he had done certain things for me, but when a lawyer, Mr. O'Brien, showed him various receipts and papers he signed a retraction; do not know where it is now; showed it to Mr. Blythe and gave it to him; Mr. Thos. V. O'Brien was my lawyer; when I left the cottage at 433 Hayes street I stored part of the furniture with H. Windel; may have given the name of Mrs. Villette, or Miss Dickason; I did go to his store a few years ago and tore out some of the pages of his book in which my name was entered as "Miss Dickason," because I was angry that he continued to enter my name as "Miss Dickason" after I had told him it was "Mrs. Blythe." Mr. Windel visited 433 Hayes street twice about the furniture; Mr. Blythe called there once, but I was out; Mrs. Joice told me that he called, and so did he himself. Witness described the interior appointments of the cottage. I stored some of the furniture at Windel's, sold some, and with some furnished a couple of rooms at 11 Geary street for Thompson, the colored man; he acted as a sort of janitor for Mr. Blythe after I left the Hayes-street cottage, where he acted as a servant for me; the articles that were sold at some auction-room, Thompson attended to it; I knew Mr. Hender-

son in Los Angeles, also in Arizona; I never had any relations with him; in Los Angeles he called on my mother to tell her that he had some money intrusted to him for me, to send me to Arizona to my father; this was in 1869; I then went to Arizona; I have been married twice, first to Mr. Peters and then to Mr. Blythe; I was married to Mr. Peters in October, 1875; the first time that I saw Mr. Blythe was in the latter part of 1873 and the first part of 1874; didn't know his name then; witness repeated the recital of the incidents of the mute flirtation; I was then taking lessons of Mr. Peters, whom I subsequently married; from the time of going to Salinas until I was divorced from Mr. Peters think I saw Mr. Blythe a few times in 1875 on the street, but don't remember whether we bowed to or recognized each other; went to Mr. Blythe's office in May, 1878, to see about hiring the cottage at 28 Dupont street; didn't go to sell a picture, nor did I ever sell him a picture; am now trying to live at 724½ Market street; there was no person present at my first interview with Mr. Blythe; could not recall all the conversation that took place at the lunch at 6 O'Farrell street that day; it was principally about the cottage and what I intended to do; went there again that evening after my dinner; was there until about 9 o'clock; went home alone that evening; saw him every day thereafter. I have brought the paper with me by which I am able to fix the date of meeting Mr. Blythe at his office, i. e., May 8, 1878; that is my writing; I think I copied that in 1883, from an old journal that I possessed before Mr. Blythe's decease; it was an old book that I copied from such extracts as I desired to preserve, and then destroyed it. This was after Mr. Blythe's death. The reason that I destroyed it was that I was rather annoyed because some persons, whom I considered my friends, to whom I had intrusted my box, had broken it open and rummaged its contents, and it made me angry. I intrusted it to Mr. George Eggleton, and it seems he gave it to Mr. Jeffers, and when I found it it was in Mr. Varney's room. I did not destroy it under advice; did it of my own motion: "note copied from old journal; became acquainted with Blythe May 8, 1878." (A. E. B.'s Exhibit N4.) The figures on that paper indicating "Blythe" are a schoolgirl's cipher that I sometimes used. (Witness, at re-

quest of Counsel Foote, gave an example of writing, and also of the schoolgirl's alphabet, Plaintiff's Exhibit 230.) The entry in the old journal was all in that alphabet. (Witness repeats what she said to Mr. Blythe on her first visit to his office.) I do not remember when I first told him my name. I think I made that entry about my first visit to Mr. Blythe about that time, May 8, 1878; did not make it after Mr. Blythe's death; the name of the lady that formerly occupied the Dupont street cottage was Mrs. Hynes; I had known her for some time and had called upon her there and was familiar with the interior; when I visited Mr. Blythe we discussed the arrangement of the cottage and alterations that I desired to be made, but they were not made; he said that if anything was done according to my design the roof would fall in; one day was so like another that I cannot remember each day; no one has instructed me how to testify nor have I made any written statement; I told Mr. Highton when I gave him my case, that is all; he told me to tell the truth when I came to testify; there was no conversation at first about his occupying the cottage with me nor that I should occupy his rooms; I cannot separate the days, the third day he might have asked me something about myself and my people, but I cannot remember what he said; during the week he said that from the first he felt that I was his affinity, that I was congenial to him; it was one afternoon, it was evening, not yet dark, after dinner; we sat in the bay window; he sat in an easy chair and I sat on an ottoman; he asked me to give an account of my life and I did so; we sat there two or three hours, long after dark, without the lights; after I told him he patted me on the head and said he thought I was too weak to battle with the world and that he would like to be my protector. He said that he was very fond of me and thought that my nature was suited to his, that he wished to be my husband or protector and that we should share our lives together; I told him that I thought he should weigh well what he said and think over the matter, that on account of his position and wealth I did not think he meant what he said; witness described the incident of Mr. Blythe's attempt to kiss her and her unsuccessful resistance and annoyance thereat; in the course of the encounter he tore the waist of my dress, I had

a thin dress on, a low bodice under a light waist; the upper part of the waist was quite thin, and in attempting to catch me, as I was trying to escape, the waist was torn by him and I was angry and cried and he undertook to apologize, but I put on my wraps and left and went over to my cottage at 28 Dupont street; he wanted to detain me, but I declined and left and he followed me immediately and came over to the cottage and made up, and I subsequently returned that evening to 6 O'Farrell street; most of the furniture used in fitting up the cottage at 28 Dupont street I bought of Goldberg & Stamper on Market street, in the name of "Mrs. Villette"— after the mistake was made in the first rent receipt, Mr. Blythe thought I might as well continue to use that name, and so it happened that the bill was made out; some of the articles I purchased from Emanuel on Fourth street, near Bryant, furniture factory; the whole of the furnishings of the house cost about $700, which I agreed for in installments, but subsequently got a considerable sum and I paid some solid cash down; had an installment contract with Goldberg & Stamper; the name in the contract was Mrs. Villette; have not preserved my copy of it; my impression is that I paid as much as $300 down; I did not furnish that cottage for the purpose of having clandestine meetings with Mr. Blythe before the ceremony of marriage with him; I remember distinctly only the one occasion in which we occupied the same relative positions described already as in the bay window—he in the easy chair and I on the ottoman—prior to the ceremony of marriage; when he proposed to be my protector or husband I told him to think over it, that if I accepted him it must be a matter for life; I told him that if I became his wife I wanted it to be a matter of life with us both; I did not keep a memorandum of everything Mr. Blythe said, but I think I made a memorandum of some things; think I did of the Xmas incident after the dinner that he had with Mr. Jeffers, but destroyed them; I think in August, 1888; I was angry once when I destroyed some of the papers, and at another time I was not in my right mind; those receipts (A. E. B's Exhibit S3 and T3), April 17 and May 17, 1879, for rent of the cottage, were made as they are while I was there and not afterward; it is not a fact that the original receipts were

made out in the name of "Mrs. Henderson"; have not told Mrs. Joice or Miss Joice to get out of the way or they would be subpoenaed and compelled to produce the letters that I wrote to them about having a will concocted in my favor. nor did I go to see the old lady or her daughter since last Thursday nor send a messenger.

Mr. Windel told me that he went to Oakland and while there called at the house of the Joices, but Mrs. Joice was not at home, they were not in; Mr. Windel told me that old Mr. Joice told him that Mr. Hart or some of his representatives had offered them $3,000 for letters or if they would testify, and $10,000 after they had testified; thought it was this Mr. Hart (indicating attorney W. H. H. Hart) that was meant; I know another Mr. Hart, a friend of the Joices; Mr. Windel went to Alameda to see a child which he has under his care in a school or convent in Alameda, and while there he called upon the Joices, so he informed me; I don't remember seeing Thompson, the colored man, before I was at Dupont street; he obtained employment from me to clean up the stairway and doing other work around the house; and when I went to Mason street he used to run errands for me; in 1880 or 1881 he did work around the block for Mr. Blythe; I bought the diamond earrings with money obtained from Mr. Blythe, and Mr. Harris purchased the rings for me; this was sometime in May or June, 1878, shortly after the marriage ceremony; I was then living at 28 Dupont street; the money was given to me at 6 O'Farrell street, sometime in the evening. At the time of the incident related, when Mr. Blythe attempted to kiss me and tore my waist, he followed after me to 28 Dupont street a few minutes later; he came in himself; he had a duplicate key all the time; he used to come in frequently afternoons to take a nap; he would take a nap on the lounge in the music-room; very often when I went over to 28 Dupont street from 6 O'Farrell street he would come with me and go upstairs to look around the house to see that nobody was there, for I was afraid there might be burglars there, as the house was lonesome; we had no gas in that house, and had to use either candles or kerosene; when he came over on the Sunday evening that he tore my dress, at 6 O'Farrell street, following me to 28 Dupont street, he apolo-

gized; I was crying; he asked me to forgive him and I said that I would; then he said he loved me and wanted me to be his wife, and he was thinking of a ceremony that would be as binding as if performed in a church, and that if I would repeat the formula he would dictate it to me, and he did so; witness repeated the words of the ceremony as given by her in her direct examination; this took place in my bedroom; I did not make any memorandum at that time of what occurred on that occasion; I remember at the time of the second anniversary of our mutual contract I made a little design in water colors and I wrote on it "May 19, 1878"; haven't the picture now; while I was making the design or sketch alluded to, it occurred to me that it was the anniversary of our mutual contract of marriage, and I put it on the design with a brush "May 19," the date of the anniversary; after the formula of marriage was pronounced we each repeated solemnly "Amen"; he went over to No. 6 O'Farrell street, and I changed my dress and went over there too and remained; we had a late supper at about 10 o'clock, and afterward there was a mutual assumption of marital rights, duties and responsibilities; between dark and that hour, he expressed himself as very happy, he repeated scraps of poetry, some of it very silly; I can repeat some; witness repeats some lines; after May 19, 1878, when we began to have so many visitors, when so many Spanish and Mexican people called about the "Coquille," I told him he ought to introduce me by my true name and as his wife, otherwise I would not entertain them; he said he would; he did not do so on all occasions; when Mr. Hodge called to see Mr. Blythe the latter told him he was going down to the colony to settle on the Colorado river with his wife, and I spoke of Mr. Blythe as my husband; I am positive Mr. Blythe spoke of me as his wife in the presence of Mr. Hodge; I introduced Mr. Hodge to Mr. Blythe as my husband, or may have said simply "Mr. Blythe"; don't remember exactly the reason why he said he wanted the marriage kept secret; at first was the Firmin trouble and partly also because of his plans in Mexico, but after we were awhile at 6 O'Farrell street he said it was no longer necessary to be so secret about it, that there was no cause for further fear; Mr. Blythe did not have a duplicate key to 433 Hayes street,

nor did anyone else save the cook; when Mr. Blythe spoke to Mr. Cox he said he was going to take his wife to the ranch on the Colorado river, and he tried to persuade Mr. Cox to go to that place and take his family with him; that Mr. Cox is now dead; his full name was Charles Cox. (McCann Exhibit 4 shown to witness.) I sent that picture to the Mc-Canns after his death; as to the others (A. E. B's Exhibit R3, McCann.'s Exhibit 1 and 2), I think I sent A. E. B.'s Exhibit R3 after his death, sent it at the time of the inscription, August 28, 1883, cannot positively say when I sent the others; I considered the McCanns my "dear friends" as I wrote in that inscription; I sent some pictures at about the same time to Mr. Smith and Mr. Bateman; I saw the Mc-Canns here about the 4th of April, 1883, and August; every time they came to town they came to the house to see me; never had any talk with him or them or any of them about their testimony in this case; Mr. Blythe addressed me in presence of Mrs. Gutierrez as his wife, this was, I think, in 1880, when he told her of his intention to take me to the colony; I introduced her to him as "my husband, Mr. Blythe"; there were only us three present; this was about a week before Mr. Gutierrez entered the employ of Mr. Blythe, which was about the middle of May, 1881; I had gone up to see Mr. Gutierrez, who was very ill and poor, and she spoke to me about procuring employment for him and I went with her to No. 6 O'Farrell street to see Mr. Blythe about hiring her husband; this was about 9 or 10 o'clock in the evening; I cannot now recall the names of all the persons to whom Mr. Blythe introduced me as his wife; I remember Mrs. Gutierrez, Mr. Kohn, Mr. Choynski, the Doyles; to Mr. Pomroy he introduced me as his niece. Mr. Andrade thought I was his niece, so did Mr. Irish; don't remember that I was ever introduced to Mr. W. H. H. Hart; once when Mr. Jeffers called they had a serious talk in the bedroom; I was moving around the parlor and heard scraps of conversation and heard something about "marry her" or something to that effect, and then Mr. Blythe called me to him and put his arms around my neck and said, "That's all right, I love her very dearly," and then told how well I had taken care of him; he was ill at that time and in bed; he had been ailing a long time with rheumatism.

Mr. Jeffers came at about 9 o'clock and remained until nearly midnight; this was in April or May, 1882; this was before the birthday dinner at Jeffers' house, two or three months before. Witness mentions names of persons to whom she was introduced by Mr. Blythe as his wife: among others a Mr. Huntington, Mr. Jessup (deceased, the late Gershom P.), Mr. Martin, who was a witness here, Mr. Elias, and others; when Mr. Beach (now deceased) came around he inquired after his "little Arizona girl," not knowing that I was married. (Witness testifies substantially as in her direct examination with regard to Mr. Beach and Mr. Mulvihill, the coal purveyor for Trevor's coal-yard.) I think I have named all the persons that I can remember to whom I was introduced by Mr. Blythe as his wife or as his niece; do not remember receiving any visitors at 28 Dupont street between May and November, 1878, except Mr. Blythe and occasionally Miss Mary Phillips, a young friend of mine; she met Mr. Blythe once in July, 1878, about the time of my father's death. (Witness names several persons who were roomers in the house 6 O'Farrell street, in 1880. Papers shown to witness, Wright Exhibits 40 and 41a.) Those are in my handwriting. (Envelope marked Wright Exhibit 41, postmarked "S. F., Nov. 15, 10 A. M., and on reverse side, "Yuma, Nov. 17., 8 P. M., Ariz.") That is in my handwriting, addressed "T. H. Blythe, care G. Ginocchio, Yuma, A. T." (Letter offered and read in evidence marked Wright Exhibit 41a. Letter and envelope shown to witness—Wright Exhibits 43 and 43a— the envelope postmarked "S. F., Nov. 11," and on reverse side, "Yuma, Nov. 13," Wright Exhibit 43, and letter, Wright Exhibit 43a, dated Nov. 10, no year.) Those are in my handwriting and written by me to Mr. Blythe while he was on his first trip to the Colorado river. (Letter shown to witness, Wright Exhibit 44, Nov. 7, 1882.) I wrote that letter and sent it to Mr. Blythe. (Letter shown to witness, Wright Exhibit 45, Nov. 8, 1882.) I wrote that and sent it to Mr. Blythe; also Wright's Exhibits 67, 68, 69, 70, 71. (Counsel shows to witness Wright's Exhibits 71, 72, 73, and they are identified as letters written by her to Mr. Blythe while he was away in November, 1882; letters read in evidence.) I remember Mr. Yberri; I was introduced to him,

but do not remember by what name. (Letter shown to witness, Wright Exhibit 79, letter from W. Yberri from Guaymas.) That, I think, is the handwriting of Mr. Yberri. (Letter shown to witness, Plaintiff's Exhibit 228a and Envelope 228.) I wrote that letter to Mr. George S. Irish, except the postscript, which is in Mr. Blythe's writing, and the envelope in his hand; the letter is dated October 8, 1882; Mr. Blythe was sitting beside me when I wrote that and dictated it to me; he was not in bed, but his arm was sore, and he added the postscript next day in his office; it was on a Sunday evening when I wrote the letter; Mr. Irish was introduced to me by Mr. Blythe as his niece, I think; I remember going out to see the electric lights in front of the Russ House, but did not tell Mr. Varney at that time, in May, 1882, that Mr. Blythe intended to adopt me as his niece and that he told me to tell him, Mr. Varney, so that he could tell the other employees; I am pretty positive I did not make any such statement; it is not a fact that Mr. Blythe ever said so; the first I ever heard of such a thing was when he introduced me as his niece to Mr. Pomroy, at 27 Geary street, and afterward when I spoke to him about it he said it was because of his business negotiations in Mexico which made it necessary that it should not be known that he was a married man. (Envelope and letter shown to witness, Wright's Exhibits 54, 54a, 54b.) I haven't seen that before. (Also Wright's Exhibits 53 and 55.) I do not remember having seen any of those before; the writer was a lady of whom Mr. Blythe thought a great deal when she was a little girl, a Miss Newell. (Letters offered in evidence to show that Mr. Blythe addressed others as "niece"; objection sustained; exception. Certain certificates of stock in the Mammoth Gravel Mining Company exhibited to witness, marked Naphtaly Exhibit No. 1—so marked because coming from the custody of the public administrator's attorney.) That name, "Alice Dickason," used to be my name. (Certificate offered in evidence; objection, overruled; exception; certificate issued July 14, 1881, in name of Alice Dickason, and so indorsed in handwriting of witness.) (Receipts for payment of rent in July and August, 1878, shown witness.) I cannot remember why I only made partial payments at that time; I cannot recollect what my expenses

were at 28 Dupont street, cannot figure it now; I can't recollect why I destroyed those tradesmen's bills that I did destroy.

Have no bills for dress goods purchased in 1880, 1881, 1882 or 1883; generally bought for cash; if I had any I have lost them. (Court Exhibit Y shown to witness, memorandum-book produced by Gutierrez.) That entry on page 33, "Novr. 30th, took care of office part of afternoon, Dickason," was made by me; when Gutierrez first knew me he always addressed me as Mrs. Blythe; he so addressed me every day when he was ill on Howard street, and I used to carry him food every day; this was in the latter part of 1879 or the beginning of 1880; I think I have seen Captain James McDonald, but never spoke to him or met him at 27 Geary street a day or two after Mr. Blythe's death, nor did I present to him a card; I positively did not have any conversation with him nor do I know the gentleman at all; now I recollect that I never met him; the person to whom I was introduced about three years ago was another gentleman, a large, portly, florid-faced man, without beard, a Captain McDonald; he was introduced to me by Mrs. Dr. J. Grey Jewell; if any such conversation occurred I should have remembered it, because Mr. George S. Irish used to bring me flowers which he said came from Captain James M. McDonald's garden; but I never saw him nor did I give him name or card; knew a Mr. Edw. Payne who kept a bric-a-brac store on Geary street in the Sawyer part of the block; I painted quantities of shells for him; decorated a number of shells; he paid $5 or $6 a pair for them; cannot remember just how many; never borrowed any money from him; did not say to him that I was going to the art school and that my uncle paid my expenses; do not remember saying that; did some work also for a store on Market street; a picture store opposite the Palace Hotel; the night of the 19th of May, 1878, after the ceremony, I spent the night at 6 O'Farrell street; that was the first time I ever spent an entire night there; there was a colored girl there, but she was absent that night. She was so often absent at nights, that finally Mr. Blythe told her she might as well remain absent altogether at nights; she had a room in the house on the fourth floor; she remained there until 1880, when she left; her name was Mary Williams; she was married, as I learned

after her leaving, to a man named Stepney; she had been married unknown to us prior to her leaving; none of Mr. Blythe's old servants liked me; Mary did not; before I went there she had her own way, and after that she did not have her own way so much; she was dismissed by Mr. Blythe; one evening she was late at dinner, and she had been latterly careless 'and tardy, and Mr. Blythe became greatly enraged and threw some glasses about, and one struck her, and she got angry and left. When I first went to 6 O'Farrell street, in 1878, Mr. Blythe had a library, parlor, kitchen and other rooms, and but one bedroom, which I occupied with him from that time on, and the arrangement was about the same; at the art school I was always known as Miss Dickason; I don't know anyone by the name of Mrs. H. H. Allen, and did not say to anyone of that name who was attending the art school in 1881 that my name was Miss Alice Dickason and that my uncle, Thomas H. Blythe, was paying my expenses, because I don't positively know any such person; when I went to Rincon Hill I told Mother Mary Francis that I was a 'single woman, and think I said my name was Miss Villette; after I was there awhile I told her that I was a married woman, and shortly thereafter I left; Mother Mary Francis gave me religious instruction every morning until when she was inquiring as to my life I disclosed to her that I was married, and she told me that the church would not recognize such a marriage; I told her that I was secretly married, but don't remember that I told her as to the manner of the marriage, except that it was not by a priest. (Witness was examined as to what she was doing on April 4, 1883, the day of the death of Mr. Blythe. Witness described what occurred at the time and the scene of Mr. Blythe's death, as he emerged from the bathroom dressed in his under-flannels—no change from direct testimony.) He had a very similar attack once before at 27 Geary street shortly after his return from the ranch in November; then I gave him a little Jamaica ginger in hot water and it relieved him; did not send for the doctor at that time because he revived; this last time sent for Dr. Stallard, but when he came it was too late. (Witness repeated substantially her testimony in regard to what took place in the house on the night of and after Mr. Blythe's

death, when Mr. Jeffers and Mr. Estee were there.)    Mr. Jeffers proposed to search for a will; he asked me if I had thought to look for a will; I told him I had been too distracted to think of it; and we then went into the room where Mr. Blythe's desk was and we made a search.    (Witness describes the way in which the search was prosecuted by them.) I was not present at any other search, cannot remember that the desk was unscrewed afterward and searched at Mr. Windel's.    (Card shown to witness and identified as in her handwriting, Plaintiff's Exhibit 284.)    I have no recollection of when that was written, it is very evident I did write that and send it to Mr. Varney from its contents.    On one side is the name ''Alice Dickason'' and on the other ''My dear Mr. Varney I have succeeded in making some good eggnog; come in and have a glass, it is better than your whisky.    Cordially yours, A. Dickason.''    I recollect when Mr. Roach, the public administrator, and his attorney, John A. Wright, were present at the time the desk was sealed, there was also a police officer present; the first time the administrator and his attorney called I did not admit them, I upbraided and told them they should be ashamed of themselves and wait until Mr. Blythe was cold in death.    (Papers shown to witness—affidavit of Philip A. Roach, filed April 13, 1883; and the reply affidavit of Mrs. Alice Edith Blythe, filed April 14, 1883.) I don't remember hearing Mr. Roach's affidavit until one day in court.    (Affidavit of Alice Edith Blythe offered in evidence; objection on various grounds specified; overruled; exception; affidavit read in evidence.)    That affidavit was read to me by Mr. Wilson, clerk of Mr. Highton, before I swore to it.    (Affidavit of the late Philip A. Roach, filed April 13, 1883, offered in evidence; objections on various specific grounds; overruled; exception; read in evidence.)    I have now heard you read that affidavit; I don't think I showed the public administrator all the papers I had; don't remember why I did not; I was at the funeral of Mr. Blythe at the Masonic Temple; a party of us went together in a carriage; I sat near the casket; the funeral services were conducted by Colonel John H. Dickinson; after the Masonic ceremonies were over he said now the wife of the deceased would look at the remains; I went to the cemetery.    (Photographic carte de

visite shown to witness and identified and marked Plaintiff's Exhibit 285.)   I have seen that before; that word on the lower left-hand corner, "Alice," is in my writing and also the writing on the back; that is my picture; I sent it to Florence after the death of Mr. Blythe; I must have sent it to Mr. Perry for the little girl.   (Another picture produced and shown to witness, Plaintiff's Exhibit 286.)   That is my picture, originally cabinet size; cut down to the form of the figure; the writing on the back is mine; it was taken before Mr. Blythe's death; it was taken in 1882.

Captain James M. McDonald appeared and is presented to the witness, but she declares she has no recollection of him. The court against objection and exception allows him to be sworn and testify in rebuttal:

I have been ill for three weeks and am not yet well; this is the lady that I saw at 27 Geary street the day after he died; I went there to assure myself by personal observations that Mr. Blythe had died and saw this lady; and after viewing the remains, which I recognized at once, I then asked her how it occurred, and she told me she had detailed the matter to a "Chronicle" reporter and the report in that paper was substantially correct; after a while I proffered my services and gave her my card and address, and asked her to whom I was speaking, and she said "Alice Dickason"; I took a card out of my vest pocket and began to write and did write "Alice Dicker"; then it occurred to me that I did not know how to spell the name and asked her and she wrote the surname "Dickason" just there as it is now; this was at about 2 or 3 o'clock the day after the death of Mr. Blythe.   (The card is marked Plaintiff's Exhibit 287.)   I put that card in my pocket and carried it there with other papers for some time afterward, until I heard that it was claimed that he was a married man, and then I put it in an envelope in my box, and there it has remained ever since until taken out to deliver to the court.   (Envelope marked Plaintiff's Exhibit 288.  Motion to strike out testimony denied.  Exception.)

Alice Edith Blythe resumes—cross: There was no bed-lounge or lounge in my studio; when I furnished the three rooms there I occupied one room as a bedroom, had a very nice bed in it, but only for one month; I have been known as

Alice Dickason, Alice Weston, Miss Villette, Mrs. Peters, and Mrs. Blythe. (Directory of 1880-81 shown to witness, and she is asked if she furnished the name of "Alice Dickason, portrait and landscape painter, 724½ Market street, residence 305 Jones street"; objection; sustained; exception.) My mother's first husband was my father, Mr. Dickason; she married George Weston, presuming my father to be dead; he died, and my father reappearing they lived together until he died; she married James Morgan, and became divorced from him; she secured the divorce; she then married Thomas Jones, and he died and she married Frank Case. I once boarded at Dr. Rousseau's in San Diego; was there known as Miss Alice Dickason, and not as "Mrs. Frank Cook"; Mr. Blythe told me that he left England when he was very young; I never heard during his lifetime that his real name was "James Savage"; I was present at times when he paid bills for the house at 27 Geary street; I never asked him to marry me in any other way than that in which we were married on May 19, 1878; I received a dispatch while Mr. Roach and Mr. Wright were in the room; I think it was from my mother and announcing that she was coming up; I have not retained that dispatch, don't know what became of it.

Redirect examination by Mr. Highton: I told my attorney when I employed him of the promise I made my husband with regard to Florence, and instructed him to defend her rights, at that time I considered her Mr. Blythe's child; Mr. Blythe once read a letter to me from a Mr. Finley in London, to whom he had written, as he told me, to find all he could about Dr. Perry and about Julia, the mother of the child; I had that letter for some time, but have it not now, and don't know what has become of it; the letter said that the writer had made search and found that Dr. Perry was traveling about under different names, and alluded to some trouble they had about jewelry, and that Julia Ashcroft and her husband were doing poorly; at the time I first went to Mr. Blythe's office I was not selling pictures in San Francisco; my mother in conversation with Mr. Blythe, in my presence, told him that I had disclosed to her the fact of the secret marriage and she hoped that I would be more successful than in my former marriage. (Letter shown to witness,

A. E. B's Exhibit, Blythe to Andrade, San Francisco, December 23, 1882, offered and read in evidence.) At one time when Mr. Yberri was stopping as a guest at 6 O'Farrell street I went to his room to notify him that the dinner was ready; I rapped on his door, there was no answer and I opened the door and went in, and he was in the rear of the room with his coat and vest off, in his shirt sleeves, and I retreated and he came forward and apologized and said he should feel more embarrassed if it were a young girl, but as I was a married woman it did not matter so much; I said that it did not, as I had frequently seen Mr. Blythe in his shirt sleeves, and then retired, after telling him that dinner was ready; after listening to Captain McDonald's testimony yesterday I have no recollection of ever having seen him before; on the day that he says he spoke to me—the day after Mr. Blythe's death—I was very ill and nervous, had been all the night before and was attended by Dr. Stallard; Mr. Jeffers made me some presents; Mr. Blythe knew of it but made no objection to them. (Witness' attention is called to the letters already in evidence written by her to Mr. Blythe while he was in Mexico.) When he went away he told me to keep a journal of my daily occupation and to send him an account of what was going on from day to day and to address him in my letters as "uncle," and I obeyed him; Mr. Blythe spoke to me frequently about the young lady, Miss Newell, whom he had known as a child and who used to call him "Uncle Tom"; he said he used to be very fond of her and had visited her parents when they lived in Stockton; I indorsed those certificates of stock "Alice Dickason" because Mr. Blythe requested me to do so; I did not write "Dickason" on that card produced by Captain James M. McDonald; I was present when Mr. Henderson called at 6 O'Farrell street; he came to make some trouble; he asked for me and Mr. Blythe told him that I was now his wife, and he ordered him to leave and forced him downstairs; Henderson claimed that he was a friend of my father and had my interests at heart, and wanted to know what Mr. Blythe was doing with me in that house, and Mr. Blythe responded that I was living with him as his wife; some words passed and Mr. Blythe drew a pistol on him, and Henderson fled and Mr. Blythe pursued him downstairs, I join-

ing in the pursuit; no shot was fired and Henderson escaped; I told my mother that I was secretly married to Mr. Blythe, but did not tell her the manner of the marriage.

### MISTRESS OR WIFE, WHICH?

Counsel for defendant (Hon. E. D. Wheeler) says that this action, so far as they are concerned, is like an action of ejectment. They cannot recover upon the weakness of their adversaries; as to the collateral claimants, they care nothing about them; as to the plaintiff, if it be shown that she is the child, and if the statutory requirements have been complied with, the defendant does not object to her receiving one-half of the estate. What relations, asks this counsel, did the defendant Alice Edith Blythe sustain to the decedent, Thomas H. Blythe? The evidence, whether false or true, shows that he represented her in four different capacities— niece, housekeeper, mistress, and wife. Three of these representations were false. Which of these relations did she occupy? She was not his niece; this is admitted by all. She was not his housekeeper; counsel says this is proved in many ways. Was she his mistress? Her conduct was widely at variance with any such a charge, and counsel described the character of a mistress in contrast with that of a wife. Was she his wife? That is the question. In the first place, there is her own evidence. Her testimony alone, if consistent with the circumstances of the case, is sufficient, and the presumptions of the law are in her favor; she is presumed to speak the truth, and the law presumes that persons living together in marital relations are husband and wife; and this counsel claims that she is corroborated by decedent's declarations on many occasions, made indiscriminately. These statements, in connection with the fact of living together, make a case that is impregnable, built upon the solid masonry of legal logic. A status once established cannot be destroyed by any number of statements, nor by the inconsistent declarations of defendant with reference to her name. If the antecedent facts established that she was his wife, no number of declarations could have effaced that status. There were many incongruous elements in the character of the decedent, Thomas H. Blythe. He was a singular man, whose counterpart never existed in

history; but whatever his character may have been, the counsel insists that the evidence proves that the defendant was his wife and is his widow.

Taking the whole body of the testimony in favor of this defendant, her counsel (Mr. Highton) claims that it forms a harmonious symmetrical case of matrimonial relations between decedent and defendant. Looking at the entire array of evidence (he asserts), the court cannot find the relations meretricious. The court should place itself in the attitude of the defendant to see what her case is, and look at it from her point of view. Defendant's counsel then, in considering the corroborating witnesses, remarks that there is no evidence of confederation among them. They are disinterested. It is true some of them are humble, but that does not lessen their claim to credit.

### IS THE EVIDENCE CONSISTENT AND HARMONIOUS?

The story of the defendant should not only be consistent with itself, but be in harmony with the whole of the testimony adduced in her behalf.

Let us consider that testimony in the order of its production:

Frederick Alfred Martin testifies that in 1881 he went to see Mr. Gutierrez at Mr. Blythe's office, 724½ Market street; Gutierrez was not in, but Blythe was in, and asked witness to have a cigar; he accepted, and smoked until the door was opened and this lady, the defendant, came in, and witness arose to leave, when Mr. Blythe said to him, "Don't be in a hurry, this is Mrs. Blythe." This witness afterward said he was in error as to the year, as he found by reference to the directory for 1882 that it must have been that year, according to his employment at the time, and the witness confessed he was very absent-minded as to names and dates.

Isaac Baer, a newspaper carrier, served papers to decedent at 27 Geary street; saw the defendant there; knew her only as Mrs. Blythe; the written portion of the paper, "A. E. B.'s Exhibit D3" is in witness' handwriting, and was delivered to Mrs. Blythe, and the witness identified other similar receipts in same manner; witness had usually made out the bills to Mr. Blythe, but on one occasion he met him on Market

street and, witness asking for the amount of his bill, Blythe said, "You go upstairs and ask my wife to pay it"; witness never knew her by any other name; as long as Blythe lived he made out the bills to him; never made out the bills to her until after his death; witness is sure about that. Certain bills were shown to witness at this point, marked "A. E. B.'s Ex. G, Novr. 1882, A. E. B.'s Ex. F, Feby, 1883, 'Miss Bligh,' " and the witness said that these bills or receipts must have been made out after his death; Mr. Blythe often said to witness to collect the bill from his wife.

Elizabeth McCann, wife of William F. McCann, testified that she knew Thomas H. Blythe; met him at his house in 1882, corner O'Farrell and Dupont streets; her son James and her husband were present; a little after they went in, Mrs. Blythe came in and went over to the bed where Mr. Blythe was, and after awhile she went away; witness' son introduced her to Mrs. Blythe by that name; witness was in Mexico with her husband and sons; Blythe came down once in November, 1882; he said he wanted to build a house for his wife to come with him; in March, 1883, when Blythe was on a visit to the ranch in Mexico, he spoke of this lady as his wife; he said she had some nice chickens on the top of her house, that she was a nice judge of chickens; he said that when he returned he would bring Mrs. Blythe there about the latter part of April, to reside in the house at the ranch which was built for him; he said it was a very nice house, that the walls were very smooth and that Mrs. Blythe would paint some nice pictures on them.

William F. McCann, husband of the last-named witness, corroborated her testimony and added that when Blythe said he was going to bring his "family" down, the witness concluded he meant "Mrs. Blythe" and the dog "General Grant"; Blythe said nothing about a child. It is not impossible that this witness' wife made a like inference, as she was present at the time of the conversation about the chickens.

David H. Wallace, a bartender at 20 Stockton street, formerly a waiter at the "Terrapin" restaurant at 15 Stockton street, testified that the defendant was a customer of his place and that he served oysters at 27 Geary street, and that he saw Mr. and Mrs. Blythe there on one occasion; there was some

company there; witness put the oysters down and Mr. Blythe asked to be allowed to assist her; and she turned to witness and said, "This is my husband, Mr. Blythe"; witness made out a bill, dated "San Francisco, April 1, 1883, Mrs. Alice Blythe to P. Scattiny, Dr.," containing charges for oysters, etc., from October, 1882, to March, 1883, and took it up to Mr. Blythe's place, 27 Geary street, for payment and ascertained for the first time that he died on the same day; could not recollect the date, nor how long it was after the bill was made out; he copied the items from the "Terrapin" account-book, from an account headed "Mrs. Alice Blythe"; witness does not know where that book is now, nor what became of it; witness left that restaurant in 1884, but did business in the pie line with Mr. Scattiny afterward, and also at the same time acted in the oyster saloon with him; during the time a Mr. Parker ran the "Terrapin" restaurant, Mrs. Blythe left orders there, and sometimes they were charged to her as "Mrs. Alice"; Parker sold out to Scattiny shortly after witness went to work there; witness knew where Mrs. Blythe's residence was, because they sent orders there frequently; it was an almost daily occurrence; the reason that so few charges were in the bill was because often cash payments were made at the date or time of leaving the orders; when witness made out the bill he took it, by direction of Mr. Scattiny, to 27 Geary street, went upstairs, knocked at the door, Mrs. Blythe opened the door, witness asked for Mr. Blythe, she said, "He is dead"; witness begged her pardon and withdrew without saying more.

Mrs. Clara P. Ford, a doctress of 211 Taylor street, saw Mr. Blythe in his house, 6 O'Farrell street; Mrs. Blythe introduced witness to him as her husband; they had conversation; witness offered congratulations, and a bottle of wine was opened on the occasion; *this was in 1879*, as nearly as witness can remember; witness called there because the lady had invited her to call; she came to witness' house on Jones street and told her she was married to Mr. Blythe and invited witness to call upon them; when witness called, she remarked that she hoped it was not too late to offer congratulations; Blythe said it was not and ordered a bottle of wine; witness called there again and afterward at 23 Geary street and had

lunch and dinner with them; dined there twice, she thinks; Mr. and Mrs. Blythe were there at the table, they three were all that were at dinner each time; the conversation generally was about cats and dogs, about the beauties of the cats and what they could do; the conversation was general about things pertaining to the house, cats, dogs and birds, pets of Mrs. Blythe; witness recited a few lines of her own poetry; on one occasion Mrs. Blythe was elaborately dressed for dinner, black silk, diamond ornaments; witness knew Alice Edith Blythe when she was a baby in Tuolumne county; she knew her by the name of Mrs. Peters at the time when she told her she was married to Mr. Blythe; she did not tell her by whom the ceremony was performed or when or where, or whether there had ever been any ceremony; when witness called upon them, the defendant introduced her to Mr. Blythe, saying, "This is my friend Mary of whom I have spoken to you, Mr. Blythe"; witness' full name is Mrs. Mary Ann Sarah Clara Victoria Ford; maiden name was Markley; she then said she hoped it was not too late to offer congratulations; *this was in the fall of 1879.*

Henry Williams was formerly a sleeping-car porter on the Southern Pacific Railroad line for fourteen years; saw Mr. Blythe on the cars at different times. On one occasion when he came up and got off the cars at Oakland he said, "Porter, will you take my valise up to my house and give it to my wife?" Witness took it up to 27 Geary street; previous to that witness had a package for him from the train at Oakland to 6 O'Farrell street, he told witness to take the package there and give it to Mrs. Blythe; Mr. Blythe was a gentleman who was very fond of luxuries, and on one occasion witness left a trout for him from Truckee, and he afterward said, "Porter, my wife tells me you left a very nice trout for me at my house"; witness delivered the trout to the lady defendant, Mrs. Blythe, and when Mr. Blythe met the witness he remembered him for it; witness was running on the Central Pacific Railroad in 1869 from Oakland wharf to Truckee, he knew he left trout at 27 Geary street in 1882 two or three times.

A. A. McLean, a specialist in mechanical treatment of hernia, saw the deceased Thomas H. Blythe twice—first at

724½ Market street, where witness was making inquiry for offices, as he was about to vacate the rooms he then occupied, and seeing a sign, "Offices to Let," on 27 Geary street, and going upstairs to the top floor he saw a large dog there, and a lady followed him and he asked for the keys of the rooms there, and she directed him to Mr. Blythe, and he went around there, and a gentleman there who had spectacles on, a short and stout man with dark mustache, handed him the keys and told him his wife would show him the rooms; witness went back and saw the rooms but did not again see the lady; the rooms did not suit the witness, and he returned to the office and left the keys; there was, on his return to the office, only a young man there; offered himself as a witness because he thought what little testimony he might give might do some good.

Mme. Blaise Lapariat was living in 1882 at 936 Howard street, French Bakery; witness identified certain papers produced (Alice Edith Blythe's Exhibits J3, K3, L3, dated July 31, 1882, August 31, 1882, September 18, 1882) as in her handwriting, all the written portions; the books from which witness made out those bills she destroyed when she sold out the business; the handwriting on the back, "6 O'Farrell street," is that of the witness; did not know Thomas H. Blythe, nor did she remember having seen the lady; the bills were made out in the name of Mrs. Blythe because that name was given to the witness; was at 936 Howard street from 1879 to 1889; destroyed the books of original entries when she sold out the business; looking again at A. E. B.'s Exhibit J3, the name "Mrs. Blythe" is not in witness' handwriting; the rest of it is; witness made a mistake when she said that all the written portions were in her writing; she did not put in the final figure "2" in 1882, in all or any of those dates, it is stamped, not written; witness had no stamps; if the figure "2" were not there she would have written it in; never saw the figure before now; don't recognize it; cannot account for its being there; in the name "Mrs. Blythe" the letter "r" in "Mrs." is the writing of witness, but not the rest of it; the letter "r" is all that she wrote; the printed "M" and her "r" after it, and the rest of the line was

blank; cannot remember that she ever had the name of Mrs. Blythe on her books or the name of Mr. Blythe.

Philip McCann says that the second visit of Blythe to Lerdo was in March, 1883; met him at Fort Yuma, Arizona, and accompanied him to the colony and left him at Las Carpas; Blythe stayed there all night and witness went on to his father's ranch; on the way down from Yuma they had meals on the way; Blythe had a basket, and when they stopped at Salvador's ranch he said the basket contained some lunch which his wife had put up for him.

Edward Maldonado, dentist, formerly a druggist on Geary street, knew Thomas H. Blythe by sight only; cannot recognize the defendant; knew a party who came into his drug store seven or eight years ago and bought articles and had them charged to "Mrs. Blythe"; she lived opposite, over Radovich's liquor store; this was in the year 1883, April 23d, that is the first and only entry on his books.

Philip Scattiny began business at 15 Stockton street in the first part of 1880, and continued there until 1887; David H. Wallace worked there for about four years from the time he came to work there; knew the lady defendant first as "Mrs. Alice," and afterward witness learned that her name was "Mrs. Alice Blythe"; she was a frequent customer of the witness and gave orders to be delivered to 6 O'Farrell street and 27 Geary street; the books of witness are now destroyed; sometimes they charged "Mrs. Alice Blythe," "Mrs. Alice B." and "Mrs. Alice"; the book of final entry from which the bills were made out contained the charge to "Mrs. Alice Blythe"; those bills were made out by Mr. Wallace; witness understood that her former name was Mrs. Alice Dickason; saw her once at 6 O'Farrell street; the "Terrapin" was a restaurant and oyster-house; men and women used to come there; they did not demand marriage certificates; did not burn the books because anyone suggested their use in connection with this case; that bill was presented on the day it was made out; Wallace took it and brought it back, saying that Mr. Blythe was dead; it is dated April 1st, but it was the *3d of April* he took it to collect.

M. S. Whiting was publishing the "Wine Dealer's Gazette" in 1879; office at 719 Market street, nearly opposite Mr.

Blythe's office; Blythe was in witness' office in 1879, and a Japanese cabinet was there to which he took a fancy and said he would like to purchase it for his wife, and witness told him he would give it to him and did so; this was in October, 1879.

William Clayton deposed that he knew Blythe from 1870 down to shortly before his death; witness' first acquaintance was when he went there to look for work; in 1879 he was working painting the block; Blythe spoke to witness about some work to be done at his house; he said to go and see the "Missus" and she would tell him what to do; witness did not know then to whom Blythe referred; another time Blythe wanted to buy a dog of witness; witness wanted $125 for it and would not take a cent less; Blythe told him to take it upstairs and show it to the "Missus"; witness did not let him have it.

Mrs. Eloisa S. Gutierrez deposed that she knew Mr. Blythe; heard him speak to Mrs. Blythe; he called her "Alice" always, and he called witness "Louise"; witness always called her "Alice"; she told witness she was married to him, and witness introduced persons to defendant by that name, "Mrs. Blythe"; witness addressed her once as "Mrs. Thomas H. Blythe"; have not that envelope now; heard Blythe say he was going to build a house in Mexico, and he was going to take Alice there and live and die in Mexico.

Charles E. Edwards never saw Thomas H. Blythe to his knowledge; knew the defendant, Alice Edith Blythe; was at 28 Fourth street when the bill (Alice Edith Blythe's Exhibit M3) was made; that bill is headed "April 14, 1883," and the first item is March 26, 1883; the witness knew the lady as "Mrs. Blythe"; she had been a customer, and he delivered goods to her at 27 Geary street; his original books are not now in his possession; was in business on Eleventh street in Oakland in 1881-82-83, but did not know the exact date of coming over here; the witness' recollection was that it was in 1885-86 that he did business at 28 Fourth street, but according to that bill it must have been before; that bill is in the handwriting of witness' bookkeeper; haven't seen him for four or five years; don't remember his name; saw her there before Mr. Blythe's death; had an account with her as "Mrs.

Blythe.'' The San Francisco Directory for 1883-84 shows: "Edwards, Charles E., butcher, 28 Fourth, r. 630 Hayes.''

W. B. Webster rented apartments at 6 O'Farrell street from spring of 1880 to spring of 1882, on the third floor; the second floor was occupied by Thomas H. Blythe and Mrs. Blythe; witness sometimes paid his rent to Mrs. Blythe; frequently called in to see them, upon their invitation, and became very well acquainted with them; usually saw the lady in the evening; witness usually arose at half-past 7 o'clock in the morning, when he went up to breakfast at the "Westminster," on Sutter street; frequently witness went up to his room and often saw her at that time; met her occasionally in the morning; she usually then wore a morning wrapper; she was superintending the servants, sometimes feeding the cats; at noontime she was dressed in a plain and subdued manner; generally found her overseeing the servants and preparing lunch; in the evenings she dressed very plainly; sometimes met persons there in the evenings, but cannot recollect the names; sometimes witness would sit on a lounge in the parlor, and sometimes in the dining-room; the furniture of the apartments was very fine; on several occasions she spoke of going to Mexico, about leaving San Francisco and going there to live; she referred to Mr. Blythe as going with her; she said she would make her future home in Mexico; there were musical instruments in their rooms; she played, and played well, too, harp and piano; witness recollected an incident; once as he was coming downstairs Mr. Blythe met him, on the 1st of January, 1881, and grasped him cordially by the hand, and opening the door of the dining-room, there was standing by the sideboard Mrs. Blythe, and he asked witness to have a glass of wine, saying, "It is unnecessary for me to introduce you, you know Allie''; witness said, "Yes, I know her very well," and they took a glass of wine; the witness identified a letter in his handwriting, dated April 6, 1883—a letter of condolence, addressed "Mrs. Thos. H. Blythe''; he mailed the letter addressed to her at 27 Geary street.

Max Koerner knew the lady defendant as Mrs. Blythe; she came into his store on Market street, under the Baldwin Hotel, before Christmas, 1882, and ordered a toilet set; she ordered it on white satin with the letter "B" on all of the

three pieces, embroidered in rosebuds; rosebud around the "B"; she was in there a half dozen times at least; witness delivered it himself on Market street, over the "Golden Rule Bazaar"; witness met Mr. Blythe coming out and asked him for Mrs. Blythe, and he said, "Mrs. Blythe come out, there's somebody wants to see you"; she came again to buy small things once in a while, cash transactions; witness did not show to Mr. Blythe those articles delivered on Market street, above the "Golden Rule Bazaar"; witness has not his books now; they went into the hands of the assignee, Mr. Greensfelder, and witness did not know what became of them.

J. C. Gilfillan knew the lady defendant as Mrs. Blythe and by no other name; she was a customer of his; knew her only as a customer; sent packages of produce to her as ordered "Mrs. Blythe, 6 O'Farrell street," and "27 Geary street."

Patrick Mulvihill, employed by Henry Trevor, coal dealer, knew Blythe three or four years before his death; knew Mrs. Blythe by that name and by no other; saw her at 6 O'Farrell street and 27 Geary street when witness went to deliver coal there; the servant received the coal; once when the witness went there and pulled the bell Mr. Blythe answered it and said it was strange that Mrs. Blythe did not have the servant to open the door; at 27 Geary street they occupied the top floor; witness saw Mr. Blythe once there; he was coming upstairs as witness was coming down; while witness was there at that time Mrs. Blythe showed him some paintings that she had been making.

Fergus Hanson knew Mr. Blythe; he used to come to the place of business of witness, at 11-12 California Market, a butcher stall; he came two or three times with the lady defendant and made some purchases; she frequently made purchases; had conversations with her; understood her to be the niece of Mr. Blythe; she told witness afterward that she was Mrs. Blythe; had a bill in my blotter against her; it is the bill marked "A. E. B.'s Exhibit O3"; witness never presented that bill to Mr. Blythe; there are only two items there—December 27, 1882, and January 16, 1883—contracted before his death.

I. N. Choynski knew Mr. Blythe from 1875, about the time witness built his house opposite Blythe's on Geary street;

knew the lady defendant *for about the same time;* she used to come in and buy articles at witness' store at different times; collected from Blythe; witness charged the articles; she said, "present those bills to Mr. Blythe"; cannot recall any remark he made in paying them; the bills were made out to Mrs. Blythe; there were at least three or four bills in the year preceding his death; witness saw him and her at 27 Geary street, at their rooms, several times; did not remember anything strikingly particular, except that he would say, "Alice, my dear, bring down some of our best wine and a box of good cigars," and at another time, while they were looking at some pictures painted by her, "Alice, you must paint a little picture for Mr. Choynski, he is my intimate friend," but witness never got the picture; there was a picture of some scene on the Colorado river where he said he was going to end or spend his days "in the bosom of his family"; she would play the piano sometimes; witness is sure that it was in 1877 or in the fall of 1876 witness moved into his store on Geary street.

Benjamin Orpheus Hodge knew the defendant, Alice Edith Blythe, since she was about five years of age here in San Francisco; knew Thomas H. Blythe for about two months before his death; was introduced to him at 27 Geary street by the defendant; she introduced him as "Mr. Blythe"; met him again in his office in 724½ Market street; the subject of their conversation was in regard to some statuary and painting that she was making for his house at his new home on the Colorado river; witness said it was very nice to have a companion who was capable of doing such nice work; Blythe spoke of his home on the Colorado river and the enjoyment he expected to have there; he said to witness that he spoke to him freely because of his acquaintance with her and his having had charge of her; he said it would give him great satisfaction to have this work and to occupy their home there in their true relations, as the world would understand it properly; upon the occasion of the introduction at 27 Geary street Blythe said that he felt that he was already acquainted with witness, because Alice had so often spoken of witness to him and of the relations that witness had occupied to her as a sort of guardian at the time she came up from Arizona;

witness saw Mrs. Blythe at 6 O'Farrell street, but did not remember the subject matter of any conversation had with her at that time; met her on the street several times, once in particular on Kearny street; had a conversation with her then; that was just before the introduction; she said Mr. Varney had fallen and broken his leg and was unable to make the collections, and she wanted witness to go up and see Mr. Blythe, to see if he would not employ him to make the collections; witness did not meet her often enough in the few years before the decease of Mr. Blythe to know what relations she occupied; witness always called her "Alice"; did not know Blythe at all in any shape before the introduction; witness always has had a kindly interest in the lady since her childhood.

The defendant in her testimony swore positively that Mr. Blythe spoke of her as his wife in presence of this witness, Mr. Hodge, and that she introduced Blythe to him as her husband.

Herman Kohn knew the lady defendant, Mrs. Blythe, in 1881 and 1882; she often came to the store of witness, where he was in his business with his father at 1114 and at 1132 Market street, to buy goods, with Mr. Blythe; first knew her as Mrs. Blythe in the latter part of 1881, or the fore part of 1882; witness said to her, "Miss Dickason, I have some very fine goods"; Mr. Blythe said, "Mr. Kohn, excuse me; Mrs. Blythe"; sometimes Blythe paid for goods and sometimes she did, and sometimes not; when she did not witness simply made a charge check; at one time witness made up a buggy robe for him from some skins that Blythe had brought up from his ranch; the robe was not finished before his death, but when the skins were dressed and plucked he said that Mrs. Blythe would be pleased with it; witness first knew Mrs. Blythe as "Miss Dickason" from 1876 to the time Blythe corrected him in the latter part of 1881 or former part of 1882; witness has had a charge against her as "Mrs. Blythe" for the buggy robe; the charge was made after his death; witness sold the buggy robe for $45; cut up the buggy robe into trimmings and sold it as trimmings for about $15; sold it to different customers who wanted beaver trimmings; witness produced the books of his business in court, such as he

retains, and finds an entry May 14, 1883, of a tag of purchase made December, 1882; no charge made against her between 1879 and 1883; the bill marked "Kohn Exhibit 1" was made out by witness, dated May 14, 1883, items of charges made for purchases on December 22, 1882, and January 10, 1883.

Henry Tosteman occupied the store on the corner of Geary and Dupont, where the "City of Paris" is now; rented the place from Mr. Blythe from the first part of 1878 to 1882, when the building was torn down. Always knew the defendant as "Mrs. Blythe."

Thomas Dain was private secretary for Blythe from June 1, 1878, to January 10, 1879; knew the lady defendant, as "Mrs. Blythe," first sometime in the fall of 1878; witness had a room on the top or third floor, above the rooms occupied by the decedent and defendant. The housework was done by a colored woman named Mary. Did not know her other name.

Herman A. Rosenbaum knew the defendant as "Mrs. Blythe"; she dealt with him in 1881 or 1882 in his business as butcher, corner Sutter and Dupont streets; the articles were delivered at 6 O'Farrell street.

John McGuire knew defendant Mrs. Blythe as a regular customer at his poultry stall for six or seven years; witness kept books, but when he closed his business he pitched his books out—had no use for them; entered the charges to "Mrs. Blythe," and they were paid every month. She lived at one time on O'Farrell street, and at another time on Post or Geary street; witness marked the packages for Mrs. Blythe and his boys delivered them; he served this lady for six or seven years and *more than that before the death of Mr. Blythe.*

If this witness did not err he was serving her as Mrs. Blythe for two years or more before she claims to have engaged in the transaction with Blythe of May 19, 1878.

The testimony of Logan Hunton, collector for the water company, and of John C. Gore, in the same situation, is not material in the judgment of the court.

Edward Neumann, chemist, had charge of the Maldonado Pharmacy, 36 Geary street, from December 12, 1882, to June, 1883; the defendant dealt there and witness knew her as

"Mrs. Blythe"; she purchased various articles; cannot remember exactly what; some of the articles were delivered to her over the store of Radovich, opposite the pharmacy; witness didn't keep the books; they were kept by Mr. Maldonado; witness thinks she first came in shortly after New Year's, 1883; does not remember whether she was introduced by some one or introduced herself.

S. F. Morris, cashier of water company, identified on the company's meter register an entry "27 Geary street," which, with the other charges, were written by a Mr. Kimball; the "Mrs. Blythe" was written by him; don't know who wrote the "T. H." over the erased "Mrs."; it was originally "Mrs. Blythe," then "Mrs." was erased and "T. H." put over.

Mrs. Frances Louise Feeney's testimony signifies nothing.

Mrs. Frances Pique had a conversation with Mr. Blythe two months before he died; went to his office to dispose of some concert tickets; witness asked him how Alice was and he said, "I want you to call her Mrs. Blythe; as long as my name's Blythe her name will be Blythe, and when my name is something else her name will be the same"; witness asked him, "Why don't you marry her?" he answered that she would not be a bit better off; that he could not marry her; it would not hold in the eye of the law; he said, "You know the reason why; you know I can't marry her by the name of Blythe, because it would not be legal," but intended to settle up his affairs here and go to Mexico and take her, and it would be all right, there he would settle and be as happy as a king; he said he had no fault to find with her; she was a good woman, a good housekeeper, and he was very happy with her; when witness had the conversation with Blythe there was no one present but him and her and the dog; he had wanted witness to take apartments with her husband and daughter in the house 27 Geary street, but witness declined, because Blythe was living with Alice *in that way,* and so told him, when the conversation ensued as before related; witness knew Alice from her childhood, for eighteen years; witness is seventy-four years of age, is on good terms with the defendant, Mrs. Blythe, and spoke to her lawyer and told him what she knew, as testified to by her.

John Franklin Bernal knew the defendant as "Mrs. Blythe." Had occasion to go to 6 O'Farrell street, because

Mrs. Gutierrez used to do washing for Mrs. Blythe and witness used to carry the bundles sometimes; they had a Chinese servant; Mrs. Blythe was always engaged at some species of domestic work; once when witness called there and rang the bell, and the Chinese servant opened the door and motioned witness upstairs, and he went up, and Mr. Blythe was in a little room, sitting at a desk writing, and witness asked him for "Mrs. Blythe," he called out, "Alice!" and she came forth and took the bundle; witness is working in the kitchen in Clark's bakery, on Kearny street; came to court under subpœna but without fee; first saw Mrs. Blythe in May or June, 1881 or 1882, at Mrs. Gutierrez's house on Geary street, near Mason street; this was in 1881; in that house witness was introduced to Mrs. Sanchez, the aunt of witness, by Mrs. Gutierrez, in Spanish, "Presento la esposa del Señor Blythe"; witness' aunt could not speak English; they had no further conversation.

Mrs. Pietra Doyle, wife of John Doyle, barber, knew Thomas H. Blythe for about a year before he died; this witness is a sister of Mrs. Gutierrez; knew the defendant Mrs. Blythe; knew her by that name and also formerly as Mrs. Peters; knew her in 1881 at corner O'Farrell and Dupont streets, where she kept a lodging-house; when witness first saw her there, Mr. and Mrs. Blythe and she were present, no one else; from that time on witness knew her only as Mrs. Blythe; she introduced witness to Mr. Blythe and she said, "Mrs. Doyle, I make you acquainted with my husband, Mr. Blythe"; witness was here from 1881 to 1882; they occupied rooms on the second floor, sitting-room, kitchen and dining-room; frequently had meals there with Mr. and Mrs. Blythe, dinner, breakfast and supper; conversed often together; he would call her "Mrs. Blythe" *all the time* when he would be talking to her; met him on the street at different times and asked him how Mrs. Blythe was, he would reply that she was well and would ask witness to come around and see them; whenever witness saw her in the house she always dressed well, plainly, sometimes wore ornaments, diamond earrings, gold watch and chain, silk dress sometimes; there was a Chinese servant there; never saw anything done by Mrs. Blythe except to make a bed in his room; she would sit talking

with witness; never saw anyone giving orders to the Chinese servant except Mrs. Blythe; first knew her as "Mrs. Peters" fifteen years ago; when they were living in San Bernardino witness knew her as "Miss Dickason"; she was married then, but witness did now know it until she went to Los Angeles and was introduced by her to Mr. Peters as her husband; witness remembers a conversation with Mr. Blythe about a blue tea-set that he said he had got for Mrs. Blythe, so they could drink tea out of it when their friends came; he once told witness that he intended to go to the Colorado river after awhile and settle there with Mrs. Blythe; he said he had bought the blue tea-set for his wife; he said either "my wife" or "Mrs. Blythe," "it is all the same," it was one or the other; he always called her either "Mrs. Blythe" or "my wife"; sometimes he would address her as "Alice"; witness' husband is here now, he came up from Los Angeles with witness yesterday (January 19, 1890); *she did not know she was to be a witness;* no one has promised to pay her for coming here to testify; on the occasion of the introduction in 1881 Blythe said she was his wife; witness had not talked with anyone about her testimony in this case; may have eaten at the house of Mr. and Mrs. Blythe fifty times; witness' husband was working here at that time; went away in 1882 to Los Angeles, and have remained there ever since; sometimes they have been at San Bernardino; visited Mrs. Blythe at 27 Geary street; "No, I never was there"; they were not living there when she visited them; do not remember the exact words of the conversation that took place at any of the meals; remember the exact words of the introduction because such a fact is apt to make an impression; received $50 from ex-Judge Hatch of Los Angeles to pay expenses to this place.

John Doyle, husband of Mrs. Pietra Doyle, a barber and hairdresser, knew the defendant since fifteen years ago in San Bernardino; saw her in San Francisco on the sidewalk in front of O'Farrell and Dupont streets, and she told him she was married, but did not tell him the name; afterward learned that it was Mrs. Blythe; witness met Blythe one day as witness was going to catch the train for San Jose to go to the Democratic State Convention, and Blythe asked him

where he was going, witness told him, and Blythe said, "Wait awhile," and looking over his shoulder said, pointing to this lady defendant, "Mr. Doyle, this is my wife, Mrs. Blythe"; think this was October 1882; witness was not a delegate to the Democratic State Convention at San Jose, but he was going there to work at his business; witness was first introduced to Mr. Blythe by Mr. Gutierrez; it was Mrs. Gutierrez who first told witness that this lady was "Mrs. Blythe"; witness knew her as Mrs. Peters in San Bernardino in the winter of 1874-75; the people around the house used to call her "Miss Alice"; witness got $50 from ex-Judge Hatch to pay expenses of himself and wife coming up here; *came up to testify in this case and for no other purpose;* they told no one before coming up here as to what they could testify to, and never talked with anyone about it; before coming here had a letter from Mr. Highton and Mrs. Blythe to which he sent an answer.

Mrs. Annie C. Joice once owned, in 1879, the cottage at 433 Hayes street; witness recognized receipts marked respectively A. E. B.'s Exhibits S3 and T3, dated April 17, 1879, and May 17, 1879, which were written by her little girl at that time by her direction; those receipts were given to the defendant Alice Edith Blythe; witness is not willing to swear that those are the identical papers that her little girl wrote; it is a long time since, and of course there is a change, but her opinion is that that is her girl's writing ten years ago; she is most positive that it is, but is not willing to swear to it; witness was in New York when defendant took the house, and when witness returned the lady complained that she had not had receipts for a month or two previous, and witness told her to give her name to "Georgie," her daughter, and she would write receipts, and she gave her the name of Mrs. Blythe; witness' little girl was then about twelve years old, in 1879; witness declined to answer whether her daughter had gone away to avoid being a witness in the case.

Mrs. Sophie Koerner, wife of Max Koerner, who formerly kept the store under the Baldwin Hotel on Market street, from 1878 to 1886, embroideries and fancy goods, corroborated her husband.

Wong Louis knew Thomas H. Blythe; worked at 6 O'Farrell street for Mrs. Blythe; went there after another Chinaman, named "Tom," who went to China; when witness went to 6 O'Farrell street he knew the defendant as "Mrs. Blythe," his friend "Tom" told him that that was her name; witness knew her by no other name; he used to cook, wash windows and attend to housework; this was from May, 1882, to October, 1882, when they moved to 27 Geary street; she used to stay at home evening, sew or read the newspaper; they used to dine together; he used to call her sometimes "my wife" and sometimes "Mrs. Blythe," and sometimes "Alice"; sometimes visitors would call, among others General Andrade—he sometimes slept there also, and had breakfast, lunch and dinner at 6 O'Farrell street; Mr. Blythe was nearly always sick; he did not sleep alone; he slept with Mrs. Blythe; witness often took breakfast to him while he was ill in bed and saw her there; Mr. Eggleton used to visit there; Mr. Gutierrez used to be there; he was working for Mr. Blythe; Mr. Cherry also; Carrie Moss (now Mrs. Cherry) also came there; also Mrs. Gutierrez; witness had plenty of work to do; slept on the top floor at 6 O'Farrell street; at 27 Geary street were all on one floor; prepared three meals a day; sometimes extra meals; at the table the "boss," Mr. Blythe, and his wife sat at table, very much the same way of life as at 6 O'Farrell street; Mr. Blythe used to spend his evenings at home with his wife; witness slept there at night but was out sometimes in the evening, and he would return at 10 o'clock; when Mr. Blythe would leave in the morning he would kiss her, and when he came in he would also kiss her and call her "my dear" and "my darling"; witness was present when Mr. Blythe died; Mrs. Blythe was very sorry; she cried terribly all the time; went to work for Mr. Blythe in May, 1882; saw Mrs. Blythe there, but Mr. Blythe was then sick and was sick for some time after; everybody that called there addressed her as "Mrs. Blythe"—Mr. Jeffers so called her, as did Mr. Andrade, Mr. Gutierrez, Mr. Varney, and everyone else who visited the house; when Mr. Blythe would leave home in the morning he would embrace and kiss the lady and say, "Good-by, my dear wife," and she would say, "Good-by, my dear husband." Mr. Blythe would come home

every day to every meal; no one told the witness what to say on the witness-stand; after Mr. Blythe died she cried "terrible"; she cried all the time; when the old man with red cheeks and white hair (the late public administrator, Philip A. Roach) came the next day she was crying; she was crying all the time.

Nathan J. Hyman, jeweler, of 307 Kearny street, fourteen years in that store, knew the defendant nine or ten years by the name of Mrs. Blythe; she had cash transactions with him; first transaction between nine and ten years ago; obtained her name from herself; did not enter the same in any book.

Louisa Sanchez, born in 1838 at the Presidio, knows Mrs. Gutierrez and Juan F. Bernal, nephew of witness; met the lady defendant, Mrs. Blythe, before the death of Mr. Blythe, who was introduced to her by Mrs. Gutierrez; have not seen her frequently since; Mrs. Gutierrez and her nephew, Bernal, and two or three others were present; the words were simply, "I introduce you to Mrs. Blythe"; this was in Mrs. Gutierrez's house on Geary street, between Dupont and Kearny, and in no other house. This witness was examined through an interpreter.

Morris Raphael, jeweler at 128 Kearny street, knew Thomas Blythe. Was introduced to the defendant at 333 Kearny street, at jewelry store of Henry Myers, where witness was then engaged, in the fall of 1882, as "Mrs. Blythe," and knew her by no other name since; she dealt at the store many times; witness was not introduced by Mr. Meyers, but after she left witness asked Mr. Myers her name, and he told him her name was "Mrs. Blythe"; when she came in afterward witness addressed her by that name always; Henry Myers was the son in law of witness.

Guillermo Andrade knew Mr. Blythe from 1876; interested with him in enterprises in Mexican lands; began to have an office with him in 1878, and so continued until the time of his death; saw him frequently while witness was in town, and for a time lived with him at his house; first went to his house at 6 O'Farrell street in 1878 or 1879—first in 1878—and lived there in 1882 about three months, more or less; in 1882 witness called at his house at his special instance and request, and Blythe desired him to take up his

abode there, because they were in business together and occupied an office together, and it was more convenient to live at his home; witness first met the lady claiming to be the widow in 1878, in the office of Blythe, 724½ Market street; saw her there several times before witness became acquainted with her; was introduced to her by Mr. Blythe in his private office; he said, ''I present to you Miss Dickason, a fine artist''; at the same time he requested her to show to witness some of her pictures in her studio in the same house, 724½ Market street, it was opposite Blythe's office on the second floor. The studio consisted of two rooms; went there with the lady and Mr. Blythe; were there five or six minutes. Witness believes he next saw her at 6 O'Farrell street; never knew that she had any other name than the one Blythe introduced her to him by; heard him call her ''Alice,'' and sometimes ''dear Alice,'' and sometimes ''my child''; once heard him introduce her to Mr. Pomroy, an attorney of Tucson, A. T., as his niece. This introduction took place by Mr. Blythe saying to Mr. Pomroy, ''This is Miss Dickason, my niece''; don't recollect whether it was at 6 O'Farrell street or 27 Geary street. Witness had much correspondence with Mr. Blythe; Wright Exhibit 78, dated March 6, 1883, from Guaymas, Mexico, was written by witness to Mr. Blythe; also Wright Exhibit 63; did not see Blythe subsequent to the writing of those letters; never heard him say that he was or was not married.

Asa Fiske testified to nothing of material import.

Frank Garrissere—married twelve years; in 1882-83 was in business at 113 Dupont street; ladies' hairdresser; knew the late Thomas H. Blythe; knew the defendant, Alice Edith Blythe, about fifteen years; worked for her since 1875 or 1876; first when witness was at 40 Geary street, in 1874 or 1875; first worked for her when she sent for him to shampoo her hair, and witness went over to her house above the barroom on Geary street and saw her there, and also Mr. Blythe; she sent witness a note to come and dress her hair and the note was signed ''Mrs. Blythe''; she sent at different times as many as four or five notes all signed in the same way; this was after the marriage of witness; witness remembers the time of Mr. Blythe's death; cannot tell the exact year;

he must be dead about seven years; the lady is Mrs. Blythe, the defendant present in the courtroom; it took about an hour or an hour and a half to shampoo her hair; witness does not remember anything that was said on any of these occasions; knew her by the name of Mrs. Blythe and never by any other name; the house was at 27 Geary street, over Radovich's saloon; witness is positive it was there in 1875 or 1876 and Mr. Blythe was there all the time, walking up and down and making some remarks on the style of dressing the hair; witness dressed her hair before and since many times, and has dressed her hair since his death at 27 Geary street, and went there in response to notes signed by her as "Mrs. Blythe"; witness has not dressed her hair in some time; the first time he dressed her hair was at 27 Geary street; the last time before Blythe died was about one month; witness kept no books and made out no bills.

W. S. Halpruner, chiropodist and orthopedist, 850 Market street, saw Mrs. Blythe at 27 Geary street; when there to fix her feet; went upstairs and entering the rooms saw her sitting on Mr. Blythe's knee, and witness said, "I am the gentleman who fixes the feet," and witness wanted to know who was his patient, and Mr. Blythe said it was this lady, "my wife," and he wanted witness to treat her nicely, and he would pay him reasonably, and he did so; paid the witness five dollars; witness was occupied about forty-five minutes; subsequently met Blythe on the street, opposite the Imperial Gallery, and witness asked him how were his wife's feet, and he said very well except one toe; it was about seven years ago (testimony given February 17, 1890), since witness treated the lady's feet, the latter part of January or the first part of February, 1883; witness remembers Mr. Blythe's appearance; he was perhaps fifty-five or sixty years old, about five feet eight inches in height; it was about 2 o'clock in the afternoon, on a week day; kept no entry of transaction; since 1882 only kept a cash-book; this little cash-book contains only the daily figures of his receipts, but no entries of separate items; when the witness met Mr. Blythe on the street he only asked him how was his wife's feet, and he said very well except one toe.

Ferdinand Falck, druggist, testified to nothing material.

Jeremiah F. Sullivan, painter, 510 Market street, knew Thomas H. Blythe; remembers when the "City of Paris" was built, was estimating on the painting of that building and called at the office, 724½ Market street, and the lady defendant was there, and witness said if he was engaged he would call again; he said "No," and told the witness to sit down; witness said he would just as lief call again, but he said "No," to remain, that this was "Mrs. Blythe," his wife, and it was the same lady who is here defendant, Alice Edith Blythe; this was in January or February, 1882.

William Hollis, real estate, 224 Montgomery, knew Thomas H. Blythe a great many years; remembers the time of the trouble with Nellie Firmin; remembers first seeing the defendant, Mrs. Blythe, about ten years ago; witness was on Market street, near the photograph gallery, and was talking to Blythe when she passed and smiled, and witness made some joking remark to Blythe about his being a great favorite with the ladies, and he said that was his wife; was only a casual acquaintance of Blythe's; he said either that the lady was his wife or "Mrs. Blythe," cannot remember which, but it left the impression on the mind of witness that she was his wife; cannot give the exact words.

Rebecca Kelly's evidence is of no consequence.

David A. Nolan, waiter in Jo Giusti's restaurant, in California Market, knew Mr. Cox, now deceased, who was a poultry dealer in the market; witness knew the defendant, Alice Edith Blythe, for twenty or twenty-two years, first knew her as Miss Dickason when she used to come to the old New York Bakery, 628 Kearny street, with her mother; then she was a girl about twelve or thirteen years old. Next saw her in the California Market, when Mr. Cox introduced witness to her as "Mrs. Blythe," about ten years ago; Cox said at the same time that he was going to her husband's ranch in Mexico; when Mr. Cox introduced witness to her it was in the restaurant; he came in and sat at the table, and said, "Mr. Nolan, this is Mrs. Blythe"; do not remember what else was said at that time; she was in the restaurant when Cox came in; she had already told witness she was a married woman, but did not mention her name, and witness did not inquire.

Stephen Vincent Elliott, employed by O'Brien & Spotorno, poultry dealers in the California Market, formerly with Chas. Cox in the same place, knew the defendant, Mrs. Blythe; she was a customer; witness often delivered poultry there, dead and alive, to Mrs. Blythe at 27 Geary street, in 1881; the packages were directed to "Mrs. Blythe"; Mr. Blythe was there at one time, and he expressed himself pleased with some live poultry witness took there; and witness put them at his request on the roof; she used to call about every day at the market and leave orders and make purchases; Mr. Cox died November 16, 1889.

Mrs. Margaret Hamilton, formerly the wife of Hugh Elias, knew Mr. Blythe very well, and saw the defendant first in what she would call Mr. Elias' office, in the Blythe block, 724½ Market street; witness went to the office for some coloring matter to finish some maps that Mr. Elias was drawing, and there met Mrs. Blythe, and the defendant was present, and he said, "Mrs. Elias, allow me to introduce you to Mrs. Blythe"; the witness has ever since known her by that name; she was always spoken of by Mrs. Elias and witness in her presence as Mrs. Blythe; Mr. Blythe called quite often to the house of witness, 326 Ellis street, when her husband was in the Colorado river colony, and frequently said to her that he was going to take them down there to settle—that is, Mr. Elias, witness, her babies, and his wife; Mr. Blythe never spoke to witness about the girl Florence; have strong doubts about the girl being his child.

The testimony of the Tidds may be passed without remark.

Mrs. Maria Antonia Peralta knew a person named Thomas H. Blythe; knew the defendant, Alice Edith Blythe, for about five years; first saw her at the house of Mrs. Eloisa Gutierrez on Geary street, between Kearny and a narrow street; don't know the places well; there were present this lady and Mrs. Gutierrez, the witness, and a gentleman who came with the lady, an elderly gentleman, to whom she introduced witness as "Mr. Blythe"; the witness was introduced to this lady by Mrs. Gutierrez by the same name as the gentleman, "Mrs. Blythe"; she said, "I introduce to you a friend of mine, Mrs. Blythe"; Mr. Blythe was present at the time; witness never saw them together after that time,

because he died; witness knew this of her own knowledge, because Mrs. Eloisa Gutierrez had prepared a dinner for both of them—a Spanish dinner; witness assisted in its preparation; the gentleman was a large, tall, thick man; he may have been taller than the lady; he must have been taller; witness does not recollect whether he had beard, mustache or goatee, or whether he had a smooth face; did not pay much attention, for witness went away almost immediately; witness does not remember whether the name was "Blythe" or "Beach"; after a pause witness said she now remembered that it was "Blythe"; witness is aunt of Juan F. Bernal; he was at her house the night before she testified and told her she would be wanted in court to testify to what she knew; the introduction took place about five years ago (witness was examined February 19, 1890); the introductory ceremony was in English; witness does not speak or understand English; the introduction was in English, she understood, because it was not so difficult; can understand a very few words. Witness being shown a photograph of the decedent (Alice Edith Blythe's Exhibit R3), she says that from the appearance of the body she thinks that is the same person, but cannot say as to the features. This witness was examined through an interpreter.

L. Oesterreicher, real estate dealer of 503 California street, knew the lady defendant, Mrs. Alice Edith Blythe; first met her in 1878; was introduced to her by an old gentleman, Joe Harris, at a house on the southeast corner of Geary and Dupont streets, a two-story frame house, where the "City of Paris" block now stands; was introduced to her as "Mrs. Blythe"; have never known her by any other name since that time in 1878; have not spoken to her since that time; she spoke to witness on the morning of the day he was testifying (February 19, 1890), about the circumstances of the introduction and the proposed purchase of property, and then he remembered, but he had not thought of it since 1878 until she refreshed his recollection.

Joseph H. Hammond, a tailor, made clothes for the decedent, Blythe; the last was in 1881; he always wore dark green, but the last suit was a shade lighter and it did not please him; he introduced witness to the lady defendant,

who was painting in a room, and said, "This is my wife, and whatever she is satisfied with will suit me"; he said, "Mr. Hammond, this is my wife, and she will pick out the goods, and whatever she selects I will be satisfied"; witness says he is hard of hearing; has been deaf for twenty years; can hear on the street or in a street-car, but not so well in a room; the introduction took place in a room in the fall of 1881, upstairs on Market street, next a photograph gallery, about opposite Third street; witness can hear sometimes better than at other times; witness says that when a person speaks to him in a room he must be close to him; when the introduction was made they were all very close together; the room was small; the lady was sitting down painting.

C. T. Medovich had a coffee saloon on Floral Grove (Brooks street); Mr. Blythe used to come in sometimes to order a cup of coffee to be sent up to Mrs. Blythe; witness has always known her by that name; was in business there about four years when he sold out to his partner.

Jacob Ward Smith, deponent of New York, formerly a resident of San Francisco, was introduced to Blythe in 1877 and subsequently became very well acquainted with him; used to dine with him, drink with him, smoke with him and sit with him in his office; in 1881, as near as deponent can recollect, does not remember the month, was invited by Blythe to dine with him at the corner of O'Farrell and Dupont streets, top floor; at the dinner deponent was introduced to a woman by Mr. Blythe; this was the first time witness met her; when witness went into the room Blythe presented him to the lady as Mrs. Blythe; he said, "This is my wife, Major Smith"; he said to her, "This is the gentleman who has come to talk with me about the railroad matters in Arizona and Mexico"; it was about 6 o'clock in the afternoon when witness went there, and he remained there until nine o'clock that night; there was no one there but Blythe, the lady, the Chinese cook, and witness; afterward Blythe removed to Geary street; witness' rooms were in 22 Geary street, opposite; was often invited by Blythe to go to his rooms upstairs, where he was living with this woman, Mrs. Blythe; they talked about railroad matters and about women; talked about his girl; Blythe told him that when the railroad

was built he was going to leave San Francisco and go down there and settle for life, take his wife with him, his dogs and all his pets; witness met Mrs. Blythe again, in 1881, can't give the month; made arrangements with Blythe in her presence at that meeting for Dr. De Groot to write a prospectus of Blythe's land and their railroad, Blythe to pay for same; at that meeting on Geary street sat with Blythe and his wife until 11 o'clock, talking and drinking and smoking; left at about 11 o'clock; the next morning after that, living opposite to Blythe, Mrs. Blythe sent the Chinese cook over to witness and told him that Blythe had taken a bath and was very sick; witness did not go over, from the fact that he was himself sick, for he had fallen down with paralysis on the street the night before, paralysis of his right side, and witness could not leave his room nor talk; all the recollection witness has of being introduced to her or of any talks is as stated; it all occurred in 1881; witness always knew her as Mrs. Blythe and always called her so; having a room directly opposite, witness used to see them sitting together at the window, every night, talking; often exchanged bows with them across the street; he called her "Pet," or "My dear"; witness often talked with Blythe at his office about railroads, lands and *his woman,* but don't remember exactly now; witness says his mind is not in a condition just now (at the time of taking deposition) to remember the exact language of the interviews; witness knew her before Blythe introduced her as his wife as "Mrs. Dickason"; Blythe told witness that he had not a relative living; that he was going to take his wife and go down to the Colorado, Lower California, and settle; raise sugar, cotton, etc.; this was in 1881, in San Francisco, in his office; witness' relations with him were very intimate and confiding; witness had known her before as Mrs. Dickason, but at that time she was introduced for the first time as "Mrs. Blythe"; met her after Blythe died in front of her door once in presence of C. P. Duane.

Hugh Elias, now of the town of Gold Hill, Storey county, in the state of Nevada, aged fifty-one years and upward, by present occupation a mining engineer, first met Thomas H. Blythe in the month of December, 1879; knew the lady desig-

nated Alice Edith Blythe during the lifetime of Mr. Blythe; had seen her since first he went to Mr. Blythe's office, passing in and out almost daily from Mr. Blythe's private office; she had also a suite of rooms on the same floor opposite Mr. Blythe's office, which at that time she used as a studio, being a very good artist in oil-color painting; about a month after witness had taken up his quarters in Mr. Blythe's office he said to witness one day, "Come across, I want to introduce you to a lady friend of mine, who, I think, will astonish you on art matters"; they were just then talking on that subject; there was another lady in the room; witness was somewhat embarrassed, and does not remember by what formality they were introduced; had several conversations afterward respecting the lady in question; remembered one rather long conversation in particular, it took place in Mr. Blythe's office; they were conversing principally on matters transcendental, destiny, affinity, etc., when he informed witness that he had certainly discovered his affinity in the person of Mrs. Alice Edith Blythe, the exact term by which he designated her at that time witness has quite forgotten; the affinity consisted of her being the right height, the right weight, the right complexion and the right temperament, giving his standards of each; on several occasions he praised her household management and expressed his admiration of her talents generally; prior to Mr. Blythe's death witness knew her as Miss Dickason, Mrs. Blythe and other names; saw them together at their home on several occasions, the conversations being generally on ordinary subjects as a rule; witness dined with them at times; she always presided, as in any household; witness met her very frequently on the street, at times in the office; often at their home; conversed on such occasions, always very friendly; addressed her sometimes by one name and sometimes by the other; in conversations with Mr. Blythe he usually referred to her as Alice, whilst witness generally called her Miss Dickason; in all conversations respecting his future home in Mexico, whenever the question of household arrangements was the immediate topic, it was distinctly mentioned that Mrs. Alice Edith Blythe was to be the head of such household; witness and family came next; Thomas Dunn was to continue keeper of the hounds;

Varney was too old; some others were mentioned as available whose names witness had forgotten; had a conversation with him in 27 Geary street, in presence of the defendant Alice Edith Blythe in the early part of February, 1883; witness was in the office arranging the terms for selling one-half of the Market street block, also the sale of the Blue Jacket mine; the conversation came about by his first informing witness that he intended shortly to visit his Mexican property and fix upon a site for his future home, the prospective beauties of which he at once commenced to descant upon; he reiterated that Mrs. Blythe, the witness and family were to go with him and remain during the term of their natural lives, there being land enough to enrich them all; such was the substance of the interview as nearly as the witness remembered it; witness remembered further at this interview the matter of providing Mrs. Blythe with palfreys and riding stock came up, as witness did not previously know that she was an equestrienne; this interview took place in Mr. Blythe's office, as nearly as witness could recollect.

Meyer Berkowitz was in business at 15 Dupont street, next to the Hammam Baths; knew Thomas H. Blythe since 1857 or 1858; knew the lady defendant as far back as 1875; Mr. Blythe brought her to his store and said she was his wife and to give her what she wanted; this was in 1881; subsequently she came in and bought a cloak; about a week before he died she came in and bought a short sacque; witness says his memory is bad, not good for dates or conversations; his memory has always been bad.

J. H. Stallard, physician and surgeon, went to 27 Geary street on the occasion of Mr. Blythe's death; found him lying on the floor in the lap of the defendant, Mrs. Blythe, and saw also Mr. and Mrs. Gutierrez; the defendant was greatly excited and awaited the result of his examination with anxiety; witness pronounced him dead; she was greatly shocked and surprised, in a highly nervous state; witness prescribed for her then, and the next day, also, she was in a highly hysterical condition, and witness again prescribed for her; the next day, i. e., the 5th of April, 1883, thirteen hours after death, Dr. W. F. McNutt and witness made a post-mortem examination and an autopsy; it was made at about

9 o'clock in the morning; it took about one hour or one hour and a half; it was very thorough; witness prepared a notice or paper for her at her request, and placed it on the door at the head of the stairs, that Mrs. Blythe being sick no one should be allowed to see her; witness attended her for about a week afterward, gave instructions that she should see no more persons than she was absolutely obliged to; witness remembered the fact of Mr. Blythe's funeral; witness attended her twice a day for several days; in about a week she had regained a fair amount of composure; the notice was put on the door on the 6th of April; witness had prescribed seclusion and absolute rest, and she complained that the intrusions of visitors had become intolerable, and asked witness to write the notice and put it up, and he did so, as he believed, on the morning of the 6th of April, 1883.

Elizabeth Ann Vigoureux saw Captain James M. McDonald twice at 1009½ Turk street; he was visiting the Perrys; he was a tall, stout man, with a full gray beard; witness has no personal acquaintance with him; she recognizes his picture as one of a group of supervisors affixed to the municipal Reports, 1887-88.

Herman Liebes, furrier, in his deposition, testifies that the decedent, Mr. Blythe, said in 1880, when he guaranteed the credit of defendant for a sealskin coat, "this lady is going to be one of these days my wife"; deponent furnished the coat on installments of $30 per month; the transaction was entered in the name of "Mrs. Dickason" (Villette); one sealskin dolman, $270; the bills were produced in connection with the deposition: "Miss Dickason, 6 O'Farrell street, October 21, 1881, in account with H. Liebes & Co., dealers in furs, 6 Montgomery street."

Counsel for the defendant in the opening argument said that they could not recover upon the weakness of their adversaries, but must rely upon the strength of their own cause, ànd in closing it was claimed that upon the testimony presented that they had proved that the defendant had become the wife of the decedent, Thomas H. Blythe, by an agreement followed by assumption of marital rights, duties and

obligations, under section 55 of the Civil Code of California.

### IS THE CLAIM OF ALICE EDITH BLYTHE SUSTAINED?

Is this claim sustained? Has the defendant, Alice Edith Blythe, maintained the claim set forth in her cross-complaint in this action? Is the story told by her consistent, in itself, consonant with her conduct from the commencement, and corroborated by the testimony produced in her behalf? And is it not met and overcome by the evidence in opposition to her claim? What is this case? Consent followed by assumption. Consent has always been of the essence of marriage, because assumption preceded by consent satisfies the statute. Form is of no consequence, it never has been a matter of moment, contends the counsel for this claimant. It would have been better, he admits, and happier for the defendant if she had insisted upon a ceremonial marriage, according to her own religious belief; but we are not dealing here with exalted standards, we are dealing with human nature as it is, with facts as they are, with the law as it exists, and, therefore, whatever our own elevated standard may be, we must concern ourselves solely with what is practical in this regard. Many things she did, concedes her counsel, which we cannot approve of as discreet or prudent; but that does not condemn her claim to the status of wife. That status is dependent mainly, for its establishment, upon her own evidence, and her counsel insists that her evidence is supported by all the facts and circumstances proved in the case. She was, he says, on the whole the best witness he ever saw on the stand; her answers were terse, comprehensive, responsive and complete; when she got through she stopped and waited for the next question. There are no discrepancies, asserts counsel, in matters of substance in her evidence; and he further says as to the reasons why she did not take up her abode in No. 6 O'Farrell street until April, 1880, that the substance of the fact is precisely as she stated it, whatever may be the immaterial variations in matters of form. Does the court believe, asks counsel, that she was at No. 6 O'Farrell street between May 19, 1878, and April, 1880? Does the court believe that from fear of annoyance

from her former husband she did not care to have her status known? Or that the Nellie Firmin troubles caused a temporary veiling by Blythe of the true relations between him and defendant, for it was a "temporary veiling" rather than secrecy?

In answer to these questions the court, in considering the testimony of the defendant, Alice Edith Blythe, in reference to spending most of her time at 6 O'Farrell street prior to April or May, 1880, will have recourse to the official report of her evidence. Her testimony shows that she did not go there to live until April or May, 1880, as appears by the following references: The colored girl was hired for Mr. Blythe in 1878, and kept house for him until and including April, 1880, as shown by the testimony. The name of the girl so employed was Mary Williams, and she was known by that name until she married a Mr. Stepney in June, 1879. At page 74 of volume 1, official reporter's transcript of the defendant's testimony, at the bottom of the page, she says that from May 19, 1878, down to October, 1878, she took about all her meals at 6 O'Farrell street; and on page 75 of the same volume she testifies that she took breakfast sometimes at her cottage, and states that the meals she took at No. 6 O'Farrell street were always taken with Mr. Blythe, and that he had a colored woman at that time whose name was Mary Stepney, who was the cook and housekeeper and waited on the table and attended to the rooms. During this period the colored woman's name was Mary Williams. The defendant could not have known her as Mary Stepney previous to June, 1879; and when the defendant went to live at No. 6 O'Farrell street, in April or May, 1880, the same colored woman was there and her name was then Mary Stepney. The defendant's testimony on the same page shows that while she was at the cottage and going so frequently to No. 6 O'Farrell street, she did not see any person and does not remember of meeting any person there during that period, from May to October, 1878, although she says that during this period she slept at No. 6, and in the room of Mr. Blythe. In her testimony, page 53 of volume 1 of the same transcript, it appears that she was familiar with the cottage, No. 28 Dupont street, before she saw Mr. Blythe

in reference thereto.  She knew a lady that had lived there, a Mrs. Heims.  She states that she frequently met Mr. Blythe there on that business in the evening, in his parlor, where he was sitting waiting for her; but she met no one else with Mr. Blythe during that time, and the conversations were mostly about the cottage.  In her testimony at the top of page 55 of the same transcript she says she moved into the cottage about the 17th of May, 1878; on this page she further states that during the time before the marriage ceremony she was with Mr. Blythe very often and that she took a great many steps back and forth not only to his rooms but to his office; she was at No. 6 O'Farrell street about every day; she would go out and purchase things and come back and tell him what she had purchased, and was at the house about every day or at the little cottage, back and forth, but did not move really in there until about the 17th.  She was in No. 6 O'Farrell street and to lunch and dinner, and when not there she would be in his office; pretty much everything she purchased she consulted him about, and she says of course that made her take a great many trips back and forth, not only to his rooms but to his office.  At the bottom of page 76 of the same transcript she was asked the following question: ''Q.  When you left that cottage in October, 1878, as you have stated, to what place did you go?'' and on page 77 this is her reply, as follows: ''A.  I went to No. 7 Mason street.''  In her testimony at the top of page 78 she states that she roomed at No. 7 Mason street until February, 1879.  On the same page she also states that she slept most of the time at No. 6 O'Farrell street in Mr. Blythe's room.  Then she was asked: ''Q.  Did you sleep at all at No. 7 Mason street?'' and she replied: ''A.  Yes, sir, sometimes I would remain there if I was not feeling well and remain at *home*.''  ''Q.  Did Mr. Blythe ever come there?''  ''A.  No, sir.''

### IS THE STORY OF THE MARRIAGE PROBABLE?

It is quite evident from this testimony that the defendant considered No. 7 Mason street her home, although sleeping at No. 6 O'Farrell street.  It seems strange that she should

have called No. 7 Mason street her *home* unless such was really the fact. She also says that Mr. Blythe never went to No. 7 Mason street. Had he been married to her he certainly should have called there, and the story of their being then married seems improbable. During this time, as shown in her testimony, page 79 of the same transcript, she was getting unsatisfactory food at No. 7 Mason street. It might be asked, what difference did that make if she took most of her meals at No. 6 O'Farrell street? It appears that Mrs. Fagan, her landlady at No. 7 Mason street, visited Mr. Blythe at his office (as Mr. Blythe told defendant) and said to him that defendant's health was quite poor, and that he had better send her up better food than she, Mrs. Fagan, was supplying her for breakfast and lunch, and also some wines and ale.

At page 86 of the same volume she states that all she did at No. 6 O'Farrell street was to look after Mr. Blythe's linen and clothes. Her counsel then asked her this question: "Q. While you were living at No. 7 Mason street and going to No. 6 O'Farrell street, did many persons come to No. 6? A. During that time I do not remember meeting anyone but Mr. Blythe."

In her testimony at the bottom of page 86, she states that at one time she was stopping at Hayes Valley; and at the top of page 88 she testified she moved from 7 Mason street in February, 1879, and went to live at 433 Hayes street. She never saw Blythe at 433 Hayes street (see page 90 of her testimony). The defendant left 433 Hayes street in June, 1879 (see page 94). She was asked the following question (see page 93): "Q. Now, while you were living at 433 Hayes street, beyond Miss Firmin, did you see any other person except Mr. Blythe and this colored woman at No. 6 O'Farrell street that you can remember? A. I cannot remember of anyone at present."

At page 94 of the same volume it appears that the defendant left Hayes street and went to the Sisters on Rincon Hill. She took the furniture she had at 433 Hayes street and fitted up a room for a colored servant, and she took the balance to 724½ Market street and furnished the studio, room 15.

She was then asked this question, at the bottom of page 95: "Q. How long did you stop or occupy those rooms at Sister Mary's; how long did you stay at Rincon Hill? A. I think until October or November of 1879."

It will be remembered that in November, 1879, Blythe obtained a release from Nellie Firmin, and it might be suggested that if the defendant was married to Mr. Blythe that she would *then* have gone to live with him at No. 6 O'Farrell street.

The defendant was asked the following question by Mr. Highton, at page 98: "Q. Where did you remove to from Rincon Hill? A. My mother came up in November, 1879; I went with her to Jones street. Q. To whose house? A. To Mrs. Herson's. Q. Who? A. Mrs. Herson's, formerly Mary Markley." (This is Mrs. Clara P. Ford.)

At page 98 of her testimony the defendant was asked whom she saw during this time, and the only persons she saw were some people around the office; that was in the fall of 1879; after she went to her studio, in June, 1879, at 724½ Market street, and she says, "I saw a great many people coming and going about his office."

She remembers Mr. De la Montanya, a clerk of Mr. Blythe's, and Mr. Dain, thereabouts, or soon after that time, and sometime afterward Mr. Elias.

It appears that her mother came up in November, 1879, and the defendant and her mother went to Jones street to live, to 305 Jones street (page 99).

If Mr. Blythe had desired the association and company of the defendant, as stated by her on page 100 of the same volume, it might be asked why she did not take her mother to Mr. Blythe's house instead of keeping from her mother the fact of her marriage, for at this time Mr. Blythe kept roomers at No. 6 O'Farrell street.

At page 101 of her testimony it appears that the defendant was living on Jones street, and considered it her home. This would be a portion of November, the whole of December, 1879, and a portion of January, 1880. It seems, as shown on page 102 of the same volume, that defendant's mother left Jones street first. Now for the first time, as shown on the same page, she speaks of meeting Mr. Andrade

while at 6 O'Farrell street, but is not sure about it or the date. It seems to her that about that time, she says, she saw Mr. Andrade and a number of Mexican gentlemen whose names she has now forgotten. She thinks one was Consul Pritchard. During this time her mother did not know anything about her relations with Mr. Blythe. One page 103 of her testimony in the same volume it appears that she removed from Jones street to 724½ Market street and occupied three rooms, 15, 16, and 17; this was in 1880; she had three rooms there for a studio, and she furnished two rooms at 11 Geary street. At page 104 of the same volume she states that she occupied the rooms at 724½ Market street until the beginning of April, 1880. It might be claimed that the only occupancy of those rooms was that of a studio, but as she kept one of those rooms as a studio up to the time of Mr. Blythe's death, it would seem that the occupation she referred to was that of living there. That is to say, according to her own evidence, she did not go away from 724½ Market street until April, 1880, for in that testimony she says, in speaking of Mr. Blythe: "He told me to make myself comfortable there for a few months; by that time he thought he would have all his affairs fixed in such a way with this Miss Firmin that it would be possible for me then to permanently reside at 6 O'Farrell street." Now, this statement is certainly inaccurate; for during the month of November, 1879, previous to the time of which she speaks, Mr. Blythe had fully fixed and disposed of all matters with Nellie Firmin, as is shown by the release on file and in evidence in this case. (Wright Exhibit 89A.) At page 105 of her testimony, it further appears that she left 724½ Market street about the 1st of April, 1880, and went to No. 6 O'Farrell street permanently. Before doing so she had a conversation with Mr. Blythe about her removal. The conversation took place at No. 6; he simply told her he wished her to get rid of her furniture and come over there to No. 6, permanently. He said that it was absolutely necessary that she should go over and take complete charge of the house, as he was troubled with the servants, and that the time had come when it was necessary for her to go.

The witness, speaking of the next person whom she met at O'Farrell street (page 110 of her testimony), says it was Mr. Gershom P. Jessup, and this was soon after April, 1880, or may have been in May or June, 1880.

From this time on the witness mentions various persons by name seen by her at No. 6 O'Farrell street, but prior to that time only mentioned Mr. Andrade, and of that she was not sure.

### THE WRITTEN EVIDENCE AS TO THE CLAIM OF ALICE EDITH BLYTHE.

Written evidence is of the highest dignity, and is to be considered of greatly more consequence than oral; and in this case this legal truism is particularly impressive in connection with the writings produced in relation to the defendant's claim of wifehood.

There is in this case a collection of writings which negative her allegation; among others her letters to Mr. Blythe while he was in Mexico; these letters are of vital import as affecting her claim to the title of the wife of Thomas H. Blythe. The counsel for defendant says that these writings constitute the strongest argument in favor of the opposition of this claim, but to his mind they constitute a strong argument in favor of the assumption of marital rights, duties and obligations; but even, he continues, if they could be tortured into evidence against her, they could not change the status assumed on May 19, 1878. Are such letters, queries counsel, to overcome the evidence of defendant herself, of sixty-four (64) witnesses, and of the fact of the consent-marriage itself, and of Blythe's own declarations? One declaration that he was married, asserts counsel, is worth a hundred that he was not married. This assertion of counsel depends for its validity on the quality of the evidence that sustains the claim that Blythe made any declaration or admission.

Let us now consider the letters, pertinent excerpts from which are here given. There is one point not controverted, that Blythe left for Mexico on his first trip on the fifth day of November, 1882. On Tuesday night, November 7th, 1882, she wrote a letter to Thomas H. Blythe (Wright's Exhibit 44), as follows:

"San Francisco, Tuesday Night, 8 P. M.,
November 7, 1882.

"Dear Uncle: I am going to write you without knowing what about. The block is all right and everything quiet. Mr. Varney seems to be busy. He has nothing to tell me to write you except 'everything is lovely.' Mr. Andrade called to see me this afternoon. I looked so fierce and dusty (for Louis and I have been raising things already) that he did not remain long; his call was short and pleasant. I thought I would be nervous and lonesome, but strange to say I am neither. I have not felt afraid. I have such perfect faith in Grant; he is worth his weight in gold. I am now so glad I did not bother with any strange old woman; I want nothing better than Grant. Monday I set Louis to washing. I made out a list of intentions for myself. I put on my hat and vowed I would not come home until every item was carried out; strange to say I have executed everything I intended to do. Louis has got through nearly all the washing, and to-day I put down a nice liner on the stairs to save the stair carpet; I continued it straight along to the bathroom, for that hall is used the most, and the hall leading to the kitchen, on that I put the old stair carpet. To-day I bought my dress, and gave it out to be made; I was not very anxious for a new dress, but I was afraid my money would evaporate. The dress is all lady cloth, all wool and black; you will like it. I told Mr. Varney yesterday to tell Mr. Jeffers of your instructions respecting the supplies for Mr. Irish's lumber, etc. Mr. Varney told me to-day that he done so. Oh, the cats. They miss you so much. Bob wails in such a doleful way. He makes me annoyed. I have been too busy to miss you much, but the cats keep busy looking for you."

This letter is unsigned.

On November 8, 1882, the defendant also wrote to Mr. Blythe (Wright's Exhibit No. 45), and in this letter she signs herself, "I remain devotedly your niece, Alice." On the Friday following the departure of Mr. Blythe the defendant wrote to Mr. Blythe (Wright's Exhibit No. 23A), as follows: "Dear Uncle: I hope this letter will find you much improved in health. I have wished every day that I could know whether you were better or not, but better I feel

sure you are. Everyone is very kind to me. Your friends have all called in succession and proffered their services. I feel honored by their kind attention and rest assured *I shall comport myself with the dignity that should belong to the niece of yours.*" She closes this letter, "I remain affectionately your niece, Alice."

On November 13, 1882 (Wright Exhibit 41a), she writes to Mr. Blythe as follows:

"San Francisco, Monday, 7:30 P. M., November 13th.

"Dear Uncle: Last night was my evening to write (that is, if I am to write every other evening), but I had tired my eyes reading through the afternoon, for Sunday is rather a slow day to get through with, so I did not feel like writing, and then I had nothing new to tell you. Mr. Varney has just left Grant with me. I asked him the usual question, he reports that everything is all right about the block, and that you have nothing to worry about, only get well; that is all you have to do; the family are well; Squint has never lost his appetite, but I have. I begin to miss you about dinner time.

"I have worked hard to-day. Louis washed, I put the curtains up to-day and did various other things. Mr. Andrade called. My eyes are not strong to-night, so I will cease writing, I have nothing new to tell you. I am contented.

"Hoping this will find you improved and find you happy, I remain devotedly your niece,                ALICE."

The next day she adds a postscript to the above and signs herself Alice.

The defendant again wrote to Mr. Blythe November 16th (Wright's Exhibit 67), and says:

"Dear Uncle: I wonder if you do not regret giving me the privilege to scribble to you. I know you want all business, and you are getting out of patience reading all this stuff; but bless you, I don't know of any business to write of. Mr. Varney promised me the first rainy day to let me have Mack to carry out all your orders about shelves."

She closes this: "From your devoted niece, Alice."

She again wrote to Mr. Blythe November 19, 1882 (Wright Exhibit 68), as follows:

"Dear Uncle: As for myself, I hardly know what is the matter with me, but I have not been feeling over well. I

have done all my work and spent all my money, and would go to work painting if I had five dollars to start in business with; but Mr. Varney is so stingy he will hardly give me any money. I will have to wait until Saturday, I suppose; he says he won't give me another cent until then because you said I had money enough to last a month. Varney is very hard on me. I thought I would have fun spending all your money while you were gone, but, alas! there is no show for me.           Devotedly yours,

                           "ALICE."

The defendant again wrote to Mr. Blythe on November 26th (Wright Exhibit 69) and in this she writes:

"Dear Uncle: Since the last writing Mr. Varney put up the shelves. Mr. Andrade called upon me, also Mr. Eggleton. They always beg me to remember them to you, and express wishes for the return of your health. Mr. Elias was also here. I gave him some claret. To-morrow I commence to paint, for all is done to the house that I can do at present. If I had money I could do more. I expended all of my $20 on myself. Good night,                ALICE."

The defendant also wrote to Mr. Blythe on December 1, 1882 (Wright Exhibit 70):

"Dear Uncle: I was made supremely happy this morning by the receipt of a letter from your own dear hand this morning. I have not expected a letter from you because you did not say you would write me. Alas, I feel used up again (pardon the expression). Monday I cleaned up the studio; saw Mr. Rashen in the afternoon; he gave me a head to copy. I painted on Tuesday, and got sick on Wednesday and Thursday. As for Mr. Varney, he always seems busy, and always about the block. Mr. Andrade calls every few days, and Mr. Eggleton also. Last Sunday Mr. Jeffers sent me some lovely flowers; yesterday he sent me a flowering shrub. If I receive much more attention from your friends, I fear I will become quite stuck up when you return. I have received a very nice letter from Mr. Irish this morning, but I hardly read it good I was so delighted with your letter; I wanted to kiss you so bad for being so good, but alas, I must wait.           Your niece,

                           "ALICE."

On December 4th the defendant again wrote Mr. Blythe (Wright Exhibits 71 and 72), and writes among other things as follows:

"Dear Uncle: I expected to be painting this morning, but I have had so many things to do before I could think of getting out of this house. Louis called me at 6:30, so I could get around. I presume you think we are very lazy, now that we do not have you to prod us up in the morning, but we are not. I am quite in business, patched up three pictures last week and have a credit at the Golden Rule Bazar of $1 for said pictures; this week two more came from the Bazar for me to fix. Night before last I had Mr. Varney go out with me a few blocks, for I had some business to attend to. He seemed afraid that you would object, but I assured him that you would not. I rarely see him for ten minutes at a time; he brings Grant but soon leaves, and I get provoked, because a lone woman likes some one to talk to. Thanksgiving evening Mr. Varney called and gallantly went to sleep in your big chair while I was saying a few words to him."

In this letter, referring to Mr. Irish, she says: "I don't know the address of Mr. Irish. I sent his letter the same as yours. He asked me if he could get that paint by the quantity." And the letter closes, "from your devoted niece, Alice."

The defendant again wrote to Mr. Blythe on December 7th (Wright Exhibit 73) and says:

"Dear Uncle: I suppose you must be tired of my letters, for I know they all sound alike. Mr. Varney has been fixing the roof all day, and looked very dirty and determined when I saw him this evening.

"From your devoted niece,

"ALICE."

#### ALICE EDITH BLYTHE'S CORRESPONDENCE.

The witness explains that she addressed Mr. Blythe as "dear uncle" because when he went away he told her to keep a journal of her daily occupation and to send an account of what was going on from day to day and to address him in

her letters as "dear uncle," because her letters might go astray and get into other hands, and she obeyed him. (See judge's manuscript notes, page 594, volume C.)

It is remarkable that Mr. Blythe, if he were her husband, never wrote a letter to this wife during his absence in Mexico, except one, which she has not produced and the address of which has not been proved; she says she did receive a letter from him, but as she cannot find it she thinks she must have destroyed it. This letter, if susceptible of proof, would have been of some importance either for or against her. Preceding the foregoing there is the letter of October 8, 1882, which the defendant wrote in Mr. Blythe's presence to George S. Irish (Plaintiff's Exhibit 228A). The defendant testifies that she wrote that letter to Mr. Irish, except the postscript, which is in Mr. Blythe's writing and the envelope in his hand; Mr. Blythe was sitting beside her when she wrote that, and dictated it to her, he was not in bed but his arm was sore, and he added the postscript next day in his office; it was on a Sunday evening when she wrote the letter; Mr. Irish had been introduced to her by Mr. Blythe as his niece. (See judge's manuscript notes, page 583, volume 6.)

In this letter she says she writes it at Mr. Blythe's request, and after writing about Mr. Blythe, his condition of health, business, etc., she continues by saying for him: "The new building and things are going as well as can be expected, and although Uncle feels indisposed for office work regularly until within the last few days. The 'City of Paris' moved into the new building three weeks ago. It is expected the interior of the building will be completed in three weeks and with all the trouble and drawbacks. Uncle is tolerably well satisfied with the building as a whole. Uncle is going to make every effort to arrange matters here with a view to leave for Lerdo within sixteen or eighteen days. Do not be alarmed, Uncle's health is excellent, never better except for his arm, which pains him so severely at night that it interferes with his sleep. I remain your friend, Alice E. Dickason."

To this she adds a postscript: "We are going to move this week to No. 27 Geary street. Uncle is fitting up the upper story for his own use. A. D."

THE IRISH LETTERS.

The following papers and letters were found in Mr. Blythe's possession which referred to the defendant as "Miss Dickason," and of the existence of which Mr. Blythe had actual notice and knowledge, and notwithstanding his knowledge did not contradict them:

Mr. Irish wrote to Mr. Blythe under date of July 26, 1882 (Plaintiff's Exhibit 441), in which he referred to the defendant, Alice Edith Blythe, in the following language:

"P. S. Kind regards to Miss Dickason."

Again Mr. Irish wrote to Thomas H. Blythe, under date of August 3, 1882 (Plaintiff's Exhibit 442), and referred to the defendant as follows:

"I left Colton last Sunday, and was surprised as well as pleased to find Mr. Andrade on the cars. We dashed into a regular business conversation at once, and though it was very hot on the desert time flew rapidly, and it was soon noon and I began looking for the eating station. Mr. A. said, 'why I have a basket here.' I at once suggested opening it; motion was carried, porter called, and table brought out, and we had a royal feast. I was very hungry and enjoyed it so much. We drank to your health and Miss Alice's, and said how little she thought when putting the lunch up who would help to eat it."

Mr. Irish also wrote Mr. Blythe under date of September 25, 1882 (Plaintiff's Exhibit 443), in which letter defendant is referred to in the following language:

"My health is indeed good, and I am feeling well and strong, and how glad I shall be when in due time we have finished the canal and brought 310 to a successful close, so I can go down with you to Mexico, for there I know we shall have a happy home, and in the evening after our daily work is over Miss Alice will cheer us up with some music, and little Flora with her pretty childish sayings."

Mr. Irish again wrote to Mr. Blythe under date of October 26, 1882 (Plaintiff's Exhibit 444), and in speaking of the defendant in this letter says:

"Kindly thank Miss Alice for writing and tell her never to hesitate, for at any time you feel tired or weary always to lend a helping hand, for I know she is willing."

In a postscript to the same letter Mr. Irish says:

"P. S. I hope you are nicely settled and comfortable in your new quarters. So glad things are running well; very encouraging. Best wishes to Miss Dickason and also to Mr. Jeffers when you see him."

### LETTERS FROM YBERRI AND ANDRADE.

There was also found in Mr. Blythe's possession a letter from W. Yberri, under date of February 27, 1883 (Wright Exhibit 70), which in the postscript refers to the defendant in the following language:

"I beg you to give my respects to Miss Dickinson. I am very much obliged to her kindness, notwithstanding I have been informed what a poor idea she has of my heart."

This letter the defendant, Alice Edith Blythe, admits was read to her and that she knows its contents, yet she never complained to Mr. Blythe nor anyone else that she was referred to as "Miss Dickason."

Under date of March 6, 1883 (Wright Exhibit), Mr. Andrade wrote to Mr. Blythe, and referred to the defendant, Alice Edith Blythe, in a postscript, in the following language:

"Unless Miss Deckenson change her ideas about me I will insist to expect her friendship with Mr. Yberri. He is already very mad and withers for days; he will be still worse. Your friend, Andrade."

In another letter, under date of March 30, 1883 (Wright Exhibit 63a), Mr. Andrade, writing to Mr. Blythe, mentions the defendant in the following language:

"Please tell Miss Dickerson I brought a little Indian Ceris dog to make her a present. He is not fierce, but very curious."

The defendant had knowledge of this letter and, on cross-examination, admits that it was shown her, and yet it appears she did not find fault that she was referred to by Mr. Andrade as "Miss Dickason."

In this connection may be considered the letter from defendant to J. C. Perry, San Francisco, May 7, 1883; envelope marked Plaintiff's Exhibit 208.

## PLAINTIFF'S EXHIBIT 208A.

San Francisco, May 7, 1883.

Dear Mr. Perry; I have intended to write you more fully and more often, but I have been quite prostrated and ill. I have had a very severe cold, so severe that I have had to keep in bed the most of the time. I have nothing new to communicate. I am·not well enough to give you an account in detail of what has been done thus far, so I have requested, or rather my lawyer read to me yesterday a very concise and clear letter he had written you, explaining to you fully and clearly everything that had occurred thus far; he will send you this letter which will explain everything much better than I can do, for my poor head is quite worn out. We expect, Mr. Perry, that you will come here with Florence, to her dear father's home, and we will send you the means to do so. I hope you will trust me fully and co-operate with us; if you do so it will be right. Nothing on earth can alter my position toward Florence. I love her because I loved her father; I will protect her, first, because I love her; second, because I have on my bended knees solemnly promised her father to do so. I have his wishes and his orders to fulfill. To me he is not dead, but with me. I am always acting under orders from him, and for that reason, Mr. Perry, I do so hope you will act with me and trust me. I want Florence with you and me and with her father, but not separated. I wish you to be so careful about giving any one power to act but ourselves, for we know what we are to dear Florence and to her beloved father; therefore, no one can, in reality, be nearer to her than we, and no one can better guard her or protect her interests than we. I so fear, through misjudgment on your part, you may fall into the hands of unprincipled and selfish people, who may even misrepresent me to you; but surely you will trust me before people you have never known, for I can never possibly have any selfish motives or interest; but others will have, for they wish and are determined to make something, and they will not proffer their false friendship for nothing; they will want money, and want it out of Florence's fortune; I can never be in that position, for I am not working to gain anything from Florence.

I love her; I am her true friend; I will work for her and protect her and help her to gain whatever is to be hers. I do it all for love of her and for love of her father. My aid and co-operation is hers; I expect nothing; I want nothing from her that is hers, unless it would be her trust and confidence. I will work for nothing, but you know others will not.

I have written you two letters; I have sent a small picture of myself; I also sent a cablegram to you, informing you of my dear husband's death. Again I allowed Elias to send you another cablegram for me. Mr. Elias was my husband's clerk at one time; he is very earnest in his wish to serve Florence and I, but he cannot be of much assistance, and I would advise you not to communicate with him, lest he might wish you to delegate some power to act for you, which would not be necessary. I have three lawyers and the most respectable element of the city to act with us and work for us; therefore you need not delegate power to any one outside of my lawyers and myself. You may trust the names of Alice Blythe (in receiving cablegrams and letters), of Henry Highton (one of the foremost lawyers of our city), of Judge Wheeler and Mr. Plunkett, but distrust the names of Maurice Estee and Hart and Tyler, and a man by the name of Jeffers or Jefress. These last four mentioned are hungry for money, so I think. I have reason to think so. I have reason to distrust them; especially do I distrust the sincerity of Mr. Jeffers. I will tell you why. At one time he assumed to be the dear friend of my husband, Mr. Blythe. After his death I discovered that his friendship beyond a doubt was really assumed and hypocritical. Little things tell a woman's heart who are really earnest and true. I had asked him to look after the flowers on my husband's casket, to see that they were taken care of, for I had an idea to preserve them for dear Florence; it is enough to say that he promised to do so but never did. To him Mr. Blythe was dead; his hypocritical friendship was at an end; he did not even care to look after the flowers on his bier, for I was too prostrated to look after anything, and he promised to do so. Other matters followed, other breaches of trust which truly opened my eyes to the true character of the man. I cannot enter into detail, but believe me, I know they are not to be trusted. If you ever

come here you will know what I tell you is true, you will see for yourself. They will proffer their friendship and services, and they will want to be paid. They will serve themselves, but not Florence. That I feel sure of. I can work for you and help you; the lawyers who serve me can serve you. Our interests are one. I don't want to be paid. I am Florence's stepmother and her friend, so trust me first.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

Anyway, I have the wreaths preserved for Florence. I only had the few preserved that were given by friends, not enemies or hypocritical friends. I have tried to keep the dogs together (and such a fight I've had for them. Some day I can tell you). I am so anxious that Florence should see "Grant and Alf and Fanny and Topsy." Thomas has Topsy, but Florence can see her, for she is near us. Then I have Florence's bird, for the bird I gave to Florence's papa. He told me he had written Florence that he would give the bird to her. In fact, I have kept everything together except some old-fashioned jewels Mr. Blythe had given me, saying some day I was to make earrings out of the turquoise studs for Florence, because she is light. He thought a pair of the turquoise studs would make up nice for Florence's ears. The administrator—temporary administrator—took them from me. I had just finished a large picture of Mr. Blythe when he died. I was going to try and send it to Florence, and he objected, saying it was too large to send away to England, so he told me to make a smaller one, and send it to Florence. I have many pictures of him. I keep many of them for Florence. I have Bob and Squint also. About Mr. Elias I cannot say anything I think. I believe he wishes to serve us, but I cannot see in what way. If you delegate any power to him you must pay him, and that is not necessary. I individually is all the aid you want, and my lawyers, you may implicitly trust Highton. He is the man. He also sent you a cablegram with my consent and approval. I received your reply, in which you stated your co-operation with us. That reply took a mountain of weight from my mind. I was so afraid some unprincipled parties or lawyers would get hold of Florence and you, really I could not sleep at night worrying about poor little Florence. After receiving your cable-

gram I felt so relieved. I have been sick under the strain of waiting for words from you. I only wanted to know that Florence was safe and with you, and hoping you would trust me, last night for the first time for weeks, I retired to soundly sleep until morning—that one good sleep has so restored me— the reason I'm able to write quite composed this morning. All I can see for you to do for the present is to co-operate with us completely, trust Alice and Highton, keep Florence strong and well. I've got a curious idea in my head about some one might steal her from you, so be so careful. It seems for the present I would keep her at home; she can study at home; and during the present state of affairs she is better close to your side. The means will be sent you to come here with you. Use your own judgment, but I would say come as comfortable as possible—have everything necessary. I wish I could get a letter soon, to know what you need. Let me know.

Don't let Florence out of your sight; keep by her.

Dear Mr. Perry: Please excuse this letter; I have written the latter part of it while suffering a headache, and amidst interruptions. I am also worried to death because you don't give me the right to protect Florence by answering my cablegram. I am so afraid some one might steal Florence from you. I worry, so keep her at home with you. Trust all cablegrams signed Alice E. Blythe and Henry Highton. Before my marriage my name was Alice Edith Dickason; after my marriage, Alice Edith Blythe; so trust me.

Dear Mr. Perry: I have this moment finished reading your reply to my first letter; also dear Florence's sweet and consoling letter. I received it while sitting here writing you. I can hardly see to finish this for weeping over Florence's letter; poor child, I pity her. My father died suddenly and hundreds of miles away from us in a wild and isolated place. My grief was great; I thought if I could only see his face once more, but to never look upon him again, to be deprived of even knowing his resting place, that almost killed me; poor Florence, none can know better than I her grief, for I have been through the same suffering. I have now before me a cablegram I am going to send you, telling you to come, and I will send you the means and advising you of a necessary

step to take. You will have it to-day, but not this letter for weeks. I wish to state this to you, Mr. Perry, I am Mr. Blythe's wife, I am Alice, the one he always speaks of in his letters to you. I married him in May, 1878. I think it was the third Sunday in May. I've lost my papers or notes of the day. I gave Mr. Jeffers my strong-box for safe keeping during my prostration; they burst open my box, broke the lock and notes that would be so important to me now were stolen from me by people, namely, I won't mention names here, but people who received our hospitality and called themselves Mr. Blythe's friends, so my notes and many proofs were stolen from me. I have been to him all these years a faithful, and God knows a loving wife. It was I Mr. Perry, who urged him (to in every way possible) to acknowledge Florence at the time of her baptism, I made him give her his name, he thought Florence Perry would be better for many reasons. The reasons I combated, and he gave her his name then, May 9th.

I have had so many interruptions that it has been difficult to finish this letter. I must now finish it hurriedly, so it will reach you about the same time that Mr. Highton's reaches you. I have done always, all. I could for Florence. Mr. Blythe (to some people) kept our marriage secret. I knew he had his own reasons for doing so, on account of some matters in England and on account of some matters here, he feared for his own bodily safety; also feared for mine. We were to go to Mexico to live there. We were to have Florence with us. Our marriage was no longer to be kept secret. I am not his niece, but I am his wife. You must trust me, for I am everything to Florence. I wish to do everything for her; I stand by the right; I· wish to see the right done. To-day, the 9th, I am much worried, for Mr. Highton and I sent you a cablegram you have not answered. I wished you to appoint me guardian or representative of Florence.

Dear Mr. Perry: I will send you some more clippings. My head aches so I cannot look the papers over. This makes the third letter I send; Mr. Highton's makes the fourth. I think I have sent and approved of five cablegrams to you. Trust to Henry Highton and to me. Give me authority to

*represent Florence's interests until you come.* Do as I advised in my cablegram to you sent the 7th of May, signed by myself and Mr. Highton. It gives us authority to protect her interest until you come, compromises no one, and helps us to protect her interests. Consult with your adviser. I am sure he will tell you it is the best course to pursue. Did you receive clipping in the paper where I asserted my wish to protect Florence? Send letters to Alice Blythe, 27 Geary street.

Mr. Perry: You can use your own discretion about explaining to Florence about her father.

I have had him embalmed; he looks as natural as in life I have been quite determined that if it is possible, Florence shall look upon the features of her noble and beloved father. The embalming promises to be quite perfect. You ask me the cause of my husband's death. The cause was determined and examined into the next day—by post-mortem examination, three eminent physicians presiding, I cannot explain as a physician would, so I will send you a report of the post-mortem examination. The aorta of the heart was diseased, some imperfection in its action.

THE FOREGOING LETTER A CONTRADICTION AND CONDEMNATION
OF THE CLAIM OF WIFEHOOD.

This letter is strongly and strangely at variance with the testimony of the defendant and with the allegations of her answer and cross-complaint in this action; as it is carefully read it seems to contain a contradiction and condemnation of her claim of wifehood.

Incidentally may be remarked the lack of unity in the recital in defendant's cross-complaint and her story in evidence of her first meeting with decedent and the subsequent proceedings down to and including the transaction of May 19, 1878.

There is no written declaration of decedent in any way countenancing the claim of the defendant to be his wife, but there is any quantity of written evidence that he did not regard her in any such light, including what has been hereinbefore quoted. The letters to the plaintiff, Florence, show

that he considered Alice Edith in another than a spousal relation; "your cousin Alice," is the expression he used in Plaintiff's Exhibit 60a, May 8, 1882, Plaintiff's Exhibit 62a, May 22, 1882, Plaintiff's Exhibit 64a, October 27, 1882, Plaintiff.'s Exhibit 65a, December 28, 1882, letter to Mr. Perry. These letters seem to show conclusively that the decedent regarded the defendant Alice Edith as niece, and not as a wife.

### WHAT THE LETTERS SEEM TO SHOW.

There are some letters appropriately inserted here, from the decedent, in San Francisco, to Andrade, in Mexico, respectively marked Plaintiff's Exhibits 281, 282, 283, in the following order:

### PLAINTIFF'S EXHIBIT 281.

San Francisco, Nov. 3, 1882.

My Dear Mr. Andrade: Your favor dated Guaymas, October 10, just received.

Real glad to hear is still on the improve, I hope you will give a wide berth, as far as you can, to the sections of the country where the cholera prevails, and that you will be able to make a quick conclusion to all your business in the City of Mexico and soon be in your full vigor and health on the banks of the Colorado river. Mr. Egleton drops in now and then to make enquiries about you. Egleton is a good old soul. The only party who called to see me about the Gulf business since my last letter was Captain Evensen. He brought with him a Dr. Tucker. Dr. Tucker, it appears owns a vessel and they seem prepared to go into the oyster business on their own account and wishing me to give them a guarantee to go and get a few loads upon paying to us the amount of royalty due the Government—one-half a dollar per ton. I said to them that they had better wait a month or two, until your return. There was no doubt but that they would get liberal terms from you. I said further, that I did not wish to take upon me the responsibility to enter into a contract and that it was you alone who was authorized by the Mexican company to make terms. I told them that most likely you would be back here early in the month of December. They appeared satisfied and will probably wait your

return. I have before me a telegram received last night from the Messrs. Ginocchio, stating that Mr. Bateman was at Yuma waiting for me. To-morrow, Nov. 4th, Mr. Reed and myself start for Yuma. The understanding with Mr. Reed is that I pay his expenses down there and that he will give me 10 or 14 days of his time to examine and go on the lands, and if it is decided to go to work then to make our final arrangement down there. However I shall try to postpone final arrangement until your return, or arrival in colony. I remember well the fervor of your expression when you said, some months ago, that it would be the happiest day in your life when you can say that the great struggle is over and hand me the titles for the long and hard contested issues in our land matters. After all the fight I hope you will be pleased to work with me in this grand enterprise and help me to carry it out to its full magnitude. The Gulf enterprise and the Colorado river enterprise are grand enough for one earth life to satisfy the most stupendous ambition. Let us let everything else go and give our whole soul to those two great schemes. I made no improvement in health until within the last 13 days. Now under the treatment of a rubbing doctor, I am slowly getting better and I trust to get well altogether down on the river. It is now late and I am tired. God bless you and hope to see you soon in perfect health. Miss Dickason thanks for your kind mention of her in your letter, and joins me in wishing you all success and an early return to your friends.

Ever yours,<br>THOMAS H. BLYTHE.

PLAINTIFF'S EXHIBIT 282.

San Francisco, March 30, 1883.

My Dear Mr. Andrade: I am anxiously waiting your next letter. As you directed, I send a certified copy of your contract with the railroad people to Mr. Gonzalez, also by request of Mr. Pomeroy. I sent him an official paper containing your first contract with the Government for building a railroad to Port Isabel. Just received a letter from Mr. Bateman, saying he feared he would not be able to build the levee agreed to be built when I left Lerdo. He said that the

Indians would not come over the river owing to another case of smallpox having broke out. Mr. Bateman is a good man, but too slow for Superintendent. In ten days from date I will be able to start for Guaymas. Let me know, either by letter or telegram, and I will start for Guaymas, and then we can go to Lerdo together. Have been quite short of money this month, but have deposited on account Mr. Yberri with Cabrera Roma one thousand dollars. Will write to Mr. Yberri and enclose the receipt for the same. I went down to the bank and saw Mr. Carmana. It was all straight, and I handed the instrument to Mr. Ahumada. Mr. Varney is getting on nicely; he was out on the sidewalk yesterday for a short time. Everything is moving about right here, and the main canal is finished for the present at the Upper Ranch. The mocking bird is sick with pulmonary troubles, and Miss Dickason is in great tribulation. It is very important that I should go to Lerdo as soon as possible, and I feel uneasy at not being there this very moment. The personal presence of either you or I at our colony all the time is highly imperative, and things will not go on right if we are not there.

Very truly your friend,<br>THOS. H. BLYTHE.

At what price could we purchase about 200 good cows at Sonora, to be sent to the colony? It is too bad that our company should not utilize the fine cattle lands we have below Lerdo.

PLAINTIFF'S EXHIBIT 283.

San Francisco, April 4, 1883.

My dear Mr. Andrade: Glad you are home from island safe. I am not much surprised that you have met with a disappointment in regard to the mines of the island. Mining reports are, as a rule, wild, extravagant and unreliable. However, the fine capacity of the island for the cattle business will tell in the long run. I should like to meet you at Guaymas as soon as possible, and from Guaymas go together to the Colorado river. Mr. Bateman and Mr. Howe writes that the work on the levee has been started and is going on with vigor, and will be finished in time. Mr. Devoto, the Italian, is hard at work preparing the nursery and planting

grape and other trees. Howe says that the wheat and barley are looking well. Have this day engaged seven more Italians for the Upper Ranch; they leave here this afternoon. I am very anxious to get things arranged in Sonora so as to get down to the Colorado river before the hot weather sets in. There is a fight already at 27 Geary in regard to the dog you propose to bring to Miss Dickason. Miss Dickason reports this morning that the mocking bird is convalescent. We have a chicken ranch on the roof at 27 Geary street, and get three fresh eggs a day.

Hoping you are well, your friend,

THOS. H. BLYTHE.

### BLYTHE'S LAST LETTER.

This last letter to Andrade, dated April 4, 1883, would seem to show that almost up to the very hour of his death, under his autograph and sign manual, he repudiated any such idea as being married to defendant; he always mentions her in writing as "Miss Dickason." There is not a scrap of his handwriting in the entire body of evidence in which she is alluded to except as "Miss Dickason," "cousin Alice," or niece.

Among the other writings there is Naphtaly Exhibit 1, certain certificates of stock in the "Mammoth Gravel Mining Company," in the name of "Alice Dickason," concerning which, in her cross-examination, the defendant says: "That used to be my name"; but according to the claim here prosecuted by her it was not her name July 14, 1881, the date of its issue, in the name of Alice Dickason, and its indorsement in her own writing, for at that time, according to her counsel, and for some time previous, her marriage had been full and complete.

### THE SIGN ON THE STUDIO DOOR.

There was also the sign on the door of the rooms occupied by her at 724½ Market street, "Miss Dickason's Studio," put up in 1879, and the card, Plaintiff's Exhibit 284, written in January, 1883, on one side the invitation: "My dear Mr. Varney: I have succeeded in making some very nice eggnog. Come in and have a glass. It is better than your whisky.

Cordially yours, A. Dickason''; and on the other side containing the card-written address, "Miss Alice Dickason."

There was also the entry in the Court Exhibit 1, identified by the defendant as in her handwriting, on page 33: "Novr. 20th, took care of office part of afternoon, Dickason." Her name is also on the roll of the Art School for the years 1880-81 as "Miss Dickason" (see testimony of John Ross Martin, on page 717, volume 8, of judge's manuscript notes); she paid her fees of tuition and was given receipts in the name of "Miss Dickason," and was known there only by that name. In the contract—for furnishing 28 Dupont street—with Goldberg & Stamper, which defendant said she had not preserved, her name was inserted as "Mrs. A. P. Villette," which she claimed was done at request of decedent; explaining that after the mistake was made in the first rent receipt Mr. Blythe thought she might as well continue to use that name, and so it happened that the bill was made. (See page 573, volume 6, judge's manuscript notes.)

### THE RENT RECEIPTS.

As to the rent receipts for May 17, June 17, July 17 and August 17, 1878, defendant testified that all she remembered of those is that Mr. Varney gave them to her from time to time; they ran in the name of "Mrs. A. P. Villette." She says that she told Mr. Blythe that the cottage was for her grandmother, Mrs. Gillette, and he simply got the name down wrong; she told him he got the name wrong in the receipts, and he replied, "Never mind; let it pass." He said it would be better to assume the name in the present circumstances, as her life was in danger, as her lately divorced husband had attempted to annoy her, and the woman Nellie Firmin was annoying him, and it would be better for the present to keep the marriage secret. (See page 553, volume 6, judge's manuscript notes.) This explanation seems somewhat in conflict with the recital in her cross-complaint, which is as follows (see supra, page 12, lines 7-21): "(d) At the time of the ceremony aforesaid (i. e., May 19, 1878), the said Thomas H. Blythe, as he informed this defendant and claimant, was having some litigation and much personal difficulty with one Nellie Firmin, who falsely claimed to be

his wife, and who was a woman of violent temper and conduct; and, until this litigation and this difficulty were settled, it was mutually agreed between the said Thomas H. Blythe and this defendant and claimant that their marriage should be kept as secret and private as possible, and that they should not ostensibly and openly live together. By agreement with him at that time, and for a considerable period afterward, she went by the name of Mrs. A. P. Villette; and in order to disarm suspicion and to avoid any question of propriety, for several months he gave her receipts for rent of the cottage aforesaid, made out in that name.''

### THE CARD GIVEN TO CAPTAIN JAMES M. McDONALD.

On the rent rolls of decedent she is set down as ''Mrs. Villette'' and ''Miss Dickason''; on the card she gave to Captain McDonald, a most important writing, she writes her name ''Dickason.'' It is true she denies the writing, but the card itself and the circumstances connected with the incident testified to by McDonald are strongly opposed to the truth of her statement. She denies in toto the facts related by him, and for the purpose of just comparison and contrast the substance of the two statements may be set side by side. On page 706 of the judge's manuscript notes, volume 8, on March 24, 1890, James M. McDonald testifies in connection with this incident: ''I swear positively as a matter of fact that that lady sitting there [indicating the defendant, Mrs. Alice Edith Blythe] wrote that word 'Dickason' on the card (Plaintiff's Exhibit 287), as I have testified; my recollection on that point is perfectly definite; cannot be mistaken on that point; am sure that it was not written by any other person or by any other lady.'' This was at about 2 or 3 o'clock in the afternoon of the day after the death of Mr. Blythe. (See page 591, volume 6, and pages 644, 688 and 689, volume 7, judge's manuscript notes.)

The defendant testifies that she did not see Captain McDonald on that day, nor did he offer his services to her nor ask her name, nor did she tell him it was ''Alice Dickason,'' and she did not write the name ''Dickason'' on that card. (See pages 739, 740, volume 8, judge's manuscript notes; also pages 585, 590, volume 6.)

### A POINT BLANK ASSERTION AND DENIAL.

Here is a point blank assertion and denial; but the court is of opinion that the testimony of the witness McDonald is true and that the defendant has failed to recall the incident and its attendant circumstances. A comparison of this card with her signature to the letter to Irish (Plaintiff's Exhibit 228a) shows a similarity amounting to identity between the "Dickason" there and the "Dickason" on the card (Plaintiff's Exhibit 287). This is very strong corroborative evidence of his testimony even in the teeth of her positive denial. There is no assignable motive for perjury on the part of the witness McDonald; he has no interest in the result of this controversy and no perceptible bias against defendant or for those in antagonism to her claim. Her testimony and his are presented upon these pages, side by side. It is impossible to reject his sworn statement, and contrasting her evidence with his there is no alternative but to deny credence to her testimony. The attempt to impeach him was utterly unsuccessful. The counsel for defendant claims that McDonald was contradicted and in most essential particulars in many ways, directly and inferentially. This contradiction in the manner indicated by the counsel is not apparent to the court; but, says the counsel, even if he were not contradicted, his evidence in no way affects the credit of her claim. She was not bound to declare herself to him, and she has told the truth now. She may not have been *bound* to declare herself, but, if McDonald has sworn to the truth, she did so declare herself and she is bound by that declaration, whatever may be its legal effect.

### THE DEFENDANT'S VARIOUS PLACES OF ABODE.

Her counsel has endeavored to show the consistency of defendant's story as to her places of living from May 19, 1878, until she finally and permanently took up her abode with decedent, at No. 6 O'Farrell street, in April, 1880, and claims to have shown, as against the contrary contention, that during this period she was at No. 6 O'Farrell street, and spent much of her life there, and sustained there to him the relation of wife; she spent much of her time there, both day and night; and her counsel stoutly maintains that she

not only shows, in contradistinction to the Sharon case, that from May, 1878, to April, 1880, she not only furnished many evidences of the assumption of marital rights, duties and obligations, but there are many analogous circumstances showing that the agreement for temporary secrecy was observed.

### WAS THERE MORE THAN A SECRET INTERCOURSE?

There was very much more than a mere secret intercourse, says counsel for defendant, between her and decedent from May 19, 1878, to April, 1880. There was an assumption prior to 1880. (See page 955, volume 9, judge's manuscript notes.)

The circumstances of the first meeting of the decedent and the defendant, and their relations at 6 O'Farrell street, were entirely within their own knowledge, and she might have given any version she pleased, if she were disposed to be untruthful. She did not yield without a struggle—without a struggle and a contract. Shall the court divorce her now? asks her counsel, after the preceding statements.

What are the many analogous circumstances showing that the agreement for temporary secrecy was kept? The agreement was, as laid down in the cross-complaint, "that their marriage should be kept as secret and private as possible, and that they should not ostensibly and openly live together," and this secret was kept even from her mother, who came to town in November, 1879, when defendant, as she testifies, went with her to Jones street, near Eddy (page 536, volume 6, judge's manuscript notes) to the house of Mrs. Herson, formerly Mary Markley (Mrs. C. P. Ford), described in her complaint as "the house of Mrs. Captain Robinson:" Her mother knew nothing at that time of her relations with Mr. Blythe; and yet, while the "temporary veiling" was not withdrawn for her own mother, we find that the landlady of the Jones street house, once Mrs. Herson, now Mrs. C. P. Ford, formerly Mary Markley, claims to have known defendant as Mrs. Blythe for about ten years prior to the date of her testimony (January 9, 1890), having been introduced by the defendant to Mr. Blythe at 6 O'Farrell in the fall of 1879, having called at that house because the lady defendant had invited her to call, having come to her house on Jones street and told her she was married to Mr. Blythe

and invited her to visit, whereupon she called, and being introduced, had champagne consequent upon congratulations. (See pages 484, 487, volume 5, judge's manuscript notes.)

### THE PLEDGE OF SECRECY.

Certainly the pledge of secrecy was not kept in this instance, if this witness is to be credited, and she is one of the witnesses to prove assumption and existence of marital relations in 1879. Thomas Dain testified to the bare fact that he occupied a room in 6 O'Farrell street, above the rooms occupied by the decedent and this lady, whom he knew as Mrs. Blythe first sometime in the fall of 1878.

H. Tosteman testified that he always knew her as Mrs. Blythe; he occupied the grocery store under 28 Dupont street, and speaks of 1878 particularly.

L. Oestterreicher was introduced to her in 1878 as "Mrs. Blythe" by Joe Harris, and never saw her subsequently until the morning of the day of his testifying (February 19, 1890), when the defendant refreshed his recollection about the matter. (See page 608, volume 6, judge's manuscript notes.)

William Clayton's deposition refers to two incidents, first in 1879, second in 1881. If the first be true, it shows on the part of Blythe a breach of the covenant to keep secret their marriage, if "Missus" be the equivalent of "wife" in popular parlance. The testimony of M. S. Whiting is obnoxious to a like criticism, if the witness has not erred in his recollection. George A. Bates' testimony (see page 494, volume 5, judge's manuscript notes) is void of significance as to the claim of defendant; indeed, if it have any force, it is against her, as his employer, Burnett C. Brown, testifies the plumbing work must have been done in 1881, and not, as Bates uncertainly said, in 1879 or 1880. (See page 734, volume 8, judge's manuscript notes.)

Mrs. Anne C. Joice's testimony may be taken in connection with her conduct in declining to answer whether her daughter had gone away to avoid service of subpœna, and that of her husband and the absence of their daughter, who would have been a material witness, as operating against, rather than in favor of defendant's claim, if, indeed, it be worthy of

serious consideration as containing any fact of consequence. (See page 515½, volume 6, judge's manuscript notes.)

W. B. Webster's evidence does not show any introduction by decedent of defendant as his wife; the only notable incident he recollects is one that occurred when he was coming downstairs on the 1st of January, 1881. Blythe met him and grasped him cordially by the hand, and opening the door of the dining-room, there was Mrs. Blythe standing by the sideboard, and Blythe asked Webster to have a glass of wine, saying, "It is unnecessary for me to introduce you, you know Allie," and Webster said, "Yes, I know her very well," and they took a glass of wine. It is straining a point to predicate a status upon such an introduction; the letter of condolence of this witness may be placed with that of C. W. Beach, neither of any consequence, entirely gratuitous, and based upon no adequate assumption.

### TRANSACTIONS WITH TRADESMEN.

N. J. Hyman's testimony only goes to show certain commercial transactions in which he chose to accept without question the name given by a customer.

John McGuire was clearly off in his reckoning, as he said he served this lady defendant, whom he knew as Mrs. Blythe, as a regular customer, for six and seven years, and more than that, before the death of Mr. Blythe, whom he did not know at all. This would make his acquaintance begin with her in that name in 1876; he had destroyed his books; he marked the packages for Mrs. Blythe, and his boys delivered them.

It may be remarked here that it is not shown that a single package from the tradesmen said to have been addressed to her as "Mrs. Blythe" came while Mr. Blythe was present, or that he ever knew anything of such transactions with the tradesmen, and it is curious that she retained so few of her bills with those with whom she claims to have dealt as "Mrs. Blythe." She says she cannot recollect why she destroyed those bills that she did not preserve, and she has no bills for dress goods purchased in 1880, 1881, 1882 or 1883. She generally bought for cash, and if she had any

bills she destroyed them.  (See pages 584, 585, volume 6, judge's manuscript notes.)

The testimony of Gilfillan and Mulvihill (page 501, volume 5, judge's manuscript notes), may be passed without comment, also that of Medovich, who testified to Blythe's coming in occasionally for a cup of coffee to be sent up to Mrs. Blythe, witness "always knew her by that name." Jacob Ward Smith's deposition is explained by his own statements toward its end concerning his mental condition, and his allusions to the defendant as Blythe's "woman" showing his understanding of their relation.  On the whole this witness' testimony may be dismissed without further allusion to its contents; it is self-condemnatory.  Mrs. Sophie Koerner and her husband, Max Koerner, may have testified truthfully as to purchases made by Mrs. Blythe in their store, but they fail to connect Mr. Blythe, except in a manner that does not convey conviction (see testimony of Max Koerner, pages 500, 501, volume 5, judge's manuscript notes), and there is some significance in the convenient loss or destruction of account-books by the Koerners, McGuire and Berkowitz.  (See page 733, volume 8, judge's manuscript notes.)

### SOME FLAGRANT CONTRADICTIONS.

Mrs. Margaret Hamilton, formerly Mrs. Hugh Elias, may have been introduced as she states, but the probability of the fact is somewhat impaired by her statement that defendant was always spoken of by Mr. Elias and herself in her presence as Mrs. Blythe, as Elias himself testifies in his deposition that prior to Blythe's death he knew her as "Miss Dickason," "Mrs. Blythe," and other names, and addressed her sometimes by one name and sometimes by the other; generally in conversation with Blythe he called her "Miss Dickason," and this witness shows her partisan bias despite her denial when she testifies at the conclusion: "I have no bias or interest in this case; Mr. Blythe never spoke to me about the girl Florence; *have strong doubts about the girl being his child.*"  (See page 604, volume 6, judge's manuscript notes.)  Mrs. Gutierrez and Mrs. Pietra Doyle are two sisters, and their testimony should be read together to emphasize the fact of their relationship; neither is to be credited

upon the point to which she is called. (See page 490, volume 5, and pages 513, 514, 515, volume 6, judge's manuscript notes.) John Doyle, husband of Mrs. Pietra Doyle, who testified that he met Blythe one day while the witness was going to catch the train for San Jose to attend the Democratic State Convention (which was held in June, 1882, although witness testifies it was October, 1882), and Blythe stopped him, and pointing over his shoulder, said, "Mr. Doyle, this is my wife, Mrs. Blythe." At about that time Blythe was sick in bed, if it were June, 1882, and if October witness could not have been going to catch a train for the Democratic State Convention. Either way the witness is caught in a falsehood of a most material and flagrant kind; his testimony also should be read in immediate connection with that of his wife.

John F. Bernal's testimony is to be treated in connection with that of Mrs. Sanchez, his aunt, with whom he claims to have been introduced by Mrs. Gutierrez to the defendant as "Mrs. Blythe" in May or June, 1881, or 1882. He testified that once when he called at 6 O'Farrell street to deliver a bundle of clothes from Mrs. Gutierrez, who used to do washing for Mr. Blythe, he rang the bell and the Chinese servant opened the door and motioned him upstairs and he went up, and Mr. Blythe was in a little room sitting at a desk writing, and Bernal asked Blythe for "Mrs. Blythe" and he called "Alice," and she came forth and took the bundle. Even if any fact were to be established by such testimony, what does it amount to? Why did not the witness deliver the bundle to the servant? How did he know the man whom he assumed to be Mr. Blythe? It does not appear that he ever made his acquaintance in any manner. Such testimony is of a piece and is cut out of the same cloth with that of Mrs. Maria Antonia Peralta, also John F. Bernal's aunt, who testifies to an introduction (page 606, volume 6, judge's manuscript notes). She says she was introduced also by Mrs. Gutierrez, at the house of the latter to an elderly gentleman, who came there with the defendant as "Mr. Blythe," and at the same time she was introduced to the lady defendant by the same person in these terms: "I introduce to you a friend of mine, Mrs. Blythe." She never saw them to-

gether again, because Mr. Blythe died; she knows this of her own knowledge, because Mrs. Gutierrez had prepared a dinner for both of them—a Spanish dinner; it was already made, witness assisted in its preparation. The gentleman was a large, tall, thick man; he may have been taller than the lady; don't recollect whether he had a beard, mustache, or goatee, or whether he had a smooth face; did not pay much attention for witness went away almost immediately; do not remember whether the name was ''Blythe'' or ''Beach.'' After a pause witness remembered that it was ''Blythe.'' Bernal was at her house the night before witness testified, and told her she would be wanted to testify to what she knew; the introduction took place about five years ago (witness' testimony was taken February 19, 1890, and Blythe died April 4, 1883, nearly seven years before); the introductory ceremony was in English; the introduction took place before 12 o'clock, noon. Witness in redirect examination says she understood the introduction in English, because it is not so difficult; she can understand a very few words; from the appearance of the body in the photograph (A. E. B.'s Exhibit R3) she thinks that it is the same person, but cannot say as to the features; this witness was examined through an interpreter.

### THE CHARACTER OF EVIDENCE AS TO INTRODUCTIONS.

Such testimony as this is difficult to treat seriously. Earnestly as the court deprecates animadversion upon witnesses, it is hard to forbear in such a case as this, but the strongest censure, perhaps, is implied in the simple statement of their story without note or comment signifying the judicial impression that it is fabrication on their part or on that of a suborner.

The introduction, if it may be called such, to the witness Herman Kohn, in the latter part of 1881 or the fore part of 1882, may be true, but when the whole story of this witness is read over much doubt is cast upon his credit. He swears that at one time he made up a buggy robe for Blythe (who does not appear ever to have possessed or used a buggy) from some skins that he had brought up from his ranch; the robe was not finished before his death, but when the

skins were dressed and plucked he said Mrs. Blythe would be pleased with it; witness had a charge against "Mrs. Blythe" for the buggy robe; the charge was made after his death; witness sold this buggy robe for $45; up to six months before testifying Herman Kohn did not think he would be called as a witness; thought he would be let out of coming at all. Witness cut up the buggy robe into trimmings and sold it as "trimming" for about $45; sold it to different customers who wanted beaver trimmings; witness brought into court such books of his business as he had retained; *there is an entry May 14, 1883, of a tag of purchase made December, 1882;* witness had no charge against her between 1879 and 1883, a bill (Kohn Exhibit 1) was made out by him dated May 14, 1883, items of charges for purchases on December 22, 1882, and January 10, 1883.

Now, why should this witness enter upon May 14, 1883, over a month after Blythe's death, purchases made December, 1882, and January, 1883? And why, in all the years previous having made no entry whatever, should he, at this postmortem date, make any entry at all against her of a bill incurred by Mr. Blythe? It was properly a claim against the estate of decedent and could easily have been collected if verified.

The testimony of Dr. W. S. Halpruner, chiropodist and orthopedist, of 850 Market street, who operated on the feet of defendant in presence of decedent, who, in answer to the inquiry, "Who is my patient?" pointed to the lady who was sitting on his knee, said, "my wife," can hardly be construed, in the circumstances, as an introduction; such a remark at such a time and place is scarcely weighty enough to affect the true quality of their relations one way or another.

The testimony of Jeremiah F. Sullivan, painter, 510 Market street, whom counsel (Hon. E. D. Wheeler) describes, while commenting upon the appearance of his witnesses, as a frank, outspoken, good-looking man, a man beyond reproach, may be true; but he is liable to be mistaken in his recollection, and even if not, the circumstances may have justified Blythe in making the remark, as another counsel says, "to preserve the decencies of the occasion." This occurred in January or February, 1882. Mr. Sullivan is a

witness who impressed the court as a truthteller and one who, making allowance for the fallibility of memory as to details after the lapse of years, related the incident as it occurred; but his evidence must be taken as a single item in a vast volume of testimony of a contrary character.

## WHAT MUST BE CONSIDERED IN SUCH A CASE.

But an isolated instance of introduction does not make manifest the claimant's case; the whole conduct and behavior of the parties must be considered.

Ferdinand Falck, called in her behalf, knew the defendant claimant, who was a customer of his, but never heard her called by any name before death of Blythe, whom he did not know.

Edward Maldonado, called for the defendant, shows that she was not in his store until after the death of Mr. Blythe, April 23, 1883, the first and only entry in his books. Edward Neumann, who was engaged in the "Maldonado Pharmacy," is uncertain as to dates between December, 1882, and June, 1883, and his testimony is subordinate to that of his employer, who kept the books and made the entry of April 23, 1883.

## THE "TERRAPIN" TESTIMONY.

Philip Scattiny and David H. Wallace, who was employed by Scattiny in the "Terrapin," must be considered in conjunction, and one item shows their common want of credit. Wallace testifies that he knew the defendant, Mrs. Blythe; she was a customer of the "Terrapin," where he was a waiter; she was living at 6 O'Farrell street and afterward at 27 Geary street; he served them with oysters at the latter place; he saw Mr. and Mrs. Blythe there on one occasion; there was some company there; witness put the oysters down and Mr. Blythe asked to be allowed to assist her and she turned to witness and said: "This is my husband, Mr. Blythe." Witness made out the bill, dated, "San Francisco, April 1, 1883, Mrs. Alice Blythe to P. Scattiny, Dr.," containing charges for oysters, etc., from October, 1882, to March, 1883; and took it up to Mr. Blythe's place, 27 Geary street, for payment, and *ascertained for the first time that he died on that same day;* witness does not recollect the date nor how

long it was after the bill was made out; copied the items from the "Terrapin" account book from an account headed, "Mrs. Alice Blythe"; does not know where that book is now nor what became of it; left that restaurant in 1884, but did business in the pie line with Mr. Scattiny afterward.

When witness made out that bill, took it by direction of Mr. Scattiny to 27 Geary street, and went upstairs; knocked at the door; Mrs. Blythe opened the door; witness asked for Mr. Blythe; she said "he is dead"; witness begged her pardon and withdrew without saying more.

It does not appear that witness ever before made out or presented a bill to Mr. Blythe, or that he ever came in contact with him except casually at the time of the introduction, so to call it; and it will be remembered that the decedent died at about 6 o'clock in the evening of April 4, 1883.

Now, what says Scattiny concerning the same matter? (See pages 492, 493, volume 5, judge's manuscript notes.) Began business at 15 Stockton street first part of 1880, and continued there until 1887. David Wallace worked there for about four years from the time witness began; witness first knew the lady defendant as "Mrs. Alice," and afterward he learned that her name was "Mrs. Alice Blythe"; she was a frequent customer of his, and gave orders to be delivered at 6 O'Farrell street and 27 Geary street; witness' books are now destroyed; sometimes they charged "Mrs. Alice Blythe" "Mrs. Alice B." and "Mrs. Alice"; the book of final entry from which the bills were made out contained the charge to "Mrs. Alice Blythe"; those bills were made out by Mr. Wallace; was told that her former name was Mrs. Alice Dickason; saw her once at 6 O'Farrell street; did not burn his books because anyone suggested their use in connection with this case; *that bill was presented on the day it was made out; Mr. Wallace took it and brought it back, saying that Mr. Blythe was dead; it is dated April 1st, but it was the 3d of April when he took it to collect.* Comment is superfluous.

### EVIDENCE OF MADAME LAPARIAT AND OTHERS.

The testimony of Madame Blaise Lapariat is strongly suggestive of sinister arts in procuring evidence. This lady

did not know the decedent nor the defendant; the name "Mrs. Blythe" on A. E. B.'s Exhibit J3 is not in her handwriting; she did not put in the final figure "2" in all or any of the dates; it is stamped, not written; *the witness had no stamp;* if the figure "2" were not there, she would have *written it in;* never saw the figure before moment of testifying; does not recognize it; cannot account for its being there; in the name "Mrs. Blythe" the letter "r" in "Mrs." was written by witness, but not the rest of it; the printed "M" and the "r" after it were there, and the rest of the line was blank; witness cannot remember that she ever had the name of "Mrs. Blythe" on her books or the name of "Mr. Blythe." Lucien Condrotte was one of the bread-carriers. In A. E. B.'s Exhibit J3 the "r" is in witness' handwriting, but the rest is not; in the other bills the "Mrs. Blythe" is in her writing; cannot state from whom the information of her name was received; the carriers never inserted the name of the person; sometimes they receipted the bills, but they had no right to insert the name; they had no right to do so.

It is quite open to inference from Madame Lapariat's evidence that the bill A. E. B.'s Exhibit J3 and some of the others were tampered with in the interest of defendant.

The testimony of Joseph H. Hammond, the tailor, a man who was too deaf to hear ordinarily audible conversation in a room, must be taken subject to the admission of witness' physical infirmity and incidental liability to mistake in the word used by decedent.

Fergus Hanson, formerly a butcher in California Market, called for defendant, understood her to be the niece of Mr. Blythe until she told him that she was Mrs. Blythe; she frequently made purchases of him; had a bill in his "blotter" against her (A. E. B.'s O3); never presented that bill to Mr. Blythe; there are only two items there, December 27, 1882, and January 16, 1883, contracted before Mr. Blythe's death.

I. N. Choynski knew the decedent, Thomas H. Blythe; became well acquainted with him in *1875,* about the time witness built his house opposite Blythe's, on Geary street; *knew the defendant for about the same time;* she used to come in and buy articles at his store; collected from Blythe; charged

the articles; she said, "Present those bills to Mr. Blythe"; cannot recall any remark made in paying them; the bills were made out to Mrs. Blythe; there were at least three or four bills in the year preceding Blythe's death; witness is sure that it was in 1877 or in the fall of 1876 that he moved into his store on Geary street.

It appears in evidence that Blythe did not move to 27 Geary street until October, 1882; no books of witness containing charges are produced, and no bills. It is clear that witness Choynski errs.

The Chinese servant, Wong Louis, is not to be depended upon; "he proves too much"; among other things, he swears that Mrs. Blythe used to stay at home evenings and "sew," read the newspapers; yet the lady herself says (see page 738, lines 29, 23, 24, volume 8, judge's manuscript notes in her rebuttal testimony): "I never did any work as a seamstress at 6 O'Farrell street, *that is one thing I can't do—* SEW." In other respects the testimony of this witness may be discredited by other evidence from the source whence it is produced.

### THE EVIDENCE OF HODGE AND ANDRADE.

Other evidence given on behalf of defendant fails to strengthen her claim. There is the very important testimony of the elderly gentleman, Benjamin O. Hodge, the guardian of the defendant when she was a child. He was introduced to Mr. Blythe at 27 Geary street about two months before his death (see pages 503-505, volume 6, judge's manuscript notes); he did not meet her often enough in the few years before Mr. Blythe's death to know what relation she occupied; always called her "Alice"; did not know Blythe at all, in any shape, and yet the defendant swears that she introduced Mr. Blythe as her husband to Mr. Hodge. (See page 579, volume 8, judge's manuscript notes.)

It is likewise with General Guillermo Andrade, to whose evidence her counsel (Mr. Highton) particularly calls the attention of the court, who was friendly with the defendant, by no means hostile in his attitude toward her as a witness; he knew her only as Miss Dickason; he was so introduced to her by Mr. Blythe; he never knew she had any other name

than the one by which he was introduced to her; heard her introduced by Mr. Blythe to Mr. Pomroy, of Arizona, as "Miss Dickason, my niece." (See page 564, volume 6, judge's manuscript notes.)

Here are persons not casual acquaintances, not chiropodists or painters in search or discharge of a transient job or contract, but familiar friends, welcome visitors and even inmates for a period of the very household of decedent, to whom she was not known except as "niece," and never alluded to in any other or more intimate relation. This applies with especial emphasis to such witnesses as General Andrade and George Eggleton, who appears to be a man of very kind heart, very friendly to the defendant, whose disposition evidently was to say everything he positively could in her favor, and yet he never heard her addressed otherwise than as "Alice," and was introduced to her by decedent, Mr. Blythe, in these terms: "Mr. Eggleton, my niece, Alice" (see page 719, volume 8, judge's manuscript notes), and defendant's counsel claims that Andrade and Eggleton really turned out to be strong witnesses in her favor.

### DOCTOR DE GROOT'S EVIDENCE.

There is also the testimony of Dr. Henry de Groot, a witness friendly to defendant, whose evidence her counsel claims strengthens her case. This witness testifies that in course of conversation with Blythe in the summer of 1881 about his mode of living decedent was very anxious to dispose of his Trinity river property at that time, and he wished Dr. de Groot to give him an account and opinion in detail, and they went over the different claims until they came to the claims named "Nellie No. 1" and "Nellie No. 2," and witness, knowing the circumstances under which they came to be so named, said, in a jocular way, that it was unfortunate, from a business point of view, that they were so named; Blythe said, "Yes," that the person after whom they were named was unworthy of the distinction, but that his experience had made him careful in his alliances; witness asked him if he was married, he said no, but that he had met a very comely young person, a Miss Dickason, whom he had taken into his service or as his housekeeper; that she was something of an

artist, and he thought by aiding her she might be able to take care of herself; that she was a person of rather high temper but amiable, and he thought they would get along together; witness went there again subsequently to present report on mining affairs, remained upward of an hour, conversed about domestic affairs; Blythe seemed to be in greater distress than before; witness suggested that in view of the contingency of death he ought to have his affairs in good shape; Blythe acquiesced and said he had an impression or foreboding that he would not live long; seemed very much depressed on that account, he said that lately since he had become ill he had a strong desire to send for his daughter; that he would like to have what he never had had, a home of his own, but that his domestic arrangements seemed to present a difficulty about bringing out his girl; witness said he thought a moneyed consideration, a few thousand dollars, might cause a good-looking young woman to prefer her freedom and take her chances of marrying a younger man in preference to keeping house for an older one; Blythe said impatiently that he had thought of that, but he did not want to terminate those relations abruptly and an expedient had occurred to him of adopting her as his niece, and he had done so; witness remarked to Blythe that he thought it was an excellent expedient; witness said to Blythe, in connection with the claims "Nellie No. 1" and "Nellie No. 2," that it was unfortunate in a business point of view they were so named, because the miners up there made remarks to his prejudice on account of her having accompanied him to the estate, and the names necessitated explanations; witness did not so state to Blythe, but it occurred to him; Blythe said he did regret the naming of the claims, as the person (Nellie Firmin) had proved ungrateful and had caused him a great deal of trouble, and he said, not mentioning her name, however, that he believed some women would poison a man to get his property, and he said his experience with her had made him more cautious since in his alliances with women; witness then said he supposed he was living a bachelor's life; he replied that the Scriptures say "it is not good for man to be alone," and "not *exactly* married"; then he said he had met a comely young woman; he said that at their age

marriage was a dangerous experiment, especially in California, where there were so many scheming adventuresses; he said he had met a comely young person, Miss Dickason, whom he had taken *into his service* or *under his protection* or as his *housekeeper;* in the course of conversation he used all of these expressions.

### TESTIMONY OF LIEBES, FUR MERCHANT, COMPARED WITH THAT OF HERMAN KOHN.

The deposition of H. Liebes, the fur merchant, examined in behalf of defendant, shows that, whatever may have been his intention as to the future, Blythe did not at that time regard this claimant as his wife. Mr. Liebes furnished a sealskin coat to defendant in 1880, and her credit was guaranteed by Blythe, who said, "This lady is *going to be* one of these days my wife." The coat was furnished on installments of $30 per month; the transaction was entered in the name of "Mrs. Dickason (Villette), one seal dolman, $270"; the bills produced in connection with deposition run: "Miss Dickason, 6 O'Farrell street, October 12, 1881, in account with H. Liebes & Co., Importers of Skins and Manufacturers of Fancy Furs, 111-117 Montgomery street." (See page 742, volume 8, judge's manuscript notes.)

Now, it is surpassing strange that the deponent should on such an occasion deny to Mr. Liebes, when he was called upon to speak to the fact, in her presence, what he declared to young Herman Kohn at about the same period (see page 505, volume 6, judge's manuscript notes). He said to Kohn, correcting him reprovingly: "Mr. Kohn, excuse me, Mrs. Blythe," and Kohn charged goods in name of "Mrs. Blythe," so he swears; but during or about the same period this millionaire husband *guarantees* credit of the same lady to Liebes for a $270 sealskin coat, to be paid for in $30 a month installments, charged to "Mrs. Dickason (Villette)" in his books, bill rendered December 17, 1880, and on the bill rendered October 21, 1881, to "Miss Dickason, 6 O'Farrell st." This was long after the necessity for retaining the "temporary veiling" of the relations of decedent and defendant had passed; why, then, say, "This lady is *going to be* my wife," while countenancing her credit for such purchases.

Liebes testifies that the names on the books and on the bills rendered were given at the time by the defendant.

### THOMAS DRAKE MATTHEWSON.

In the summer of 1882, according to his testimony (see page 718, volume 8, judge's manuscript notes), Thomas Drake Matthewson had a conversation with Blythe about art and artists at 724½ Market street, and Blythe took Matthewson across the hall to a room where there was a young lady engaged in painting pictures, and he introduced witness to her as "Miss Dickinson." Blythe said she was an orphan or half-orphan, or something of that sort, and that he was assisting her.

### GARRISSERE, THE HAIR DRESSER.

The testimony of Frank Garrissere, examined in behalf of defendant, needs only to be read to show that the witness erred egregiously, if he thought he was telling the truth; he swore that in 1882-83 he was doing business at 113 Dupont street; that he knew the defendant, Alice Edith Blythe, for about fifteen years, and worked for her since 1875 or 1876, first when he was at 40 Geary street in 1874 or 1875; first worked for her when she sent for him to shampoo her hair, and went over to her house above the barroom on Geary street, and saw her there, and also Mr. Blythe; she sent the witness a note to come and dress her hair, and the note was signed "Mrs. Blythe"; knew her by the name of Mrs. Blythe and never by any other name; her house was at 27 Geary street, over Radovich's saloon; witness was positive it was there in 1875 or 1876, and Mr. Blythe was there all the time, walking up and down and making some remarks on the style of dressing the hair; witness kept no books and made out no bills. The fact is, as clearly appears, that Garrissere was not doing business on Geary street when defendant and decedent occupied 27 Geary street.

### ELLIOTT'S ERROR.

The young man, Stephen Vincent Elliott, who testified that he was born in Stockton, September 6, 1860, and yet was only twenty-six years old on February 19, 1890 (date of testifying), can scarcely be held accountable for his state-

ments, insignificant though they are; he testifies that he often delivered poultry, dead and alive, to Mrs. Blythe at 27 Geary street *in 1881;* that the packages were directed to Mrs. Blythe, and that Mr. Blythe was there one time and expressed himself as pleased with some live poultry, and at his request witness put it on the roof. Of course, as the decedent and defendant did not go to 27 Geary street until the fall of 1882, witness must have made a mistake when he said 1881.

### MRS. PIQUE'S TESTIMONY.

Mrs. Frances Pique, called by the defendant, testified direct against her claim (see pages 510, 511, volume 6, judge's manuscript notes). This venerable lady was on good terms with the defendant, having known her from her childhood, and asked the decedent, with whom she was and had been in cordial relations for many years, why he did not marry Alice, and he answered that he could not marry her. "You know I cannot marry her by the name of Blythe; it would not be legal." He had no fault to find with her; she was a good housekeeper and he was happy with her; witness declined to accept his invitation to take apartments with her husband and daughter in the house at 27 Geary street "because he was living with Alice *in that way,*" and so told him.

### THE "GOLDEN RULE BAZAAR" EVIDENCE.

Wm. F. Hanson, superintendent of the "Golden Rule Bazaar," testified that he knew the defendant since, probably two years before Blythe's death, when she first dealt with him and bought a fancy card-receiver and gave her name as "Dickason," because witness wrote it as "Dickinson," and she said it was not so and corrected him. (See pages 708-711, volume 8, judge's manuscript notes.)

Andrew M. Davis, proprietor "Golden Rule Bazaar," knew defendant as "Miss Dickason"; identified an entry on a book of his firm: "Petty Cash D. B. 1882," page 168, "Miss Dickenson March 17, 1883, $4," referring to cash received from defendant.

### QUADE, THE GROCER.

A. Quade, the grocer, formerly with C. J. Hawley & Co., 215-217 Sutter street, from 1869 to 1883, knew the defendant

as a customer of that firm, prior to the death of Blythe, but did not know her by any name.

### JOHN K. LUTTRELL'S STATEMENT.

John K. Luttrell testified that decedent spoke about marriage to him; Blythe was talking about his cats and dogs and how he spent his evenings, and witness jestingly said to him that he ought to get married; Blythe said he was too old, that anyone who would marry him then would do it simply for his money; that he never had been married and consequently never would marry; Blythe urged witness to visit him and remain at his house instead of going to the hotel, that he had no one but his housekeeper, whose name he did not mention, and that they would spend their evenings pleasantly together; but witness did not accept the invitation; this was in the early part of 1883. (See page 731, volume 8, judge's manuscript notes, and pages 116-119, volume 2, same.)

### MILO SYDNEY JEFFERS ON SAME SUBJECT.

Milo Sydney Jeffers testified that the first time he met the defendant was at a lunch at 6 O'Farrell street to which he was invited by Mr. Blythe to meet Geo. S. Irish. The lady was addressed as Miss Dickason, and witness always knew her subsequently by that name. Jeffers had a conversation with Blythe about the defendant in July or August, 1882, in Blythe's room; witness asked him if he intended to marry "Alice"; Blythe said, "No, but I will make her my legal niece." That was all that was said on the subject; she was not in the room at the time, but was in the house. (See page 694, volume 7, judge's manuscript notes.)

### JOHN T. GRAY, THE PLUMBER.

John T. Gray, plumber, did plumbing work for decedent at 27 Geary street, had conversation with him in reference to defendant; he simply said: "Go there and Miss Dickason will show you what is to be done." Mr. Blythe always said "Miss Dickason"; that was his general way; witness did work for Blythe for several years at 6 O'Farrell street and 27 Geary street; from the time witness first saw the defend-

ant until the death of Blythe knew her only as "Miss Dicka-son."

### JOHN A. WRIGHT, THE ADMINISTRATOR'S ATTORNEY.

John A. Wright, attorney, testified that he first saw the defendant the day after Mr. Blythe died, in the rooms at 27 Geary street, in the afternoon; there were present W. H. H. Hart, Mr. Jeffers, the late Philip A. Roach, public administrator, and one or two ladies, besides defendant; it was in a room facing Geary street; there was in it a bed and a desk or secretary and some other articles of furniture. Witness stated to those present his purpose in being there; Jeffers said he desired the public administrator to know that the deceased had given the furniture of the rooms to this lady; witness asked, "Which lady?" Jeffers answered, pointing to the defendant, "This lady, Miss Dickason," and in response to witness Wright's question as to where the papers of the deceased were she pointed to the desk, and the witness and his client sealed it.

Geo. S. Irish testified that he was introduced to defendant by Mr. Blythe as "Miss Dickason, my housekeeper," in February, 1881, at 6 O'Farrell street.

### VARNEY'S VERSION.

The counsel for the defendant says that he does not think there is any substantial conflict between the testimony of the witness Varney and that of the defendant on any material point.

Varney's testimony, as taken from the judge's manuscript notes, is as follows: I was general superintendent for Mr. Blythe's Block; first saw defendant in May, 1878, when she came to me to hire rooms; she said that Mr. Blythe sent her to me as he was busy; I gave her the key and inspected the interior of the cottage at 28 Dupont street with her, and made certain alterations at her request; I first knew her as Mrs. A. P. Villette; I did not give up the key until the house was repaired; she gave me her name on a card as "A. P. Villette"; I kept the card for a while, but I have been unable to find it; I told her the rooms were $25; she made no objection but said

she would take the rooms if I would make the repairs; she moved in May 17, 1878; she paid the first month's rent and that is the receipt (A. E. B.'s Exhibit 3); that is all in my handwriting; I handed it to her at the time; I knew her by the name in the receipt, "Mrs. A. P. Villette"; she gave me the amount, $25; that other receipt (A. E. B.'s Exhibit X3) was made out by me about the time it was due, June 17, 1878, and presented by me to the lady; I did the collecting myself at that time and for all that year; she paid me $25; I knew her at that time by the name "Mrs. A. P. Villette"; same answer as to A. E. B.'s Exhibit Y3, July 15, 1878; the ink portion is in Mr. Blythe writing, the pencil initials "L. H. V." under the signature are mine; can't say when it was paid; the writing on the back, "paid $20," is not mine; I have a cash-book containing entries of rents collected; here it is (produces book; counsel Highton examines witness as to the authenticity of the book; Plaintiff's Exhibit 293); this book is a complete record of all rents received by me during the period it covers, and entries were made at the times made and set down in the book, it is full and accurate. (Counsel asks that witness turn to entry "May 17, 1878." in Plaintiff's Exhibit 203; objection; overruled; exception.) Q. When did you make that entry? Objection on various grounds; overruled; exception. A. I generally always entered the names of the parties on the first of the month; in that case, May; entered the names of the parties from the receipts furnished by Mr. Blythe, and the date of the month opposite the name was entered when the rent was paid, and in the columns on the right of the name the amount paid; without any reference to that book, and from my independent recollection, I can say that the rent for July, 1878, was paid in two different portions; in the book it appears in one payment. (A. E. B.'s Exhibit V3 shown to witness, receipt dated August 15, 1878.) The body of that is in Mr. Blythe's handwriting; the signature is his; the initial "L" in pencil under it is not mine, but the "H. V." looks like mine; the indorsement in pencil "A. P. Villette, paid August 24, $15.00," is mine;

it is entered in the cash-book the same, except as to the date of the month; in September, 1878, there is an entry on page 21 of the book, "Sept. 17-20, Mrs. A. P. Villette, $15"; the name was entered on the first of the month; her rent was due on the 17th, and so that date was put down, and the only way in which I can explain the "20" after the vertical curve or dash separating it from "17" was that she paid the $15 on that day; she left the fore part of September; knew her then as "Mrs. A. P. Villette"; I saw Mr. Blythe going into the house 28 Dupont street while it was undergoing alteration prior to May 17, 1878, when I was there supervising the changes; the defendant, Alice Edith Blythe, was not there at the time; Mr. Blythe had a rent roll of his property; he kept it in his safe, room 21, 724½ Market street, at the time of his death. (Counsel hands to witness Plaintiff's Exhibit 290, and asks him if he ever saw that before.) I have seen that book before; that is in Mr. Blythe's handwriting; I began to do his collecting July 1, 1875, and after that he used that book as his rent roll; those entries on page 43 are in his handwriting; I do not know who made the marks or checks in the six columns to the right of the names; never saw them before; the cross (x) marks signified that the rents so marked were paid by me to him; his custom was to mark rents paid to him by or through others with a little zero or cipher (0). (Plaintiff's Exhibit 290 is offered in evidence; objection on various grounds; exception. Page 43 of the book, Exhibit 290, is admitted in evidence; motion to strike out; denied; exception.) Mr. Blythe had other tenants on Dupont street from May, 1878; witness enumerates several; I have seen that page 49 of same book before, in October, 1878; the figures in the left-hand columns, and the names in the middle and the months at the top of the six right-hand columns are in his writing; the marks under the months were made by him, as on page 43; the line was drawn through the name "Mrs. A. P. Villette" in October, 1878, the last of the month, when he and I settled; it was drawn by him; page 63 of Plaintiff's Exhibit 290, I first saw in December, 1878. (Offered and read in evidence under objection, as with pages 43 and 49.) Mr. Blythe moved into 6 O'Farrell street in December, 1877, and resided there

until fore part of October, 1882; on or about the 8th of May, 1878, he had a colored servant, a lady, and a Chinese servant; the colored woman's name was Mary Williams; she remained there until April, 1880; I went to 6 O'Farrell street frequently; sometimes to see about the wood and coal used in the house and sometimes to see if he wanted anything; most always went up every night to take up a basket of wood that I had cut for him in the basement of the block from odds and ends found around the block; that continued as long as he lived there; sometimes I would see Mr. Blythe, sometimes the China boy, and sometimes the colored woman servant; the coal was taken up by Patrick Mulvihill; I would take up the kindling after I had done my day's work, between 6 and 7 o'clock in the evening; during that time never saw her there during 1878, nor did I see her in his office in 1878; never saw them together that year on the street or elsewhere; took kindling in 1879 in the same way; in that year, in July or August, ascertained that defendant had a name other than Mrs. Villette. After she left 28 Dupont street next saw the defendant, Mrs. Alice Edith Blythe, about the middle of 1879, in room 15, of 724½ Market street, second floor, and then learned through Mr. Blythe that he had let Miss Dickason have room 15; that was a day or two before I saw her there in the room. (Page 65 of Plaintiff's Exhibit 290 shown to witness; objection; overruled; exception.) I first saw that in the month of April, 1879; witness testifies similarly as to pages 43, 49, 63; on page 65 the figures "15" on the left of the name "Alice Dickason," and on the right three zeroes, "o" meaning that the tenant paid directly to Mr. Blythe, and the figure "15" (under head July) and the figure "10" the amount of rent; during the first six months of 1879 had frequent occasion to go to 6 O'Farrell street, and was in his rooms, in the bathroom and in his bedroom, went there every few days to fix the bathroom, the plumbing was bad, often went with the plumber, John T. Gray, to fix the bathroom; never saw the defendant, Alice Edith, during that time; was there very seldom at meal times, but I was there sometimes; I saw no one at table but Mr. Blythe during that period, and the same in 1878. (Page 69, Plaintiff's Exhibit 290, shown to witness; objec-

tion; overruled; exception.) I first saw that about October 1, 1879. (Witness answers same as to 43, 49, 63, and 65. Objections same as to the other pages; overruled; exception. Page 69 offered and read in evidence, subject to objection and exception; the particular entry being on the line where is written "Alice Dickason"; the figures in the seventh column signify the amount of rent paid. Page 75 of Plaintiff's Exhibit 290 shown to witness and witness answers:) I saw that before, about April, 1880; it was in the possession of Mr. Blythe and is in his handwriting; all of it; the facts are the same as in the case of the others. (Page offered and read in evidence subject to objection and exception. Page 81 of Plaintiff's Exhibit 290 shown to witness.) I have examined all of the writing on that page; first saw the page in October, 1880; it is all in his writing except one name, Mrs. M. W. Hutchinson, and I don't think the names of the months are in his writing; otherwise the witness testifies the same as to the other pages. (Page 81 offered and read in evidence; objection; overruled; exception.) First saw page 93 about April, 1881; it is all in his writing; same answer as to similar previous questions. (Page 93 offered and read in evidence under objections and exceptions. Same question as to page 105.) First saw that in October, 1881. (Offered and read in evidence; same objections and exceptions. Pages 111, 119, identified in the same manner and admitted in evidence. Plaintiff's Exhibit 291, shown to witness.) I saw that book first on Sunday, April 1, 1883, in my room 22, at 724½ Market street; it was in Mr. Blythe's possession; he presented the book to me and asked me to look it over and see if the names of the tenants were correct; the handwriting is that of Mr. Blythe—all of it; it was then in its present condition; that was his rent roll beginning from the first of April, 1883. (Book offered in evidence; objection on general and specific grounds; overruled; exception; admitted in evidence.) I once had a conversation with the defendant, Alice Edith Blythe, about her leaving 28 Dupont street, at the time of leaving, when she paid the last rent; she said the rent was too high and she would leave on that account; I have known her by three names: "Mrs. Villette," "Mrs. Peters," and "Miss Alice Dickason,"

about the middle of 1879, in July; I addressed her by name other than "Mrs. Villette"; had a conversation with Mr. Blythe in room 20 of 724½ Market street, in July, 1879, and he said to me that he had let the room 15 to Miss Alice Dickason; from 1879 up to the middle of June, 1882, I always knew her as Miss "Alice Edith Dickason"; from that time until the death of Mr. Blythe knew her as "Cousin Alice" and "Miss Dickason"; never knew her during that time by any other name; Mr. Blythe occupied the third floor of 6 O'Farrell street, and he hired out to others the fourth floor; I collected the rents; some of the names of the tenants were Tasch, Weil, Hoffman, G. P. Jessup, Webster, Mrs. Staples, Lightner, Porter, J. H. Woods, A. Goertz; first saw the defendant, Alice Edith Blythe, in the latter part of April or the first part of May, 1880; do not remember what occurred; after that saw her most every time I called there; I did some work there; put up some clothes-hooks in a little room off the hall; she asked me if I would put up some hooks to hang her clothes on; there was a three-quarter bed in the room; the room was about eight by ten feet; afterward they took down the bed and made a storeroom of it; one morning in July or August, 1880, Mr. Blythe came over to the office and said he wanted me to take a bed from the fourth floor and put it in what was called the "Jessup" room, and that Miss Dickason was going to occupy that room; this was on the extreme west end of the building, and Mr. Blythe's room on the extreme east; I went over with Thomas Dunn, and we took the bed from the upper floor and put it in the Jessup room in place of another one; she said nothing except that she was very much pleased that she was going to have such a pleasant room; the room had one single bay-window; the room was about twelve by fourteen; there were two entrances, one was by folding-doors opening into another room, used for a library room; I paid rent for my room at 724½ Market street at the rate of $12.50 per month up to the time of Mr. Blythe's death; I saw the defendant at Mr. Blythe's office in 1879; I remember Mr. Blythe's illness in 1882; the nature of his illness was such as to prevent his coming out to attend business until some time in July; I frequently visited him during his illness; he was then

at 6 O'Farrell street, where I also saw the defendant, Mrs. Blythe. (Book marked Plaintiff's Exhibit 294 shown to witness.) The entries in that book were made by me; it is my account-book, showing my accounts with Thomas H. Blythe; on page 139 are entries made by me, among other items one of money paid to defendant, ''1882, June 7, Miss Dickason, for Mr. Blythe, $10.'' I paid it to the lady defendant here, Mrs. Alice Edith Blythe, she said Mr. Blythe had sent her over for $10 and I gave it to her, and in the same way gave her $10 again, both times it was on the sidewalk in front of the ''City of Paris'' building, the second time was June 16, 1882; on one or the other of those times she asked me to take a walk with her, as Mr. Blythe had requested her to ask me to take a walk with her that evening, and I agreed to do so after my work was over; she wanted to go down in front of the Russ House to see the electric lights in front of that hotel, that was the object she said of her going out, and we went down there; and then we took a walk and finally we went into the ''Ichi Ban,'' on Geary street, and were looking at some rugs and skins, bear and lion skins, and other wares in that store; she said that Mr. Blythe was going to build a house in Mexico, and he would have no carpets but cover the floor with skins and rugs; after leaving the store she told me that the reason why she took the walk was that Mr. Blythe was going to adopt her as his niece, and he wanted her to tell me and Thomas Dunn, the watchman; we addressed her as ''Cousin Alice''; heard Mr. Blythe introduce her to Dr. S. S. Kahn as his niece; the doctor was attending me when I had broken my legs; Mr. Blythe said, ''Dr. Kahn, this is my niece, Miss Alice Dickason''; Mrs. Blythe was in the room when Dr. Kahn came into my room; Mr. Blythe had a settlement on March 25, 1883; I know that Mr. Blythe went to the Colorado river on November 5, 1882, because I went down to the boat with him; it was Sunday, two days before election; Thomas Dunn also went with us and helped to pack Mr. Blythe's traps; Mr. Blythe returned on the twenty-second day of December, 1882; I received that card (Plaintiff's Exhibit 284) on January 1, 1883, and acted on it, went over to 27 Geary street and had a glass of eggnog, found there Mr. and Mrs. Blythe, whom I then knew

as "Alice Dickason," Mr. Blythe occupied the whole of the top floor; I had something to do with fitting it up for occupancy; had a window cut out for his bedroom, room 19, which had no light except through the folding-doors, which I took out by his direction to make the opening larger; he had his desk in room 20, the front room; his rooms were on the easterly side of the house; I also fixed up the rooms 21 and 22 on the westerly side, and made similar alterations; the other rooms were not altered; there were four bedrooms on the floor, 19, 22, 23 and 27; I was in room 23 once in 1876; was in that room in September, 1882; I was taking off the blinds, and after painting them put them on again; had some conversations with Mrs. Blythe while Mr. Blythe was away in Mexico in the fall of 1882; she pointed out to me the room she occupied, room 23; Mr. Blythe's bedroom was 19 opening into room 20, and 21 opened into 20; there were nine rooms on the floor; I broke the small bones on both of my feet below the ankle joint. (Witness describes how it occurred.) I was confined in my room at 724½ Market street; Dr. Kahn attended me and was assisted by Dr. Rosenstirn; had a day nurse, Mary O'Donnell, and a night male nurse whose name I do not recall; on the door of the studio the defendant had a name "A. Dickason"; when Mr. Blythe and I made out our settlement he would read over the names aloud twice and we would check them off; when he came to my name he would say "Yourself" instead of "L. H. Varney," when he came to the name of the defendant, Mrs. Blythe, he read aloud "A. Dickason" and he would say, "paid me," and when the list was finished he would begin again and go over the names aloud, and I would call out the amounts paid; I had conversations with the deceased, Mr. Blythe, about the defendant, Mrs. Blythe; once in the year 1873, and as late as 1882, at the times of our settlements at different times; I know L. J. Gutierrez; he occupied rooms at 11 Geary street in the Blythe block; I do not know whether he was paying rent in 1883; the reason why the names of persons are left blank in some of the spaces in the seventh column of Plaintiff's Exhibit 291 I do not know; Mr. Blythe left for Mexico the second time on March 1, 1883, and returned on the 13th of March; remember the

time of his death; when I went to the house on the Saturday after his death I was accompanied by General James Coey; he assisted me upstairs, I being lame and on crutches; saw the defendant there; she was lying on the bed; she said she was very sorry he died. (Witness relates what she said.) I saw the remains that day; I was in the rooms fifteen or twenty minutes; the defendant, Mrs. Blythe, came to my room on the Monday following and said to me, "I am Mrs. Blythe"; I said, "Alice, since when have you been Mrs. Blythe? This is the first time I ever heard you called Mrs. Blythe"; she said, "You know how I have been living with Mr. Blythe, and I expect you to help me prove my claim," and I replied, "I know nothing about it"; I had some conversation with her upon one occasion shortly before he died, in my room; no one was present; she came up to me to bring my breakfast; she said she thought she would have to leave him because on the morning at breakfast he got mad and threw all the things on the breakfast table on the floor; that she had bought some things on credit while he was away and the bill from Halpine at 704-706 Market street was brought in and laid upon his plate and when he looked upon it he became angry; I have stated all of the conversation that I think of; during the time that Mr. Blythe was away I paid her money about every week by the name of "Alice Dickason" or "Mrs. Dickason." In October, 1882, on the fourth floor of 27 Geary street Mr. Blythe introduced defendant to a man whose name I do not recall as his "niece, Miss Alice Dickason."

### DR. KAHN'S INTRODUCTION.

Dr. Samuel S. Kahn, who attended Varney in his sickness, after the accident happened to him at room 22, 724½ Market street, testifies that he saw defendant in that room and was introduced to her by Mr. Blythe, who said, "Dr. Kahn, my niece, Miss Alice Dickason"; she bowed, but said nothing; at that time the witness was present about fifteen minutes; on another occasion in the hall outside of Varney's room, in the morning two or three days afterward, the witness met Blythe in the hall conversing with this lady, and as was witness' custom he stopped to tell Mr. Blythe how Mr. Var-

ney was getting along, and Blythe again said, "Dr. Kahn, Miss Dickason"; about ten days afterward another complication was added to Varney's injury by pneumonia attacking him, and witness told Blythe of the gravity of the illness and the necessity of the nourishment, and Blythe said, "That is all right; my niece attends to that."

### THE FOREGOING A FAIR VIEW OF THE CASE.

The court has striven to give a fair view of the case as presented in evidence for and against the defendant; if some witnesses have not been specificially treated, it is because their testimony was not essential to inform or instruct the judgment of the court; but I think full and faithful attention has been given to all the points of importance.

Counsel for claimant contends that upon this body of testimony, tested by the standard of reasonableness, which the court is bound to apply, the preponderance is indisputably in her favor, and insists that the evidence of defendant herself, of sixty-four witnesses, and of the fact of the consent marriage itself, and of Blythe's own declarations, must determine the issue in favor of the claimant. If the court assume the existence of the agreement and take the sixty-four witnesses, as counsel has enumerated and classified them, the conclusion is inevitable—she was the wife, she is the widow, established under section 55 of the Civil Code of California.

### THE RULE OF EVIDENCE.

If mere numbers are to prevail, the case of defendant is as 64 to 33—the number of witnesses which the counsel said have testified orally against her, but the rules of evidence favor quality rather than quantity, even assuming numerical superiority in this case. The rule as given by the Code of Civil Procedure, section 2001, is that the court, sitting as a jury, is not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction, against a less number or against a presumption or other evidence satisfying the mind; and the same section of the code also prescribes that in civil cases the affirmative of the issue must be proved, and when the evidence is contradictory the decision must be made according to the preponderance of evidence.

Counsel says that decedent's first idea may have been that of a liaison, but he was not accustomed to have his purposes thwarted, nor even postponed for a time; he for the first time met a woman who was not to be easily overcome, but who resisted his advances until they came in the honorable guise of matrimony.

THE PROBABILITY OF THE STORY OF THE CONSENT MARRIAGE.

Now we come to the consent formulated in the cottage at 28 Dupont street, May 19, 1878.

Is it probable that the agreement or consent alleged by her was ever undertaken? Was the decedent then in a situation to engage in such a contract?

The defendant's counsel says that his proposition is that so far as decedent's agreement with the defendant is concerned, he was justified in considering himself an unmarried man, as the result turned out in the Nellie Firmin litigation, and free to undertake a matrimonial alliance, for before that time an application for alimony was denied in the nineteenth judicial district court by his honor, Judge Wheeler, and subsequently the decree was entered that there had never been a marriage.

Counsel says that at the time of the defendant's first interview with decedent she was of absolutely stainless character, a young woman of twenty-three years of age, who had, it is true, been knocked about this western world, but who had preserved a spotless name: she was not without experience, but she had shown herself able to protect herself against improper advances; she was ambitious, as her endeavors to acquire an education to make herself self-supporting proved; she was of a domestic turn, unusually so, as her subsequent life demonstrated; she had an ambition to secure a permanent home, and her whole life behind her forced her to desire it; it was natural that she should have acted as she did. How was it with Blythe at that time? Counsel for defendant thinks he may have been contemplating an alliance with the defendant to extricate himself from the impending difficulties with Nellie Firmin. How does this position of counsel consort with the assumption that the denial of alimony presaged a decree against Nellie Firmin, and consequently there were no practical difficulties on that score in his path?

But counsel says her story is presumptively true; it is not capable of direct contradiction; it is confirmed by all the circumstances of the case; it is consistent with all the conduct and declarations of the decedent; and it is not contradicted by any fact in proof in this case. All of these are strong statements and uttered with the force of conviction, and the good faith of counsel is not to be questioned. Is the story of the defendant credible or probable as to what took place at the time of the consent marriage sworn to by her? Is it consistent with the circumstances of this case, or corroborated by the facts in proof? As to the situation of the decedent, the circumstances surrounding him at that time were such as to make it imprudent for him to engage in such a contract; he was then in the midst of the Nellie Firmin litigation, for notwithstanding the denial of the application for alimony, he could not foretell the event of such a suit. There is no evidence here that he was more highly gifted than other mortals with respect to the course of law or the current of justice in human tribunals, and it is in the highest degree improbable that he would precipitate himself into another alliance before he had emerged from the Firmin trouble, which might possibly have terminated in a decision against him and thus make himself a bigamist. We have seen that he said to Dr. de Groot that his experience with Nellie Firmin taught him caution in contracting alliances with other women. Why should he in the full tide of that experience contract such an alliance as is here alleged with defendant?

#### THE ALLEGED BETROTHAL AND MARRIAGE.

Her story of the betrothal and marriage is very interesting, but it is entirely dependent upon her own testimony. It is incumbent on the defendant to prove the fact of marriage on the 19th of May, 1878; they were either married on that day or they were never married; and this fact, the consent marriage, is wholly dependent upon the evidence of the defendant. It is remarkable that a person with the principles she professed and the determination to be involved in no entangling alliance capable of being misinterpreted, who wanted it to be a matter of life and death, who told him if

she should accept him she wanted some ceremony or contract made; wanted the matter to be permanently fixed, if it were to be done privately or secretly, because she had had a great deal of trouble in her life, and she wanted it so arranged that it would be a matter of life or death forever, it is remarkable that in such circumstances she should not have insisted on some authentic and express evidence of so solemn a compact. Her counsel says she did not yield without a struggle and a contract. Where is the contract? She was a woman of experience in the world, had been married and divorced, and married by a minister of a denominational church; was fully alive to the situation in which she had either placed herself designedly or found herself placed; she had ample knowledge of men, and keen sense of the importance of preserving in permanent and indelible form the proof of marital relations; she says herself she wanted it fixed for life by "ceremony" or "contract." What was the ceremony? Where is the contract? She professed belief in the creed of a church that regards marriage as an institution of divine ordinance, and yet she accepted this "formula" dictated by Blythe as lawful and binding as if they went to church. If she were in earnest in wanting a ceremony or contract, why not put it in writing? Was such a formula to possess the sanction and wear the honorable guise of matrimony to this young woman who resisted the less worthy advances of a man who was not accustomed to have his purposes thwarted, nor even postponed for a time? Was it natural that she should have acted as she did in consenting to such a marriage?

WHAT DEFENDANT SHOULD HAVE DEMANDED AS HER DUE.

At the time of this transaction, if she were, as her counsel claims, "a woman who was not to be easily overcome," she could and should have demanded and insisted upon some sort of authentication of the fact of so serious consequence to herself; but she did not. Her own evidence shows her intense appreciation of the necessity of having the matter so consummated that the tie binding them should be indissoluble, and yet she was content with a "formula" the proof of which is impossible except by her own bare statement.

It is said that her testimony must be taken as true because it is uncontradicted; manifestly in its nature it does not admit of contradiction by direct evidence, yet is it not contradicted by reason of its inherent improbability and the antecedent and subsequent facts and circumstances as related even in her own story as told in her pleading and proofs?

Her counsel says a man cannot use a woman for five years, the best years of her life, and arrange matters that after his death she shall be relegated to the condition of mistress; the law does not allow this. At the same time counsel strenuously insists that her claim of wifehood is confirmed by all the circumstances of the case, and is consistent with all the conduct and declarations of decedent.

### WHAT IS THE LAW OF THIS CASE?

What does the law allow in cases of this character? What is the law of this case?

So far as the immediate interest involved is concerned, although important, it matters little compared with the interests of organized society. Marriage is more than a contract; it is a status; an institution of society and its foundation; it does not come from society, but contrariwise; it is the parent of society, and it is supremely important that its stability shall be secured; its contraction must be surrounded with safeguards and its sanctity upheld. Every solemnization of marriage must be in the face of the public; and the statute says where there is no solemnization there must be consent followed by mutual assumption of marital rights, duties or obligations: Civ. Code, sec. 55.

### CONSENT THE PERVADING PRINCIPLE OF THE LAW.

The defendant here claims marriage by contract or consent, followed by mutual assumption under this section. Consent is the pervading principle of the law; marriage is derived from consent duly authenticated, independent of the conjunctio corporum; publicity is the publication of that consent; and that consent must go right up to the moment of their taking up life as husband and wife; it must coexist with the assumption of marital rights, duties and obligations: Kelly on French Law of Marriage; Carmichael v. State, 12 Ohio St. 560.

### THE LAW OF CALIFORNIA SOLELY DOMINANT.

This case must be governed by the law of California and by that alone, and however interesting may be the discussion of the origin of the institution of marriage, it is foreign to the purpose except to explain the law as it stood when our statute was framed and adopted. We are aided but little (as was said by Mr. Justice McFarland in the first Sharon appeal, 75 Cal. 69, 16 Pac. 345) in determining this question by inquiring what the law of England was upon the subject fifty or a hundred years ago. It is the law here and now that we are to deal with, and the code treats of marriage fully and establishes the law upon that subject; and the provisions of that law presently considered are as follows:

### WHAT CONSTITUTES MARRIAGE?

"Sec. 55. Marriage is a personal relation arising out of a civil contract, to which the consent of the parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations."

### MINORS CAPABLE OF CONTRACTING MARRIAGE.

"Sec. 56. Any unmarried male of the age of eighteen years or upwards, and any unmarried female of the age of fifteen years or upwards, and not otherwise disqualified, are capable of consenting to and consummating marriage."

### MARRIAGE, HOW MANIFESTED AND PROVED.

"Sec. 57. Consent to and subsequent consummation of marriage may be manifested in any form and may be proved under the same general rules of evidence as facts in other cases."

Consent must be followed by assumption: "follow" means here "succeed," "as day *succeeds* to day and night to night," as "wave *follows* wave": Webster's Dictionary.

Such an assumption should be immediate or at least within a reasonable time.

### COHABITATION NECESSARY.

There cannot be an assumption of marital rights without cohabitation. What is cohabitation? That a marriage may

be inferred from cohabitation seems to be the settled law of most countries. Mr. Justice Thornton quotes approvingly the language of Fraser in his work on Husband and Wife, who says in the opening sentence of chapter eight of the first volume: "If a man and woman cohabit together as husband and wife, and are held and reputed by their neighbors and friends as married persons, they are *presumed* to have entered into marriage." The learned author adds by way of explanation: "Cohabitation and repute do not make marriage; they are merely items of evidence from which it may be *inferred* that a marriage had been entered into." In the case at bar there is no evidence of repute and none was offered: White v. White, 82 Cal. 430, 23 Pac. 276, 7 L. R. A. 799.

### WHAT IS COHABITATION?

Cohabitation is the act or state of dwelling together, or in the same place with another; the state of living together as man and wife: Webster's Dictionary; Bouvier's Law Dictionary; Worcester's Dictionary.

It must be at bed and board as husband and wife. Constancy of dwelling together is the chief element of cohabitation. It is therefore totally incompatible with the notion of matrimonial cohabitation, if the parties were to live in separate houses; and as it is one of the most obvious and best understood consequences of marriage that the husband communicates to his wife his station in society, so where he associates with friends and acquaintances to whom he never speaks of his wife, it is not cohabitation or the behaving to each other as husband and wife: Fraser Husband and Wife, 401.

### LIVING TOGETHER AS HUSBAND AND WIFE.

Cohabitation, which is evidence of the assumption of marital rights, duties or obligations, must be a "living together as husband and wife." At common law and under statutes authorizing marriage by consent without formal ceremony, if the parties agree to take each other for husband and wife, and *from that time* live together *professedly in that relation*, proof of these facts is held to be sufficient to constitute marriage. Certainly nothing less than this can be

held to be sufficient under the latter clause of section 55 of the Civil Code. The proof of the contract is not enough, even if it were proved in this case. There must be evidence to show that they *assumed* the relations of husband and wife, which calls for the same degree of proof, if cohabitation be depended upon, as was required at common law to establish the marriage: Sharon v. Sharon, 79 Cal. 699, 22 Pac. 26, 131.

The mere fact that parties who have agreed to become husband and wife thereafter have sexual intercourse is not sufficient of itself to show a consummation of the marriage, or that they have assumed toward each other marital rights, duties, and obligations within the meaning of the section: 79 Cal. 670, 22 Pac. 26, 131.

In this case the parties did not live together at all, according to the evidence as it is presented in the foregoing pages; they had separate habitations for two years; she never assumed his name; and even when in the same habitation they did not assume marital rights, duties, or obligations, as those words have received judicial definition and interpretation; they did not hold forth to the world by conduct, demeanor, and habit that they were man and wife: 79 Cal. 663-668, 22 Pac. 26, 131.

There can be no stronger nor more apposite authority than the one last cited; upon the question of assumption, it fits to the facts of this case and in so far must be considered as conclusive in and upon this court:

It is claimed in the case at bar that the consent-marriage took place on May 19, 1878, and that the assumption of the marital relations was undertaken as soon as practicable; to some extent, the counsel for claimant says, it was immediate; on the same evening they assumed such relations. He admits that under the Sharon case secret intercourse is inadequate to establish marriage, but asserts that it is unnecessary that every conceivable element should coexist. Consent and assumption are sufficient, and he says that there are no authorities cited that the assumption must be immediate, but as a matter of fact counsel claims that in this case the assumption was immediate; the assumption here was progressive and scarcely interrupted.

### CONSENT AND CONSUMMATION SHOULD BE CONSEQUENT AND COMPLETE.

As to the meaning and effect of the words employed in the statute, section 55, Civil Code, the court has already cited from the standard lexicons, and it is clear that consent and consummation should be consequent and complete. The counsel in his opening statement did not claim that the marriage was "full and complete," until they began to live together in April, 1880, at 6 O'Farrell street, and in his closing argument speaks of a "progressive assumption," which is a term, so far as the court's research has extended, not found in the law reports or text-writers, and certainly not in the statute, where it is "assumption" pure and simple and unqualified save by the element of mutuality.

### WHAT THE EVIDENCE SHOWS.

In the opinion of this court the length of time between May 19, 1878, and the time of defendant's taking up her permanent abode at 6 O'Farrell street, in 1880, was not sufficiently close to apply the alleged consent of May 19, 1878, to the act of April, 1880, for there were two years intermediate the two events, and, therefore, the marriage not having taken place in May, 1878, could not have been consummated in May, 1880; the alleged contract of May, 1878, was in abeyance and must be held to have been abandoned because not followed by assumption. In the opinion of the court this is the true expression, intent, and meaning of the section upon which this claim is based.

The evidence shows, beyond all doubt, that during that important interval of time she was not known as his wife, or by the name of decedent Blythe, and that she was known then and thereafter by their neighbors and friends by another name, and that she allowed herself to be so called, not asserting what she claims now to have been her true name and status, and in this connection might be applied the rule by Mr. Justice Fox in White v. White, 82 Cal. 453, 23 Pac. 276, 7 L. R. A. 799, "whenever a party has by his own act, declaration or omission, intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out

of such act, declaration or omission, be permitted to falsify
it.'' This is a conclusive presumption: Code Civ. Proc., sec.
1962.

In this case, as appears from the references to the evidence
hereinbefore made, there are innumerable admissions in writ-
ing which show that defendant never considered herself as
his wife until after the decease of Thomas H. Blythe, and
there are numberless oral statements proceeding from her
in absolute accord with her written admissions.

### CONTRADICTIONS IRRECONCILABLE.

The contradictions in the case of this claimant are irrecon-
cilable, and cannot be reconciled on the basis that decedent
and defendant were husband and wife. She has not affirma-
tively established her case, much less sustained it by a pre-
ponderance of evidence against the mass of testimony in
opposition to her claim; her own evidence does not har-
monize with her pleading, her witnesses fail to substantiate
her statements in material particulars, and some of them are
so palpably untruthful that the marvel is that anyone has
had the temerity to trade upon their testimony. Of the many
significant incidents that have been testified to in this case,
some may have escaped the attention of the court and thus
passed without comment, such as the mutilation of Windel's
book accounts of the transactions with the defendant, where
the page containing her name as Dickason was torn out by
her, showing that she was not known by any other name un-
til after the death of decedent, but enough has been estab-
lished to cause her claim to be rejected as not supported by
a preponderance of evidence.

### A CASE WITHOUT LEGAL MERIT—NEITHER WIFE NOR WIDOW.

This may be a case of hardship, but with that considera-
tion this court cannot be concerned. It is a case without
legal merit; the court can only regard the facts in evidence
and administer the law as it is found, and so holding the de-
termination must be and it is against the claim presented
and prosecuted by the defendant claimant. She was not the
wife and she is not the widow of the decedent, Thomas H.
Blythe.